UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOCAL 3621, EMS OFFICERS UNION, DC-37, AFSCME, AFL-CIO, <u>et al</u>., <br><br> Plaintiffs, <br><br> -v- <br><br> THE CITY OF NEW YORK, <u>et al</u>., <br><br> Defendants. | CIVIL ACTION NO.: 18 Civ. 4476 (LJL) (SLC) <br><br> **<u>REPORT & RECOMMENDATION</u>** |

**SARAH L. CAVE,** United States Magistrate Judge.

**TO THE HONORABLE LEWIS J. LIMAN**, United States District Judge:

## I.  <u>INTRODUCTION</u>

Plaintiffs, a union (Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO ("Local 3621")) and two employees of the New York City Fire Department ("FDNY"), bring this putative class action against the City of New York (the "City"), the FDNY, the Department of Citywide Administrative Services ("DCAS"), and several John and Jane Does (collectively, "Defendants"), alleging that employees in the FDNY's Emergency Medical Services Bureau ("EMS") who seek promotions above the rank of lieutenant are subject to disparate treatment and disparate impact based on impermissible considerations.  Plaintiffs assert claims under 42 U.S.C. §§ 1981 and 1983, and the New York State and New York City Human Rights Laws.  (ECF Nos. 1 ¶¶ 1, 4; 26 at 2–3).

Before the Court is Plaintiffs' Motion for Sanctions in the form of an Adverse Inference (the "Motion").  (ECF Nos. 328, 329).  Citing Defendants' "failure to produce outstanding demographic data along with the legend and [Federal Rule of Civil Procedure] 30(b)(6) witness regarding same [sic]" (the "Demographic Data Witness"), Plaintiffs ask the Court to "accept as

established that Defendants' demographic data proves Plaintiffs' claims of discrimination," (the "Adverse Inference").  (ECF No. 329 at 2).  Defendants argue that the Adverse Inference is not warranted because the demographic data "does not contain promotional information sufficient to draw any negative inference of discrimination in promotions," Defendants have produced the demographic data as required by the Court's orders, and Plaintiffs failed to work with Defendants to "trouble-shoot" the data and identify a date for the deposition of the Demographic Data Witness.  (ECF No. 332 at 1–2).

For the reasons set forth below, the Court respectfully recommends that the Motion be GRANTED IN PART and DENIED IN PART.

## II.  BACKGROUND

The factual background of this case is set out in detail in the Court's March 11, 2020 Memorandum Opinion & Order resolving various discovery disputes (the "March 11 Opinion"), and is incorporated herein by reference.  Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2020 WL 1166047, at *1 (S.D.N.Y. Mar. 11, 2020).  The March 11 Opinion was not the end of the parties' disputes concerning class certification discovery, which was the subject of five motions to compel by Plaintiffs, three previous sanctions motions (two by Plaintiffs, one by Defendants), 24 conferences, and more than 20 orders.  See, e.g., Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2021 WL 134566 (S.D.N.Y. Jan. 14, 2021) (denying Plaintiffs' prior motion for sanction of adverse inference); Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2020 WL 7260805 (S.D.N.Y. Dec. 10, 2020) (resolving dispute over sealed document and Plaintiffs' motion for reconsideration); Local

2

3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2020 WL 7239615 (S.D.N.Y. Dec. 9, 2020) (resolving Defendants' motion to compel and Plaintiffs' cross-motion for a protective order); Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2020 WL 6742754 (S.D.N.Y. Nov. 11, 2020) (resolving Plaintiffs' motion to quash Defendants' subpoena to non-party); Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2020 WL 3271687 (S.D.N.Y. June 17, 2020) (resolving Plaintiffs' motion for reconsideration of Court's June 12, 2020 discovery order); Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2020 WL 3120382 (S.D.N.Y. June 12, 2020) (resolving Plaintiffs' motion to compel with respect to Defendants' Fed. R. Civ. P. 30(b)(6) affidavit). (See also ECF No. 282 at 2 n.2 (listing ECF numbers for 20 court orders); id. at 2 n.3 (discussing Plaintiffs' motions to compel)). Notwithstanding the fact that class certification discovery closed on November 25, 2020, and the parties are in the midst of briefing Plaintiffs' motion for class certification (the "Class Motion") (ECF Nos. 300, 355),[1] the parties' disputes concerning class certification discovery have not ceased.

### A. The Demographic Data

The Motion itself does not describe what Plaintiffs mean by "demographic data," but in its December 15, 2020 order (the "Dec. 15, 2020 Order"), the Court defined the term, based on Plaintiffs' document demands, as the following information for each EMS employee active at any time from 2012 to the present:

---

[1] Judge Liman recently stayed briefing of the Class Motion pending a ruling on another sanctions motion Plaintiffs anticipate filing. (ECF No. 365).

> Employee name; ID#; gender; race; salary; dates of hire, rehire, termination (if applicable); rank or title when first observed; all changes in rank or title with date of change; annual performance evaluation rating for each year; date acquired EMT-B or EMT-Paramedic certification.

(ECF No. 267 at 2 n.1 (quoting ECF No. 70 at 3 (Request No. 2)).  The Court will employ this definition of "Demographic Data" for purposes of the Motion.

### B.  Orders Regarding the Demographic Data

The Court has entered fifteen (15) orders concerning the Demographic Data, which has also been discussed during several of the two-dozen conferences the Court held concerning class certification discovery.  (ECF Nos. 71, 178, 191, 197, 199, 218, 240, 246, 267, 269, 315, 317, 327, 353, 362).  Because Plaintiffs are seeking potentially outcome-determinative sanctions in the Motion, it is necessary to describe each of these orders seriatim.

On December 21, 2018, Plaintiffs included in their First Requests for Production of Documents ("Plaintiffs' First Requests") a request for Demographic Data "[f]or each EMS employee active at any time in the 2012–2018 time frame."  (ECF Nos. 192 at 2, 192-1 at 15).  On January 27, 2020, Defendants produced a spreadsheet containing Demographic Data for the period January 1, 2013 to April 9, 2019 (the "1/27/20 Demographic Data").  (ECF Nos. 256 at 1; 267 at 2).  On February 11, 2020, Plaintiffs included in their Supplemental Demand for Production of Documents ("Plaintiffs' Second Requests") a request for Demographic Data "[f]or each EMS employee active at any time from 1996 to present."  (ECF Nos. 192 at 5; 192-2 at 15).

In January 2020, Plaintiffs first raised with the Court concerns about the Demographic Data.  (ECF No. 70 at 3).  While acknowledging that Defendants had produced Demographic Data, Plaintiffs stated that "it was unclear whether [Defendants] have complied with their discovery

obligations," because Defendants had represented that they would produce the employees' names, identification numbers, gender, race, salary, and title entry date, but in fact produced "different" information. (Id. at 2–3). Defendants acknowledged that they had agreed to produce the "race and gender of individuals in the EMS Bureau," but asserted that there was "[n]o inconsistency" between the Demographic Data they agreed to produce and the Demographic Data they in fact produced. (ECF No. 70 at 3). Following a conference with the parties on January 29, 2020, the Court declined to adopt Defendants' narrowing of the scope of the Demographic Data and ordered them "to produce the requested demographic information from January 1, 2012 to the present" along with "a legend for the abbreviations used in categorizing the information." (ECF No. 71 at 2 (the "Jan. 30, 2020 Order") (emphasis added)).

On March 13, 2020, Defendants produced to Plaintiffs a spreadsheet containing Demographic Data for the period January 1, 2012 to December 31, 2019 (the "3/13/20 Demographic Data"). (See ECF No. 192 at 3). The 3/13/20 Demographic Data, which the parties submitted to the Court via email but did not file on the docket due to confidentiality,[2] contained the following column headings: Agency_Code; Acronym; Empl_Num; Last_Name; First_Name; Mid_Init; Gender; Ethnicity; Title_Code; Titl_Descr; Titl_Level; Titl_Suffix; City_Start_Date; Agcy_Start_Date; Titl_Entry_Date; Sal_Base_Rate; and Suffix Description.

On June 17, 2020, Plaintiffs sent Defendants a letter (the "June 17 Letter") listing the information, including a legend, that they and their class certification expert believed was still missing from the Demographic Data. (ECF No. 136 at 28–29). At a conference on July 7, 2020,

---

[2] See ECF No. 195 at 22 (transcript of Conference held on October 5, 2020) (directing Plaintiffs to submit the Demographic Data spreadsheet by email).

Plaintiffs' counsel referenced the issues raised in their June 17 Letter, and Defendants' counsel represented that the information Plaintiffs were seeking had "already been provided" or could be compiled from the produced Demographic Data. (Id. at 29–30). After hearing the parties' exchange, the Court requested that Defendants engage in "an informal conversation" with Plaintiffs' counsel and expert to give "some guidance about how to maneuver the spreadsheet and see if that might resolve the issue," which Defendants' counsel readily agreed to do, in the form of a conversation with a representative from the Department of Citywide Administrative Services ("DCAS"), the agency that compiled the Demographic Data. (Id. at 33–34). At a conference with the Court on July 30, 2020, the parties discussed their respective difficulties in setting up the call with the DCAS representative, so Court directed Plaintiffs' counsel to provide Defendants' counsel with a list of topics to be covered during that call to facilitate identifying the right DCAS representative to participate. (ECF No. 146 at 36).

On August 28, 2020, Plaintiffs' counsel participated in a call with Barbara Dannenberg, DCAS Deputy Commissioner for Human Capital. (ECF No. 192 at 3). The Court did not participate in this call and no transcript has been provided, but Plaintiffs have represented to the Court that Dannenberg confirmed that the 1/27/20 Demographic Data and the 3/13/20 Demographic Data: (i) only included data for employees active on December 31, 2019; (ii) did not differentiate between or provide promotion dates to Lieutenant, Captain, Deputy Chief, and Division Commander; and (iii) provided base salary but not full salary. (Id.) Plaintiffs also represented to the Court that Dannenberg stated that DCAS could provide annual snapshots for each year from 2012 forward that would include all employees and the Demographic Data Plaintiffs were seeking (the "Annual Snapshots"). (Id.) On August 31, 2020, Defendants' counsel told Plaintiffs' counsel

that it would produce the Annual Snapshots, although it would "take some time."  (Id.; ECF No. 192-4).

On September 8, 2020, Plaintiffs filed a motion for sanctions (ECF No. 164) ("Plaintiffs' Sept. 2020 Sanctions Motion") asserting that, "[w]hile Defendants have produced some of [the Demographic Data], their production [was] not complete and the information produced [was] not usable by Plaintiffs' expert."  (ECF No. 165 at 3 n.2).  Plaintiffs claimed that, notwithstanding Defendants' counsel's August 31, 2020 statement that the Annual Snapshots would be produced, Defendants' counsel had "reverted back" to the position that the information had already been produced.  (ECF No. 192 at 3).  On September 9, 2020, Defendants produced "a second DCAS dataset" to remedy the deficiencies Plaintiffs had identified in the call with Dannenberg (the "9/9/20 Demographic Data").  (Id. at 4).  During Dannenberg's September 10, 2020 deposition, however, she was unable to explain the 9/9/20 Demographic Data, in particular, whether it was inclusive of or supplemental to the 3/13/20 Demographic Data.  (Id.)  In addition, Dannenberg testified that FDNY, not DCAS, maintained and would have been the agency to compile the information for the Annual Snapshots.  (Id.)  Apparently, the 1/27/20, 3/13/20, and 9/9/20 Demographic Data were compiled by DCAS from two databases, the City Human Resource Management System ("CHRMS") and the Citywide Equal Employment Database System ("CEEDS").  (ECF Nos. 256 at 2; 267 at 3).

The Court held a conference on September 21, 2020, following which it permitted Plaintiffs to file a letter-motion detailing the Demographic Data they claimed Defendants had not yet produced.  (ECF No. 178 (the "Sept. 21, 2020 Order")).  At that time, Plaintiffs did not do so.

Following a conference on October 5, 2020, the Court again permitted Plaintiffs to file a letter-motion detailing the Demographic Data they contended Defendants had not yet produced, and directed Defendants to respond by "indicat[ing] with specificity where Plaintiffs can find this information" in the Demographic Data already produced.  (ECF No. 191 at 1 (the "Oct. 5, 2020 Order")).  In the Oct. 5, 2020 Order, the Court also notified the parties that it would hold Plaintiffs' Sept. 2020 Sanctions Motion in abeyance pending the next conference, with the objective of resolving Plaintiffs' questions about the Demographic Data.  (Id. at 2).

Pursuant to the Oct. 5, 2020 Order, Plaintiffs filed a letter-motion to compel Defendants to produce Annual Snapshots "of all EMS employees active at any time each year from 2012 to present."  (ECF No. 192 at 1 ("Plaintiffs' Oct. 2020 Motion to Compel")).  Plaintiffs acknowledged that, although Defendants had produced Demographic Data, "such information has either been incomplete, inaccurate or produced in a manner that is unusable and/or unverifiable[.]"  (Id. at 2).  Plaintiffs contended that their class certification expert was unable to use the Demographic Data as produced.  (Id. at 3).  Among the defects Plaintiffs found in the Demographic Data that Defendants had produced, it:  (i) only included employees who were active as of December 31, 2019; (ii) failed to differentiate between ranks; (iii) and did not include all dates of promotions to Lieutenant Captain, Deputy Chief, and Division Commander.  (Id.)

During a conference with the Court on October 19, 2020, Defendants' counsel represented that the Demographic Data "suffer[ed] from . . . data entry issues," due in part to the fact that gender and race are self-reported and may change over the course of employment, and noted that information such as overtime was stored in a separate database.  (ECF No. 348 at 7).  After a lengthy debate during the conference concerning what information Plaintiffs were

seeking in the Annual Snapshots and Defendants' process for compiling it, the Court set a briefing schedule on Plaintiffs' Oct. 2020 Motion to Compel and directed Plaintiffs to "file a letter on the docket specifying the information they are seeking to be included in the [Annual S]napshots, including date, format, fields, and metadata," following which the Court would order Defendants to produce Annual Snapshots for 2012 to the present.  (ECF No. 197 (the "Oct. 19, 2020 Order")).  Plaintiffs submitted their letter listing the information they asked be included in the Annual Snapshots (ECF No. 198), and following a conference on October 27, 2020, the Court ordered Defendants to "provide [A]nnual [S]napshots from the HRIS [Human Resources Information System] database (as of December 31 or January 1 of each [of] 2012 through 2019) of all EMS employees active any time each year from 2012 to the present," and to "include the categories of data listed by Plaintiffs at ECF No. 198."  (ECF No. 199 (the "Oct. 27, 2020 Order")).  The Court also required Defendants to notify Plaintiffs by October 30, 2020 if the FDNY's HRIS database did not include any of the data points Plaintiffs requested.  (Id.)

On November 2, 2020, the Court held a conference with the parties, and directed the parties to meet and confer to attempt to resolve outstanding issues concerning the Demographic Data, Annual Snapshots, and other issues raised in Plaintiffs' Oct. 2020 Motion to Compel.  (ECF No. 205).  In a letter of the same date, Defendants represented that they would produce the Annual Snapshots.  (ECF Nos. 204; 221 at 1).  After Plaintiffs represented, on November 12, 2020, that Defendants "refused to meet and confer" about the Annual Snapshots, the Court ordered the parties to meet and confer on that subject by close of business on November 13, 2020.  (ECF No. 218).  On November 13, 2020, the parties met and conferred, and Defendants represented that they would produce the Annual Snapshots by November 15, 2020, which, Plaintiffs

acknowledged, "should resolve" this issue.  (ECF No. 221 at 1).  After correcting some last-minute

data issues, Defendants produced the Annual Snapshots on November 18, 2020 (the "11/18/20

Annual Snapshots").   (ECF No. 238 at 35).   The 11/18/20 Annual Snapshots consisted of

approximately 26 spreadsheets (id. at 35–36; ECF No. 243 at 12), derived from two sources, the

first being HRIS, and consisting of:

> (i) a spreadsheet of promotional histories of current EMS employees for the five
> EMS codes for 2012 to the present; (ii) a spreadsheet of promotional histories of
> ceased EMS employees for the five EMS codes for 2012 to the present; (iii) a
> spreadsheet containing demographic historical snapshots of current EMS
> employees for the five EMS codes from 2013 to the present; and (iv) a spreadsheet
> containing demographic historical snapshots of ceased EMS employees for the
> five EMS codes for 2013 to the present.

(ECF No. 267 at 3 (the "HRIS Data")).  The second source for the 11/18/20 Annual Snapshots was

FDNY's Personnel Management System ("PMS"), from which Defendants produced:

> (i) a spreadsheet containing the changes in base salary of current EMS employees
> for the five EMS codes from 2012 to present; (ii) a spreadsheet containing the
> changes in the base salary of ceased EMS employees for the five EMS codes; (iii) a
> spreadsheet containing the total salary earned by current EMS employees for the
> five EMS codes from 2012 to the present; and (iv) a spreadsheet containing the
> total salary earned by ceased EMS employees for the five EMS codes for 2012 to
> the present.

(Id. at 3–4 (the "PMS Data")).

During conferences on November 18, 2020 and November 23, 2020, the Court continued

to discuss with the parties Plaintiffs' concerns about usability and completeness of the Annual

Snapshots.  (ECF Nos. 238 at 35–37; 243 at 7–29).  For example, Plaintiffs were having difficulty

tracking employees across multiple spreadsheets and discerning the meaning of the column

headings; Defendants also noted that some employees' Social Security numbers erroneously

appeared.  (ECF No. 243 at 11–13).  Noting that Defendants had already produced Demographic

Data multiple times, the Court explained that:

> if the data doesn't exist in the clean, organized way that [Plaintiffs' counsel]
> wanted it, I'm hard pressed to order the City to create something for your
> purposes.  I am perfectly willing to require the City to provide as much explanation
> so you understand what the data is that you have in front of you . . . But . . . if the
> data exists in three different databases and . . . it ended up being 26 total
> spreadsheets because there's one for each year in the time period, that's not
> illogical to me.  And so if there is some more explaining that needs to be done,
> that's one thing, [but] requiring the City to resort the data in the way you want it
> if it is not kept that way in the ordinary course, that's beyond what the rules
> require.

(Id. at 15).  Thus, rather than require an additional production of Demographic Data and the

inevitable delay that would involve, the Court ordered Defendants to provide a legend for the

Annual Snapshots and reproduce corrected data by November 30, 2020, following which the

parties were to meet and confer to discuss any remaining questions.  (ECF No. 240 (the "Nov. 24,

2020 Order"); see ECF No. 243 at 24–25).

On December 2, 2020, although the Court was continuing to hold in abeyance Plaintiffs'

Oct. 2020 Motion to Compel, which pertained to the Demographic Data, and notwithstanding

the numerous conferences and orders described above in which the Court worked to help resolve

Plaintiffs' concerns, Plaintiffs filed a second motion to compel Defendants to reproduce the

Demographic Data.  (ECF No. 245 (the "Dec. 2020 Motion to Compel")).

The next day, December 3, 2020, the Court discussed with the parties some corrections

Defendants needed to make to the Annual Snapshots, and then directed Defendants to provide

the corrected data by December 4, 2020, directed the parties to meet and confer regarding any

remaining questions Plaintiffs had by December 7, 2020, and directed Defendants to produce a

Rule 30(b)(6) witness regarding the Demographic Data by December 11, 2020.  (ECF No. 246 (the "Dec. 3, 2020 Order")).  On December 3, 2020, Defendants produced to Plaintiffs data corrected in accordance with the Court's instructions during the November 23, 2020 and December 3, 2020 conferences (the "12/3/20 Annual Snapshots").  (ECF Nos. 256 at 4; 267 at 4).

Between December 4 and 7, 2020, the parties continued to meet and confer regarding all of the Demographic Data Defendants had produced; Defendants represented to Plaintiffs that FDNY's Bureau of Technology Development and Systems ("BTDS") had confirmed that all of the information Plaintiffs had requested had been produced, with one caveat: "FDNY did not start keeping snapshots of historical demographic data until the beginning of 2013, and it would be difficult, if not impossible, to recreate this data." (ECF No. 256 at 4–5).  Following their production of the 12/3/20 Annual Snapshots, Defendants maintained that they had produced all of the Demographic Data that Plaintiffs had requested and that Defendants represented to the Court they intended to produce.  (ECF Nos. 204; 256 at 5; 267 at 4).

On December 11, 2020, Plaintiffs deposed Defendants' Rule 30(b)(6) witness, Kamaldeep Deol ("Deol"), following which Plaintiffs contended there remained four open questions about the Demographic Data:

> (1)  Codes on the spreadsheets for which Defendants have not provided a legend or description (the "Spreadsheet Codes");
> (2)  235 employees who are included in the promotional history spreadsheet but not in the Annual Snapshots (the "235 Employees");
> (3)  750 employees included in the Annual Snapshots but not in the promotional history spreadsheet (the "750 Employees"); and
> (4)  Duplicate entries in the spreadsheets containing data for ceased employees (the "Ceased Duplicates").

(the Spreadsheet Codes, the 235 Employees, the 750 Employees, and the Ceased Duplicates, together, the "Data Questions") (ECF No. 263 at 2; see ECF No. 267 at 5).  Plaintiffs had also deposed Defendant's witness Aurora Perez ("Perez"), who described a process of submitting a "Service Request" to "NYCAPS Central" for demographic data reports.  (ECF Nos. 263 at 3; 263-2 at 4–5).[3]

On December 15, 2020, the Court issued its order ruling on Plaintiffs' Oct. 2020 Motion to Compel and Dec. 2020 Motion to Compel.  (ECF No. 267 (the "Dec. 15, 2020 Order")).  After recounting much of the same history described above, the Court again "decline[d] to order Defendants to search for and produce Demographic Data from yet another database, in yet another format, compiled by perhaps another individual, particularly given that Defendants have already made four productions of Demographic Data."  (Id. at 5 (emphasis added)).  The Court noted, "[t]hat the Demographic Data is not organized in precisely the format that Plaintiffs would desire is not a basis for imposing an additional burden on Defendants or an additional delay in this case."  (Id. (citing In re Payment Card Interchange Fee & Merch. Disc., No. 05 Md. 1720 (JG) (JO), 2007 WL 121426, at *4 (E.D.N.Y. Jan. 12, 2007)).  The Court concluded that Defendants had shown "good cause" why they should not be compelled to produce additional Demographic Data during class certification discovery, and noted that, "[e]ven if Plaintiffs are correct that relevant Demographic Data exists in another location or format," Plaintiffs' request was "'unreasonably cumulative or duplicative'" and had already been "'obtained from some other source that is more

---

[3] NYCAPS means New York City Automated Personnel System, which "allows [City] employees to get instant access to their Personal Information, Tax and Payroll, Benefit Information, Employment Verification, Jobs, and more."  See NYC Payroll Portals, https://www1.nyc.gov/site/opa/other-services/portals.page (last visited March 28, 2021)..

convenient, less burdensome, or less expensive.'"   (ECF No. 267 at 5-6 (quoting Fed. R. Civ. P. 26(b)(2)(C))).

As to the Data Questions, however, the Court deemed them to be valid and not burdensome for Defendants to answer.   (ECF No. 267 at 6).   The Court therefore ordered Defendants to "make inquiries about the Data Questions, meet-and-confer with Plaintiffs to provide answers . . . , and provide a Rule 30(b)(6) witness <u>who must be prepared to testify with knowledge on behalf of Defendants</u> about the Data Questions during a deposition of no more than two (2) hours in length."  (<u>Id.</u>)

The very next day, Plaintiffs filed a motion for reconsideration of the Court's Dec. 15, 2020 Order, seeking, <u>inter</u> <u>alia</u>: (i)   Defendants' "sworn testimony" that the Demographic Data Defendants had produced was complete and "which file is responsive to which of the 13 data points required to be produced"; (ii) an "order that Defendants produce the four missing areas of data in the form produced [sic] along with an affidavit from Defendants' Rule 30(b)6 [sic] witness stating what the files are and which of the data points they are responsive to."  (ECF No. 268 at 3).  In an order dated the same day (the "Dec. 16, 2020 Order"), the Court denied Plaintiffs' first request, for an affidavit of completeness, for three reasons:

> (1) Plaintiffs' request for such an affidavit [was] predicated on their request for production of additional Demographic Data, which the Court denied in the [Dec. 15, 2020] Order; (2) the Court ruled in [that] Order which questions about the Demographic Data were valid (the "Data Questions") and required Defendants to meet-and-confer and provide a Rule 30(b)(6) witness as to those Data Questions and not other topics (specifically noting that the witness "<u>must be prepared to testify with knowledge</u>" on the Data Questions); and (3) Plaintiffs have provided no authority, either in their initial request or in their current Motion, for imposing a certification of completeness requirement on Defendants at this stage of discovery.

(ECF No. 269 at 3–4).  The Court noted that there was "no bar" to Plaintiffs raising in their Class Motion the perceived deficiencies in the Demographic Data, but given the close of class certification discovery on November 25, 2020 and the impending briefing schedule for the Class Motion, "[t]he parties must proceed with the record that exists, and make their arguments to the best of their ability on that basis."  (Id. at 4).

As to Plaintiffs' second request, for production of the "four missing areas of data," the Court interpreted this to be Plaintiffs' rearguing their requests for additional Demographic Data that the Court denied in the Dec. 15, 2020 Order and to expand the limited testimony the Court allowed as to the Data Questions; the Court therefore denied both.  (ECF No. 269 at 4).

The parties scheduled the deposition of the Demographic Data Witness for December 30, 2020, but the day before, Defendants' counsel stated that Defendants did "not have a Rule 30(b)(6) witness available for tomorrow, as the data provided by the FDNY [the HRIS Data] was run from a subset of FISA_OPA, and is therefore [a] 'snapshot' and not a complete history. That agency will be re-running the data, and a representative from FISA_OPA will serve as the Rule 30(b)(6)."  (ECF No. 312-2 at 1).[4]  Curiously, notwithstanding the Court having twice found good cause to deny Plaintiffs' demands that Defendants produce additional Demographic Data, Defendants sought to postpone the deposition of the Demographic Data Witness so they could produce a fifth set of Demographic Data.

---

[4] "FISA_OPA" refers to the Financial Information Services Agency/Office of Payroll Administration, and is the City's agency responsible for data processing, including payroll.  See NYC Payroll Glossary, https://www1.nyc.gov/site/opa/other-services/glossary.page#fisa (last visited March 28, 2021).

The parties' disputes continued, this time with respect to scheduling the resumed deposition of one of Plaintiffs' witnesses, Vincent Variale, and the deposition of Defendants' Demographic Data Witness, resulting in Defendants' motion for sanctions (ECF No. 308) and Plaintiffs' cross-motion (ECF No. 312).  In an order dated February 11, 2021, the Court granted both motions in part, ordering Plaintiffs to make Variale available for a one-hour deposition no later than February 19, 2021 and ordering Defendants to "make a Rule 30(b)(6) witness available for a deposition on the [D]emographic [D]ata no later than February 28, 2021."  (ECF No. 315 at 7 (the "Feb. 11, 2021 Order")).

The parties did not meet either deadline in the Feb. 11, 2021 Order.  By February 18, 2021, the parties had yet to agree on a date for Variale's deposition (with each side blaming the other), and Defendants had yet to complete production of the FISA/OPA "salary and leave data," which they did not expect to do until February 24, 2021, so Defendants offered Plaintiffs an extension of an additional week to depose the Rule 30(b)(6) Demographic Data Witness.  (ECF No. 325-1 at 10).  Defendants thus moved for an extension of time to depose Variale; Plaintiffs opposed and cross-moved for an order directing Defendants to provide more than one date for the deposition of the Demographic Data Witness and to produce any outstanding Demographic Data no later than 72 hours before the deposition.  (ECF Nos. 324, 325).

In an order dated February 19, 2021, the Court held that Defendants had failed to show good cause for a further extension of the deadline to depose Variale, and granted Plaintiffs' request to require Defendants to "provide more than one date for the Rule 30(b)(6) [D]emographic [D]ata [W]itness and [] provide the outstanding data at least 72 hours in advance of that deposition."  (ECF No. 327 at 2 (the "Feb. 19, 2021 Order")).

16

On February 24, 2021, Defendants' counsel sent an email to Plaintiffs' counsel with a link through which to download "the salary and leave data compiled by FISA/OPA" (the "2/24/21 Demographic Data").   Plaintiffs' counsel, finding the link to be "inoperational," notified Defendants' counsel, who suggested retrying the password and suggested an application to use to conduct the download.   (ECF No. 351-4 at 2).   On February 25, 2021, Plaintiffs' counsel continued to receive an error message, and informed Defendants' counsel, "[t]he problem is not on our end.  Please correct and advise when the issue has been resolved."  (Id. at 1).   Several hours later, Plaintiffs filed the Motion.  (ECF No. 328).

### C.  The Motion

In the Motion, Plaintiffs contend that Defendants have violated the Court's Feb. 11, 2021 and Feb. 19, 2021 Orders because the 2/24/21 Demographic Data was "inoperable" and Defendants failed to provide dates for the Rule 30(b)(6) Demographic Data Witness deposition. (ECF No. 329 at 2).  Plaintiffs contend that "Defendants have engaged in a pattern of producing incomplete, disorganized, undefined and ultimately unusable or unwieldy portions of numerous data sets . . . despite the fact that . . . they could have provided the complete data set in 'two to three weeks' through a Service Request to NYCAPS Central."[5]   (Id. at 3).  As support for their contention that "a Service Request to NYCAPS Central" would have remedied all of the deficiencies in the Demographic Data, Plaintiffs cite a brief excerpt from Perez's deposition, in

---

[5] "[The] NYCAPS ESS system allows [City] employees to get instant access to their Personal Information, Tax and Payroll, Benefit Information, Employment Verification, Jobs, and more.  NYCAPS means New York City Automated Personnel System; ESS means Employee Self Service.  See NYC Payroll Portals, https://www1.nyc.gov/site/opa/other-services/portals.page (last visited March 28, 2021).

which she testified that reports in response to such requests typically take "two to three weeks."

(ECF No. 263-2 at 5).

Plaintiffs contend that they been prejudiced by having "to expend substantial time and resources processing the information in the haphazard piecemeal way it was produced, expend time and cost in compelling production of missing information and limiting their ability to review and use the data at critical points in this proceeding." (ECF No. 329 at 3–4). Plaintiffs assert that the Adverse Inference is warranted because they "have established that Defendants not only had an obligation to produce this data, but they have in fact been required by the Court to do so no less than six times and therefore their failure to do so establishes their culpability." (Id. at 5).

Defendants oppose the Motion on four grounds. First, Defendants assert that the 2/24/21 Demographic Data contains "salary and leave history," not "promotional information," and therefore is not "sufficient to draw any negative inference of discrimination in promotions." (ECF No. 332 at 1). Second, Defendants maintain that the 2/24/21 Demographic Data was produced "not only well in advance of the 72 hour/February 28, 2021 deadline issued by the Court, but within the three week timeframe Plaintiffs claim the information should be able to be provided [sic]." (Id.) Defendants note that their counsel "reached out to determine" which files were "problematic," but instead of "trouble-shooting," Plaintiffs filed the Motion. (Id. at 2). Third, Defendants note their production of the 11/18/20 Annual Snapshots, as corrected on December 14, 2020. (Id.) Because the "snapshots" Plaintiffs had requested "did not present a complete, transactional salary and leave history . . . it was impossible for a Rule 30(b)(6) witness to testify to a particular member's salary and leave history using the 'snapshot' data alone," and so Defendants "offered to produce a complete set of data, compiled by FISA-OPA," that is, the

2/24/21 Demographic Data.  (Id.)  Thus, Defendants argue, "any claims of prejudice are the result of Plaintiffs' decision to request a static, yearly 'snapshot' of salary and leave history, rather than a more informative data set with a transactional history."  (Id.)  Fourth and finally, Defendants argue that "had Plaintiffs worked with Defendants to trouble-shoot any difficulties they were experiencing downloading the data, and had Plaintiffs worked with Defendants to identify a date for the Rule 30(b)(6) witness deposition, [that] deposition arguably, could have taken place" on March 1, 2021.  (Id.)

On reply, Plaintiffs complain that Defendants are attempting to shift the blame to Plaintiffs for their own delays in producing Demographic Data and Rule 30(b)(6) witness.  (ECF No. 350 at 3–7).  Plaintiffs continue to insist that all their problems could have been solved had Defendants made the Service Request to NYCAPS Central, as described by Perez.  (See supra § II.B. at 13).  Plaintiffs also contend that Defendants have failed to meet their burden to show that Plaintiffs have not been prejudiced by the discovery delays, thus justifying the Adverse Inference.  (ECF No. 350 at 7).

**D.  Filings Subsequent to the Motion**

On March 5, 2021, the Court notified the parties that, pending this Report and Recommendation on the Motion, Defendants were required to, by March 12, 2021, "provide to Plaintiffs multiple dates for the scheduling of the Rule 30(b)(6) Demographic Data witness in March 2021," and, at least 72 hours before the scheduled deposition, provide the "data legend," and "the data on which the Rule 30(b)(6) Demographic Data Witness is testifying."  (ECF No. 353) (the "Mar. 5, 2021 Order").

On March 15, 2021, Plaintiffs filed another motion to compel (the "Mar. 15, 2021 Motion"), contending that Defendants had not complied with the Court's Mar. 5, 2021 Order. (ECF No. 360). Apparently, Defendants' counsel told Plaintiffs' counsel that the Rule 30(b)(6) deposition could occur on March 18, 2021, or in April, and produced a legend that was partially cut-off and needed to be explained by additional codes. (ECF No. 360-1 at 1–2, 10–11).

That next day, the Court issued an order (the "Mar. 16, 2021 Order"), (i) directing Defendants to "produce a complete legend of all codes, not just the HRIS codes, at least 72 hours before the deposition" or have the Demographic Data Witness be prepared to answer questions regarding the codes and descriptions; and (ii) clarified that because the 2/24/21 Demographic Data was a supplement to the Annual Snapshots that Defendants had produced, the Demographic Witness must be prepared to testify as to the 2/24/21 Demographic Data, but not as to the Annual Snapshots or the data to which Ms. Deol had already testified. (ECF No. 362 at 2–3). The Court also reiterated its order that the Demographic Data Witness' deposition occur before the end of March 2021. (Id. at 3).

On March 29, 2021, in response to questions posed by the Court (ECF No. 368), Plaintiffs filed a letter indicating that the Rule 30(b)(6) Demographic Data Witness deposition occurred on March 26, 2021. (ECF No. 371). Plaintiffs nevertheless contended that Demographic Data was "still missing," Defendants had not produced a complete legend ahead of the deposition, and the witness was unable to testify as to the codes and abbreviations in the Demographic Data. (ECF No. 371). On March 30, 2021, the Court ordered Defendants, by April 13, 2021, to produce a complete legend for the Demographic Data codes, as previously required by the Mar. 5, 2021 and

Mar. 16, 2021 Orders, and warned Defendants that failure to comply may result in sanctions.

(ECF No. 372).

## III. <u>DISCUSSION</u>

### A. <u>Legal Standards</u>

Plaintiffs bring the Motion under Federal Rule of Civil Procedure 37(b)(2), which provides

for sanctions for "Failure to Comply with a Court Order" as follows:

> (A) <u>For Not Obeying a Discovery Order</u>.  If a party or a party's officer, director, or managing agent — or a witness designated under Rule 30(b)(6) or 31(a)(4) — fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.  They may include the following:  (i) directing that the matters embraced in the order or other designated facts be taken as established for purpose of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.
> . . .
> (C) <u>Payment of Expenses</u>.  Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2)(A), (C).  The purpose of disciplinary sanctions under Rule 37 is threefold:

(1) to "ensure that a party will not benefit from its own failure to comply"; (2) to serve as "specific

deterrent[] and seek to obtain compliance with the particular order issued"; (3) "to serve a

general deterrent effect on the case at hand and on other litigation, provided that the party

against whom they are imposed was in some sense at fault."  <u>S. New Eng. Tel. Co. v. Glob. NAPs</u>

Inc., 624 F.3d 123, 149 (2d Cir. 2010) (quoting Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 71 (2d Cir. 1988)).

"A court order directing compliance with discovery requests is a required predicate to Rule 37(b) sanctions." Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16 Civ. 1318 (GBD) (BCM), 2017 WL 3671036, at *18 (S.D.N.Y. July 18, 2017); see Salahuddin v. Harris, 782 F.2d 1127, 1131 (2d Cir. 1986) ("The plain language of Rule 37(b) requires that a court order be in effect before sanctions are imposed[.]"); Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1364 (2d Cir. 1991) ("[T]here must be a valid court order in force before sanctions may be imposed pursuant to Rule 37(b)(2)."). The court order need not be in writing. See Joint Stock Co., 2017 WL 3671036, at *18; JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., No. 03 Civ. 5562 (JGK) (AJP), 2005 WL 1958361, at *14 n.10 (S.D.N.Y. Aug. 16, 2005).

District courts have "broad discretion in fashioning an appropriate sanction" for discovery violations, and sanctions "may be imposed where a party has breached a discovery obligation" either through "bad faith or gross negligence" or through "ordinary negligence." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 101 (2d Cir. 2002). When exercising discretion to impose a sanction under Rule 37(b), courts in the Second Circuit consider four non-exclusive factors: "(1) the willfulness of the non-compliant party or the reason for non-compliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." S.E.C. v. Razmilovic, 738 F.3d 14, 25 (2d Cir. 2013) (quoting S. New. Eng. Tel. Co., 624 F.3d at 144)). "Prejudice to the moving party may also be a significant consideration, though not an absolute

prerequisite in all circumstances." Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n, 319 F.R.D. 122, 126 (S.D.N.Y. 2016). "No single factor is dispositive." Joint Stock Co., 2017 WL 3671036, at *21.

The sanction of an adverse inference under Rule 37(b)(2)(A)(i) is an inference that the unavailable evidence "would have been of the nature alleged by the party affected by its" delayed production. Residential Funding, 306 F.3d at 109 (quoting Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998)). A party seeking an adverse inference instruction based not on destruction but rather on untimely production "must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding, 306 F.3d at 107; see Kortright Capital Ptrs. LP v. Investcorp Inv. Adv. Ltd., 330 F.R.D. 134, 137 (S.D.N.Y. 2019) (citing Residential Funding, 306 F.3d at 107). An adverse inference instruction is "an extreme sanction and should not be imposed lightly." Treppel v. Biovail Corp., 249 F.R.D. 111, 120 (S.D.N.Y. 2008). The adverse inference is meant "to restore a prejudiced party to the 'position he would have been in absent'" the withheld evidence. Raymond v. City of N.Y. No. 15 Civ. 6885 (LTS) (SLC), 2020 WL 7055572, at *7 (S.D.N.Y. Dec. 2, 2020) (quoting Kronisch, 150 F.3d at 126). Any sanction the Court imposes under Rule 37(b)(2) must "relate to the particular claim to which the discovery order was addressed." Seena Int'l Inc. v. One Step Up, Ltd., No. 15 Civ. 1095 (PKC) (BCM), 2016 WL 2865350, at *14 (S.D.N.Y. May 11, 2016) (quoting Daval Steel Prod., 951 F.2d at 1366)).

**B.  Application**

As the Court held in the Dec. 15, 2020 and Dec. 16, 2020 Orders, Defendants had shown good cause why they should not be required to produce additional Demographic Data.  (ECF Nos. 267 at 5–6; 269 at 3–4).  At this point, then, Defendants still have not produced in response to the Court's Orders a complete and readable legend for the 2/24/21 Demographic Data (or explanatory testimony).  (ECF Nos. 353, 362).  Thus, this is not a case involving destruction of or failure to preserve Demographic Data, for which "the appropriate sanctions [would] traditionally include the drawing of adverse factual inferences."  Slattery v. United States, 46 Fed. Cl. 402, 404 (Fed. Cl. 2000) (citing Black's Law Dictionary 1086, 1401 (6th ed. 1991)); compare City of Almaty, Kazakhstan v. Ablyazov, No. 15 Civ. 05345 (AJN) (KHP), 2019 WL 3281326, at *7 (S.D.N.Y. July 3, 2019) (recommending imposition of adverse inference sanction against defendant who refused to produce any documents in discovery); Golia v. The Leslie Fay Co., No. 01 Civ. 1111 (GEL), 2003 WL 21878788, at *11 (S.D.N.Y. Aug. 7, 2003) ("The Court is prepared to give the jury a strongly worded instruction that they may, if they choose, infer that the destroyed documents contained evidence unfavorable to defendant, and that they may apply this inference, as well as the circumstances surrounding the destruction, against defendant in determining the merits of the case.").  Instead, the Court employs the three-part analysis for determining the propriety of an adverse inference for delayed production of the legend and the Demographic Data Witness, as set forth in Residential Funding, 306 F.3d at 107.

**1.  Obligation to produce**

The Court concludes that Defendants had an obligation to produce the legend, which the Court directed Defendants to produce in the Mar. 5, 2021 and Mar 16, 2021 Orders.  (ECF Nos.

353, 362).  Indeed, the legend was discussed during numerous court conferences, and in the Jan. 30, 2020 and Nov. 24, 2020 orders.  (ECF Nos. 71, 240).

### 2.  State of mind

As the Second Circuit explained in Residential Funding, the state-of-mind requirement for an adverse inference sanction can be satisfied on a showing of "ordinary negligence."  306 F.3d at 101, 113; see Kortright, 330 F.R.D. at 138 (employing Residential Funding's ordinary negligence standard to determine whether sanctions were appropriate for non-production of evidence). Here, while there is some evidence to support Defendants' assertions that they did not act with "any ill will or in bad faith," the Court cannot find that Defendants' failure to timely produce a complete legend and the Demographic Data Witness were "the product of mere inadvertence." Kortright, 330 F.R.D. at 138.  The Court made it clear in the Jan. 30, 2020 Order which Demographic Data Defendants had to produce, accompanied by a legend.  (ECF No. 71 at 2).  At that point in time, Defendants should have undertaken to confirm the most efficient and complete source of that information, collect and produce it, and provide a Rule 30(b)(6) witness to testify about it.  See Fashion Exch. LLC v. Hybrid Promotions, LLC, No. 14 Civ. 1254 (SHS) (OTW), 2019 WL 6838672, at *7 (S.D.N.Y. Dec. 16, 2019); (noting that party "did not treat the [discovery] issue seriously enough to thoroughly investigate" and make a timely production).

The Court recognizes Defendants' efforts to make six productions of Demographic Data-- the 1/27/20, 3/13/20, 9/9/20, 11/18/20, 12/3/20, and 2/24/21 Demographic Data.  As discussed during the Demographic Data Witness's deposition, these productions consist of approximately 73 files (or spreadsheets).  (ECF No. 371-1 at 70).  At this point, however, the Demographic Data appears to have come from at least six different data sources — CHRMS, CEEDS, HRIS, PMS, BTDS,

and FISA/OPA — none of which the Court, and apparently Plaintiffs, can yet be sure is complete and correct for purposes of the Class Motion.  Whether due to resource constraints or lack of attention to the issue of Demographic Data in the first instance in January 2020, this subject has certainly consumed an inordinate amount of both the parties' and the Court's time in attempts to ascertain what Demographic Data exists and could be produced, and in what format.  Insofar as Defendants "failed to take reasonable steps to comply with [their] discovery obligations," the Court deems Defendants' conduct to be sanctionable, although it is unclear whether Defendants' stalling was designed "to intentionally deprive [Plaintiffs] of evidence or merely due to gross incompetence."  Fashion Exch. LLC, 2019 WL 6838672, at *5–6; see Residential Funding, 306 F.3d at 110 (explaining that it is appropriate for court to consider party's "acts evincing 'purposeful sluggishness'" as supportive of an adverse inference sanction); Kortright, 330 F.R.D. at 138 (finding party's failure to timely locate and produce documents satisfied ordinary negligence state-of-mind requirement for sanctions); In re Sept. 11th Liab. Ins. Coverage Cases, 243 F.R.D. 114, 130 (S.D.N.Y. 2007) (finding that "[c]ounsel's failure to recognize the importance of [a particular document], and produce it timely, especially when alerted to its possible existence by opposing counsel" constituted "negligence or worse").

As a result of these delays, the parties are now four months past the class discovery cut off, yet Plaintiffs still do not have a complete legend for the Demographic Data and did not have the benefit of the testimony of the Demographic Data Witness before the deadline for filing the Class Motion.  In addition, the fact that Defendants appear to have unilaterally postponed the Demographic Data Witness's deposition so they could produce additional Demographic Data after the Court twice told them they were not required to do so defies explanation, other than

to delay that deposition. In addition, Defendants fail to explain why they could not have produced the FISA/OPA data in the first instance, or at least some point earlier in 2020, before the Class Motion deadline.   In sum, based on the record before the Court, Defendants' "conduct is sufficient to establish that [they] acted with [at least] a negligent state of mind."   Kortright, 330 F.R.D. at 139.

### 3. Relevance

When it comes to untimely produced evidence, courts undertake to ensure that "the negligent party [] sustain liability for breaching its discovery obligations where such breach causes injury, but the moving party should not obtain a windfall for uncovering evidence that would have made little difference in the underlying case." In re Sept. 11th, 243 F.R.D. at 125.  While the legend has not yet been produced, and the Demographic Data Witness has not yet testified, it is undisputed — at this point in the case — that the Demographic Data itself is relevant, but if it cannot be understood, by means of a legend or a witness's testimony, its value is diminished. Accordingly, the Court concludes that these two additional pieces of evidence are also relevant.

### 4. Appropriate sanction

Although the Court has found that Plaintiffs have made a sufficient showing that an adverse inference is an available sanction under Rule 37(b), the Court must still consider whether that sanction, or some other sanction, is appropriate.  See Fashion Exch., 2019 WL 6838672, at *6 (considering whether requested sanctions would be "disproportional to the prejudice" suffered).   The Adverse Inference that Plaintiffs seek — to "accept as established that Defendants' demographic data proves Plaintiffs' claims of discrimination" — would "essentially absolve [Plaintiffs] of the duty to prove liability." Kortright, 330 F.R.D. at 139.  In circumstances

where Defendants have made at least <u>six</u> productions of Demographic Data, the Court concludes that to impose the Adverse Inference — to say that <u>all</u> of the Demographic Data Defendants have produced <u>establishes</u> that Defendants' promotional practices were discriminatory — would amount to a disproportional "windfall" for Plaintiffs.  <u>Id.</u> at 139; <u>Phoenix Four, Inc. v. Strategic Res. Corp.</u>, No. 05 Civ. 4837 (HB), 2006 WL 1409413, at *7 (S.D.N.Y. May 23, 2006) (denying adverse inference for late production of evidence "where the [non-producing party has] come forward with the evidence, even if after the close of discovery").

In addition, the Court observes that Plaintiffs were nevertheless able to file their Class Motion, supported by the report of an expert who relied on portions of the Demographic Data without any suggestion that he found any deficiencies or had any difficulties understanding or using the data for his analysis.  (ECF Nos. 301, 307-8).  Therefore, although the Court is careful "not to 'hold[] [Plaintiffs] to too strict a standard of proof regarding the likely contents of the" legend and Demographic Data Witness's testimony, Plaintiffs' ability to proceed with the Class Motion in their absence diminishes the amount of actual prejudice from the delays.  <u>Residential Funding</u>, 306 F.3d at 109 (quoting <u>Kronisch</u>, 150 F.3d at 128).

Where the prejudice to Plaintiffs is manifest, however, is in the extent of motion practice and Court intervention that has been necessary to secure not only the additional productions of Demographic Data, but also conversations with Defendants' representatives to explain the data and, ultimately, to obtain the legend (which remains outstanding (<u>see</u> ECF No. 372)) and the Demographic Data Witness's deposition.  As noted above, both Plaintiffs' Oct. 2020 and Dec. 2020 Motions to Compel, as well as the Court's Jan. 30, 2020, Nov. 24, 2020, Dec. 3, 2020, Feb. 11, 2021, Feb. 19, 2021, Mar. 5, 2021, and Mar. 16, 2021 Orders (each of which followed either

28

a conference with or filings by the parties) were necessary to narrow Plaintiffs' questions and concerns about the Demographic Data and get the parties, finally, to schedule and appear for the Demographic Data Witness's deposition.  (ECF Nos. 71, 240, 246, 315, 327, 353, 362).

Accordingly, the Court recommends that an award to Plaintiffs of their reasonable expenses and attorneys' fees caused by Defendants' failure to timely produce the legend and the Demographic Data is justified.  See Fed. R. Civ. P 37(c)(1)(A); Phoenix Four, Inc., 2006 WL 1409413, at *7 (denying adverse inference sanction but awarding attorneys' fees and costs to "restor[e] the prejudiced party to the position it would have been in had the misconduct not occurred") (citing West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).  Based on its review of the record, the Court respectfully recommends that Plaintiffs be awarded reasonable attorneys' fees and costs for bringing: (i)  the Oct. 2020 Motion to Compel (ECF No. 192); (ii) the Dec. 2020 Motion to Compel (ECF No. 267); (iii) the Mar. 15, 2021 Motion (ECF No. 360); and (iv) the current Motion (ECF No. 328).

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Court respectfully recommends that Plaintiffs' Motion be GRANTED IN PART and DENIED IN PART, insofar as Plaintiffs' request for an adverse inference be DENIED, and Plaintiffs be GRANTED sanctions in the form of reimbursement for reasonable attorneys' fees and costs for: (i) the Oct. 2020 Motion to Compel (ECF No. 192); (ii) the Dec. 2020 Motion to Compel (ECF No. 267); (iii) the Mar. 15, 2021 Motion (ECF No. 360); and (iv) this Motion (ECF No. 328).

Dated:      New York, New York
             March 31, 2021             SO ORDERED.

SARAH L. CAVE
United States Magistrate Judge

\*             \*             \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Liman.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).