UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                       :

LOCAL 3621, EMS OFFICERS UNION, DC-37,      :
AFSCME, AFL-CIO, individually and on behalf of its  :
members, RENAE MASCOL, and LUIS RODRIGUEZ,  :
on behalf of themselves and on behalf of all other   :
similarly-situated individuals,                  :

                           Plaintiffs,      :

                   -v-              :

CITY OF NEW YORK, et al.,              :

                     Defendants.    :
                                         :
------------------------------------------------------------------X

18-cv-4476 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

     Renae Mascol ("Mascol"), Luis Rodriguez ("Rodriguez" and together with Mascol, "Representative Plaintiffs"), Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO ("Local 3621," and collectively with Representative Plaintiffs, "Plaintiffs") bring a putative class action for discrimination based on certain protected characteristics, including race, sex, and/or gender, against the City of New York ("City"), the New York City Fire Department ("FDNY"), the Department of Citywide Administrative Services ("DCAS") and John and Jane Does Nos. 1 to 20 (collectively, "Defendants").[1] Dkt. No. 1 ¶ 1.  The complaint asserts that the promotional process for Emergency Medical Services ("EMS") officers to certain leadership positions has resulted in disparate and discriminatory promotional practices in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law ("NYSHRL"), New

---

[1] DCAS is an agency of the City and is responsible for the administration of civil service examinations and the promotion and placement of City employees.  Dkt. No. 1 ¶ 13.

York City Human Rights Law ("NYCHRL"), as well as 42 U.S.C. §§ 1981 and 1983.  *Id.* ¶¶ 3, 87–124.

Plaintiffs move for an order certifying certain classes pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), appointing Representative Plaintiffs as class representatives, and appointing The Kurland Group as class counsel.  Dkt. No. 300.

For the following reasons, the motion for class certification is denied.

## BACKGROUND

The parties engaged in discovery for the purpose of filing and contesting the present motion for class certification.  *See* Dkt. No. 79 at 12.  The following facts are taken from the parties' submissions in connection with the motion for class certification "and the Court resolves factual disputes as necessary for the disposition of" the motion.  *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 258 (S.D.N.Y. 2018).

## I.    Promotional Process

### A.    Overview

The EMS Bureau of FDNY has four class titles in ascending order of responsibility: (1) Emergency Medical Specialist Trainee; (2) Emergency Medical Specialist – EMT ("EMT"); (3) Emergency Medical Specialist – Paramedic ("Paramedic"); and (4) Supervising Emergency Medical Service Specialist ("SEMSS").  Dkt. No. 307-1 at 2.  To become an EMT, Paramedic, or SEMSS, an individual must take a civil service examination.  Dkt. No. 307-1 at 3; Dkt. No. 354-7 at ECF pp. 4, 5.  In addition to qualify for promotion to the SEMSS title, a candidate must, among other things, be an EMT or a Paramedic within EMS, then be selected off an eligible list established from the examination for that title, and then pass a probationary period.  Dkt. No. 307-1 at 3.

The SEMSS title consists of Level I and Level II positions.  *Id.*  A Level I employee is known as a "Lieutenant" and a Level II employee is known as a "Captain."  *Id.*  To become a Captain, FDNY imposes the following criteria for eligibility: (1) four years of full time experience as an EMS Lieutenant; (2) a current, valid New York State Department of Health EMT-B or EMT-Paramedic certification; (3) a clean disciplinary record/patient care record for the prior two years; (4) a satisfactory attendance record; and (5) an overall annual performance evaluation rating of "Good," "Very Good," or "Outstanding" for the prior year.  Dkt. No. 307-13.  Interested applicants who meet those criteria must then apply with a cover letter and resume.  *Id.*  Those candidates who apply are vetted to determine whether they meet all eligibility requirements.  Dkt. No. 354-9 at ECF p. 10.  Eligible candidates are then invited to interview.  Dkt. No. 307-13.  There is no written examination to be eligible for a Captain position.  Dkt. No. 307-1 at 3.

Within SEMSS Level II, there are two additional positions other than Captain that an EMS officer may apply for: Deputy Chief and Division Chief (together with Captain, the "Leadership Positions").  Dkt. No. 307-1 at 3.  To be eligible to become a Deputy Chief, an individual must first work for two years as a full-duty EMS Captain and, to be eligible to become a Division Chief, an individual must first work for two years as an EMS Deputy Chief.  Dkt. No. 307-13.  In addition, to be eligible for the Deputy Chief and Division Chief positions, the individual must have a valid paramedic certification, a clean disciplinary record for the past two years, a satisfactory attendance record, and a satisfactory annual performance evaluation rating for the prior year.  *Id.*  If eligible for promotion to either Deputy Chief or Division Chief, the individual is then subject to an interview process prior to promotion.  *Id.*  There is no written

examination to be eligible for either of the Deputy Chief or Division Chief positions.  Dkt. No. 307-1 at 3.

The interview process for promotion is largely the same for each of the Leadership Positions.  Dkt. No. 307-15 at ECF pp. 4, 12; *see* Dkt. No. 307-14.  Applicants during the interview process are rated from 1 to 5 based on their answers to each question that they are asked.  Dkt. No. 307-15 at ECF p. 6.  Each applicant is asked the same questions as his or her fellow applicants for that position; however, the questions asked across the three Leadership Positions differ depending on the position.  Dkt. No. 307-14; Dkt. No. 307-15 at ECF p. 18.  In other words, although all applicants for Captain are asked the same questions and all applicants for Deputy Chief are asked the same questions, the Deputy Chief questions differ from the Captain questions.  Dkt. No. 307-14; Dkt. No. 307-15 at ECF p. 18.  Those questions are vetted by Human Resources ("HR") and the Equal Employment Opportunity ("EEO") Office prior to being asked.  Dkt. No. 354-4 at ECF p. 4.

The interviewers for the candidates differ across days and across positions.  Dkt. No. 354-15.  However, each applicant is interviewed by a three-person panel composed of two EMS officers and one representative from HR.  *Id.*  In addition, a person in the EEO Office observes each interview.[2]  Dkt. No. 354-17.  Interviewers for each of the three positions are subject to a twenty to thirty minute training about the interview process.  Dkt. No. 307-15 at ECF p. 6.  During the training, interviewers are given paperwork that explains the rating scale and outlines the requirements needed for a particular score.  *Id.*  Interviewers are then shown the questions that they are allowed to read and instructed that they must read the questions verbatim.  *Id.*

---

[2] Defendants note that "[a]t some point prior to 2016, the EEO representative became an observer, rather than a panelist who scored interviewees."  Dkt. No. 355 at 9.

Interviewers are not given a training on avoiding implicit bias in grading. *Id.* However, FDNY personnel are otherwise provided with diversity training. Dkt. No. 354-3.

After the interviews, the scores assigned to each candidate by the three interviewers are added up. *See* Dkt. No. 354-17. The candidates are then listed from highest scoring to lowest scoring. *Id.* A list of the names of the highest scoring candidates is sent to the Commissioner of the FDNY who makes the final decision about whom to promote. Dkt. No. 354-2 at ECF p. 4. The list of names provided to the Commissioner includes the same number of names as open positions; in other words, if there are fifteen open positions, then the fifteen applicants with the highest scores on the interview (and who are otherwise eligible) will be sent to the Commissioner. *Id.* at ECF pp. 5–6.

The process for being appointed to the Leadership Positions stayed largely the same throughout 1998 to 2019. *See* Dkt. No. 307-6 at ECF p. 52; Dkt. No. 307-3 at ECF p. 10. Around 2020, in addition to the interview, the EMS Bureau of FDNY started to evaluate applicants on additional criteria such as college education, specialty training, specialty locations, and seniority. Dkt. No. 307-16 at ECF p. 4.

## B.    Evidence of Discrimination

### 1.    Expert Testimony

In support of their motion for class certification, Plaintiffs submitted a fifteen-page expert report by Shane Thompson, PhD ("Dr. Thompson"). Dkt. No. 307-8. Dr. Thompson is a forensic labor economist with a Ph.D. in economics from the University of Arizona. *Id.* ¶ 2. He is the chief economist and founder of Precision Analytics Co., LLC. *Id.* Dr. Thompson states that he was hired to perform analyses to identify whether there is statistical evidence of discriminatory promotional disparities within EMS. *Id.* ¶ 6.

In his report, Dr. Thompson concludes that "[t]here is statistically significant evidence of discriminatory promotional disparities" and the "statistical evidence shows that the common promotional policy has resulted in disparities that commonly disadvantage the class." *Id.* ¶ 7. Dr. Thompson states that in conducting his analysis he received 41,866 records from Plaintiffs' counsel that represented end-of-year snapshots for 7,391 EMS officers from 2012 to 2019. *Id.* ¶ 10. He states that he then prepared the data for analysis by (i) dropping EMS officers who did not have titles relevant to the analysis (6,944 EMS officers remained); (ii) creating a categorical variable for the four race-gender combinations: white males, white females, non-white males, and non-white females; (iii) creating an indicator for Leadership Positions; (iv) identifying the highest title attained for each EMS worker; (v) identifying the tenure each EMS worker attained; and (vi) collapsing the dataset to one record per EMS worker. *Id.*

Using this data, he states that he then ran two logistic regressions to determine how race and gender correlated with Leadership Positions after accounting for the employee's tenure. *Id.* ¶ 13. In the first regression, Dr. Thompson compared employees in Leadership Positions and employees in non-Leadership Positions, whereas in the second regression, Dr. Thompson retained only Lieutenants in the non-leadership group (*i.e.*, he removed EMTs and Paramedics). *Id.* The results of the two regressions are represented below:

*Table 1: Regression 1 and Regression 2 Results – Leadership vs. Non-Leadership by Race and Gender*

| Variable | Regression 1 N = 6,944 Pseudo $R^2$ = 0.2827 | | | Regression 2 N = 906 Pseudo $R^2$ = 0.0642 | | |
|---|---|---|---|---|---|---|
| | Odds Ratio | Predicted Probability | P-value | Odds Ratio | Predicted Probability | P-value |
| Race/Gender | | | | | | |
| White males (baseline) | 1.0 | 4.4% | | 1.0 | 27.7% | |
| White females | 0.91 | 4.1% | 0.661 | 0.84 | 24.4% | 0.470 |
| Non-white males | 0.42* | 2.0%* | <0.001 | 0.62* | 19.5%* | 0.014 |
| Non-white females | 0.51* | 2.5%* | 0.003 | 0.93 | 26.3% | 0.775 |
| | | | | | | |
| Tenure | 1.27* | - | - | 1.14* | - | - |

Note: Asterisks (*) denote statistical significance at the 5% level. For the race/gender odds ratios (the first four rows of the table), asterisks denote statistically significant differences at the 5% level *relative* to white males. An odds ratio of 0.91 for white females, for example, can be interpreted as *white females with the same tenure as white males have 9% lower odds of having Leadership Positions*. The same interpretation follows for other race/gender combinations relative to white males. Predicted probabilities are the regression-adjusted probabilities (i.e., probabilities after adjusting for tenure) of having Leadership Positions for each race/gender combination. P-values denote the probability of observing such a disparity from the white male odds if, in reality, there is no difference.

*Id.* Based on the results of the regressions, he concludes: "[a]mong the full population of EMS officers, non-white males and non-white females have statistically significantly lower odds of having Leadership Positions than white males, even if they have the same tenure as white males." *Id.* ¶ 13. He continues:

> In the refined population of EMS officers, in which I remove EMTs and paramedics from the non-leadership group, leaving only Lieutenants as a comparison, the same advantage for white males still holds. The regression-adjusted probability of having Leadership Positions for white males (27.7%) is again higher than all their counterparts. Note that the sample of employees is smaller, and correspondingly, so is the likelihood of statistically significant differences between groups. Nonetheless, the size of the difference between white males (27.7%) and non-white males (19.5%) remains statistically significant—that much disparity has roughly a 1.0% of occurring by chance.

*Id.* ¶ 16.

Dr. Thompson also notes that he examined the time it took for EMS officers to be promoted from EMT to Captain. *Id.* ¶ 17. He conducted this analysis on the 39 EMS officers for whom he could identify every appointment date from EMT to Paramedic to Lieutenant to

Captain. *Id.* ¶ 18.  Dr. Thompson found that "[a]mong the 39 EMS officers who [were]

promoted from EMT to Captain, it took non-white males (16.6 years) three years longer to be

promoted to Captain than their white counterparts (13.5 years)" and "[i]t took non-white females

15.9 years." *Id.* ¶ 20.

In response, Defendants submitted their own expert report by Christopher Erath, Ph.D

("Dr. Erath").  Dkt. No. 354-19.  Dr. Erath is a director of BLDS, LLC, a consulting firm

specializing in the analysis of labor markets, and he received a PhD in economics from the

University of Wisconsin.  *Id.* at 1.  In his report, Dr. Erath notes that he was "asked to review the

report submitted by Shane Thompson claiming to present analyses to identify if there is

statistical evidence of promotional disparities within" EMS and "to review evidence disregarded

by Dr. Thompson showing applicants to Captain and the corresponding selections."  *Id.*  He also

states that he utilized three sources of data in his analysis: (1) two spreadsheets showing year-end

snapshots of EMS employees and positions held between 2013 to 2019; (2) two spreadsheets

showing job changes and their dates between 1999 to 2019; and (3) documents showing actual

applicants to Captain openings for 2014-2019 and the selections made.  *Id.*  Dr. Erath notes that

Dr. Thompson used the first two of these sources, but not the third.  *Id.*

Dr. Erath starts his reports by identifying what he claims are deficiencies in

Dr. Thompson's report.  *Id.* at 2.  He notes that to properly perform an analysis, Dr. Thompson

should have "identif[ied] those who could have been promoted and (2) investigate[d] whether

statistical disparities exist in promotion rates within that group."  *Id.*  However, Dr. Erath states

that "Dr. Thompson does neither" and never "consider[s] who became a Captain during the

period for which he has data even though Captain is the only leadership position into which an

EMS employee in a lower-level position can move." *Id.* at 2.  Dr. Erath attempts to illustrate the

point through an analogy:

> Consider a simple situation where there are three positions: first, second, and third grade, with third the highest. Those in first grade can be promoted to second grade, and those holding second grade positions can be promoted to third.  If we wish to study potential disparities in promotion to third grade, those in first grade positions are irrelevant—they are not eligible for promotion to third grade until they achieve second grade.  At the other end, those who are in third grade when first observed are irrelevant to our study of promotions to third grade, as they cannot be promoted to third grade again.

*Id.*  He then concludes that Dr. Thompson's analysis is flawed as he includes "both employees

holding positions too junior to qualify for promotion to Captain or higher" and "employees

already at Captain or higher when first observed." *Id.* at 3.  He notes that the 6,944 figure

includes employee who could not have been promoted to a leadership position such as those

already in positions such as Division Chief in 2013 when the data began.  *Id.*

Dr. Erath then states that he conducted his own analysis of the available data regarding

promotion to Captain.  In conducting this analysis, Dr. Erath notes that the data lacked the detail

necessary for him to take into account all eligibility criteria for promotions, such as performance

rating.  *Id.* at 4.  However, Dr. Erath states that he was able to ensure that the candidates met the

first eligibility criteria—which is that they must have spent four years as a Lieutenant—for

promotion.  *Id.*  He notes that, using this mode of analysis, he found that "[a]mong those eligible

for a promotion to Captain by Lieutenant service, white men were less likely to be promoted to

Captain than their counterparts over the 2013-2019 period; men were less likely to be promoted

to Captain than women; and whites were less likely to be promoted to Captain than non-whites."

*Id.* at 5.

Dr. Erath also states that he conducted an analysis using data showing each opening for

Captain from 2014 to 2019, the applicants for the position, applicants disqualified on account of

objective criteria such as disciplinary record, and those promoted.  *Id.* at 6.  Dr. Erath concludes

that for each of the years analyzed, there was no support for the claim that white men were

benefited in the promotion process.  He states that "[i]n virtually every one of these comparisons

non-whites, women, or the counterparts of white men were promoted at a greater rate than

whites, men, and white men."  *Id.* at 7.

Finally, regarding Dr. Thompson's time to Captain analysis, Dr. Erath states that it

suffers from several flaws including: (1) "[i]t is based on only 39 people and with such a small

sample the results can be unduly influenced by a single person"; and (2) "[t]ime from EMT to

Captain depends on a number of factors outside of FDNY's control, such as performance on civil

service exams, attendance record, and choice to apply and when to apply for each promotion in

the chain."  *Id.* at 8.

### 2.    Anecdotal Evidence

In support of their class certification motion, Plaintiffs also submit declarations from

EMS officers testifying to their experience with the promotion process.  Dkt. Nos. 302–07.

Those declarations are summarized below:

<u>Mascol Declaration</u>:  Representative Plaintiff Mascol, who is an African American

woman, states that she has first-hand experience with the promotion process and has "seen that

the criteria for grading is subjective and lends itself to unconscious bias."  Dkt. No. 302 ¶ 4.  She

states that notwithstanding her credentials, she has been passed over after completing the

promotion process five times before she became Captain.  *Id.* ¶ 5.  She states that after each

interview, she was told she did well, but not well enough.  *Id.* ¶ 6.  She notes that she "later

learned in the course of this litigation that" she "had been secretly removed from the list of

potential candidates."[3]  *Id.*  In addition to the interview process, Mascol notes that to be eligible, a candidate must have a performance evaluation from the prior year and those evaluations are filled out in the "same subjective way where unconscious bias factors in."  *Id.* ¶ 10.  Finally, she states that "if you take allowable leave such as parental leave or military leave prior to applying for Promotional Positions, you are deemed 'unratable' and are not given a performance evaluation" and this "disqualifies you from being able to apply"; moreover, individuals with disabilities, notwithstanding the ability to have a reasonable accommodation, are disqualified from applying.  *Id.* ¶ 12.

Rodriguez Declaration:  Representative Plaintiff Rodriguez, who is a Latino man, states that when he applied to the position of Captain, he was told that he would not be promoted because he had taken too much leave for a line of duty injury.  Dkt. No. 303 ¶ 5.  He states that the "decision to treat those who take leave for line of duty injuries as less qualified or not qualified for Promotional Positions is improper."  *Id.* ¶ 7.

Variale Declaration:  Vincent Variale ("Variale") is President of Local 3621.  Dkt. No. 304 ¶ 2.  Variale states that the promotional process is "subjective, discretionary and bias[ed] and adversely impacts EMS Officers who are non-white and female and adversely treats those who are Non-Full Duty Status."  *Id.* ¶ 6.  Variale states that "Defendants have been aware of this problem since it began" and "they do not see it as a problem."  *Id.* ¶ 9.

Boyd Declaration:  Tonya Boyd ("Boyd") is an African American woman who is employed by the FDNY as a Deputy Chief in EMS.  Dkt. No. 305 ¶ 2.  She states that she has participated in the promotional process and the interview process for the ranks of Captain,

---

[3] Mascol was disqualified from promotion due to a disciplinary record within the preceding two years.  Dkt. Nos. 354-11, 354-14; Dkt. No. 355 at 9.

Deputy Chief, and Division Chief and has faced discriminatory treatment in the process of applying for each of the positions. *Id.* ¶¶ 3, 4. She notes that the bias begins in the qualifications required to apply and carries over into the interview and states that she has filed an unconscious bias EEO complaint regarding grading in the annual performance evaluations. *Id.* ¶¶ 5–7. She states that when she "applied for Division Chief in February of 2020" she was "passed over, while 6 other individuals, none of which were more qualified than" her were promoted; all were white and five out of six were male. *Id.* ¶ 9.

Saffron Declaration: Jason Saffron ("Saffron") is African American and Puerto Rican and is employed as a Captain in EMS. Dkt. No. 306 ¶ 2. He states that he interviewed for the position of Deputy Chief in 2020, but was told that he was disqualified because he had a reasonable accommodation due to a short-term disability and did not have an evaluation of "very good" or "outstanding." *Id.* ¶¶ 3–4. He states that in his last evaluation he received ratings of "very good" or "outstanding," but because he had taken leave pursuant to the Family and Medical Leave Act ("FMLA") due to his short term disability during the prior year, FDNY deemed him unratable and disqualified him from the promotion process. *Id.* ¶ 5.

## PROCEDURAL HISTORY

The class action complaint in this action was filed on May 21, 2018. Dkt. No. 1. Defendants answered on October 11, 2018 and filed an amended answer on February 5, 2021. Dkt. Nos. 24, 310.

On March 11, 2020, the Court set a class certification discovery deadline of March 29, 2020. Dkt. No. 79 at 14. On March 31, 2020, the Court extended the class certification discovery deadline to July 31, 2020. Dkt. No. 83 at 1. The Court again extended the class certification discovery deadline to September 30, 2020 on June 30, 2020. Dkt. No. 128 at 3. On

September 30, 2020, the Court extended the deadline for completion of discovery relevant to class certification to November 25, 2020.  Dkt. No. 189.

During the course of class certification discovery, disputes arose between the parties, and Plaintiffs filed a motion for sanctions in the form of an adverse inference due to Defendants' failure to produce certain demographic data in the course of class certification discovery.  Dkt. No. 373.  Plaintiffs' motion was granted in part and denied in part; Plaintiffs' request for an adverse inference was denied, although Plaintiffs were awarded sanctions in the form of reimbursement for reasonable attorneys' fees and costs.  Dkt. No. 422; Dkt. No. 446 at 19.

Plaintiffs filed their motion for class certification along with supporting documentation on January 18, 2021.  Dkt. Nos. 300–307.  On March 11, 2021, Defendants filed their memorandum of law in opposition to the motion to certify the class along with supporting documentation.  Dkt. Nos. 354–357.  On October 22, 2021, Plaintiffs filed their reply memorandum in support of their motion as well as a supporting affirmation.  Dkt. Nos. 441, 443.

Oral argument was held on the motion for class certification on March 7, 2022.  Dkt. No. 448.  After oral argument, the parties filed letters alerting the Court to recent decisions of courts in the District.  Dkt. Nos. 450–52.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 23(a), plaintiffs may sue on behalf of a class where:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  *Kassman*, 416 F. Supp. at 273 (citing Fed. R. Civ. P. 23(a)).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Instead, the party moving for class certification "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*  Accordingly, a court must only certify a class "after a rigorous analysis" reveals that the "prerequisites of Rule 23(a) have been satisfied," *id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)), an analysis that often requires the courts to touch on "aspects of the merits in order to resolve preliminary matters," *id.* at 351–52.

## DISCUSSION

Plaintiffs move to certify a class under Federal Rule of Civil Procedure 23(a) and 23(b)(2) comprised of EMS officers in the SEMSS title from 1996 to present who are non-white, female, have received a reasonable accommodation, or have taken a leave of absent due to a disability or pursuant to FDNY time and leave policies (estimated at 2,178 individuals), which Plaintiffs refer to as the "Equitable Class."  Dkt. No. 301 at 10–11.  Plaintiffs also seek to certify two classes under Federal Rule of Civil Procedure 23(a) and 23(b)(3) comprised of (1) non-white and/or female EMS officers in the SEMSS title from 1996 to present (estimated at 1,007 individuals), which Plaintiffs refer to as the "Race/Sex/Gender Class" and (2) EMS officers in the SEMSS title from 1996 to present who have received a reasonable accommodation or taken a leave of absence because of a disability and/or have taken a leave of absence pursuant to FDNY time and leave policies (estimated at 1,007 individuals), which Plaintiffs refer to as the "Non-Full Duty Status Class."  *Id.* at 15.  Defendants oppose the motion on the grounds that Plaintiffs have not satisfied the requirements of Rule 23.  Dkt. No. 355.

As discussed further below, Plaintiffs fail to sufficiently demonstrate commonality under Rule 23(a)(2) and thus the motion for class certification must be denied.

I.      **Commonality**

"As is true in many Title VII class actions, the 'crux of this case is commonality.'"

*Kassman*, 416 F. Supp. 3d at 274 (quoting *Dukes*, 564 U.S. at 349); *see Richardson v. City of New York*, 2021 WL 1910689, at *6 (S.D.N.Y. May 12, 2021).  Commonality requires a showing that "there are questions of law or fact common to the class."  *Dukes*, 564 U.S. at 349 (quoting Fed. R. Civ. P. 23(a)(2)).  However, not just any common question suffices; instead, "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.  "In the context of an employment discrimination class action, commonality demands that there be 'some glue holding the alleged reasons for all [the challenged employment] decisions together . . . [that] will produce a common answer to the crucial question *why was I disfavored*.'"  *Richardson*, 2021 WL 1910689, at *7 (quoting *Dukes*, 564 U.S. at 352).

For a disparate impact class, the Supreme Court has stated that this glue may come from either a "companywide evaluation method that can be charged with bias" or "significant proof that [the employer] operated under a general policy of discrimination."  *Dukes*, 564 U.S. at 353 (internal quotation marks and citation omitted).  "Typically, an employer's policy of 'allowing discretion by local supervisors over employment matters' will not present questions and answers common to a large class."  *Richardson*, 2021 WL 1910689, at *7 (quoting *Dukes*, 564 U.S. at 355).  In such a case, while some "managers may be guilty of intentional discrimination that produces a [] disparity," others will surely "select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all."  *Dukes*, 564 U.S. at 355–56.  "In such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's."  *Id.*

For a disparate treatment claim, on the other hand, "[p]laintiffs need not identify a common mode of exercising discretion." *Chalmers v. City of New York*, 2022 WL 4330119, at *13 (S.D.N.Y. Sept. 19, 2022); *see Richardson*, 2021 WL 1910689, at *9. Plaintiffs, instead, may offer proof that the defendant engaged in "widespread acts of intentional discrimination against individuals," or that "intentional discrimination was [defendant's] standard operating procedure." *Richardson*, 2021 WL 1910689, at *9 (quoting *Reynolds v. Barrett*, 685 F.3d 193, 203 (2d Cir. 2012)).

## A.    Disparate Impact Claims

Plaintiffs bring disparate impact claims on behalf of the Race/Sex/Gender Class under Title VII, NYSHRL, and NYCHRL.[4] Dkt. No. 301 at 14. To prevail on a disparate impact theory of liability under these provisions, a plaintiff must "identify a specific employment practice or policy," "demonstrate that a disparity exists," and establish that the employment practice or policy has a causal relationship with the disparity. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (internal quotation marks and citations omitted); *see Syeed v. Bloomberg L.P.*, 2022 WL 3447987, at *11 (S.D.N.Y. Aug. 17, 2022) (noting that disparate impact claims under NYSHRL for conduct post-2019 and NYCHRL involve these same three factors but are construed more liberally). Thus, prior to class certification and to make out a disparate impact claim, "[t]he plaintiff must begin by identifying the specific employment practice that is challenged." *Dukes*, 564 U.S. at 357 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)) (noting that this requirement is "all the more necessary when a class of plaintiffs is sought to be certified"); *see Chin*, 685 F.3d at 154 ("To make out a disparate

---

[4] Plaintiffs also bring claims under 42 U.S.C. §§ 1981 and 1983 premised on Defendants' violation of their rights under Title VII, NYSHRL, and NYCHRL. Dkt. No. 1 ¶¶ 113–124.

impact claim (or, more generally, to rely on statistical evidence), a plaintiff must identify a specific discriminatory employment practice.").

In their opening brief in support of class certification, Plaintiffs appear to argue that the specific employment practice that they are challenging on a classwide basis is the promotional process to the Leadership Positions generally.  Dkt. No. 301 at 11–12 ("[T]he common issue is whether the Promotional Process causes adverse impact to women and non-white EMS Officers and adverse treatment to Non-Full Duty Officers."); *id.* at 12 ("The question of whether the Promotional Process utilized by Defendants results in an adverse impact" is a common question.).  Defendants, however, respond that this promotional process is too generalized to constitute a *specific* promotional process for purposes of a disparate impact claim.  Dkt. No. 355 at 16–17.

Defendants are correct that Plaintiffs may not point to the promotional process generally as the basis for their disparate impact.  The Supreme Court has stated that "it is not enough to . . . point to a generalized policy that leads to such an impact.  Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities."  *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005) (internal quotation marks and citations omitted).  Accordingly, "in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests," the plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."  *Watson*, 487 U.S. at 994.[5]

---

[5] Courts have recognized an exception to this rule where a plaintiff "can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis."  *Chin*, 685 F.3d at 154 (quoting 42 U.S.C. § 2000e–2(k)(1)(B)(i)).  However, Plaintiffs do not invoke this provision, nor do they attempt to demonstrate that the elements of the promotion process to the Leadership Positions are so intertwined that they are incapable of

Promotions to the Leadership Positions are determined by several distinct requirements and employment practices, "combin[ing] subjective criteria with the use of more rigid standardized rules or tests." *Id.* To start, an applicant must first meet certain standardized, eligibility criteria prior to being promoted. For example, she must have a clean disciplinary record for the past two years. In addition, she must have an overall annual performance rating for the prior year of a sufficient level. If the applicant meets those eligibility criteria, the applicant must then complete an interview, at which she is scored and ranked relative to the other applicants based on her performance. And, finally, the promotion must be approved by the Commissioner of the FDNY. Because there are several distinct steps that make up the overall promotional process (and thus various steps at which an applicant may fail to be promoted), there are several distinct ways for a single employee potentially to suffer discrimination in that process—including as a result of standardized rules or subjective criteria. Thus, to state a disparate impact claim based on failure to promote, Plaintiffs must identify which of these specific employment practices that make up the overall promotion process is "allegedly responsible for any observed statistical disparities." *Smith*, 544 U.S. at 241.

Apparently conceding this point, Plaintiffs in their reply brief attempt to focus on specific aspects of the promotional process that they claim create an adverse impact on the proposed class. Dkt. No. 440 at 5–6. Those aspects of the promotional process that they argue have an adverse impact and create "common questions of fact impacting all members of the classes" are numerous and are listed below:

> 1) Do the eligibility requirements for the Promotional Process have an impermissible and adverse impact on the proposed classes in violation of Title VII?
> a) Is there bias in the grading of the required annual performance evaluation such that proposed class members' promotional opportunities are unfairly decreased?

separation.

18

b) Is discipline history impermissibly used against members of the proposed classes thereby unfairly excluding them from promotional opportunity? c) Are there impermissible eligibility requirements that exclude proposed class members from consideration for promotional opportunity? d) Do Defendants have a pattern or practice of violating their own policies regarding eligibility requirements that adversely impacts proposed class members' promotional opportunities?

2) Does the Interview Process allow for implicit bias that adversely impacts the proposed class members in violation of Title VII? a) Do the questions asked measure the skill, knowledge and ability of an applicant for the stated position they are applying for? b) Does the format of the Interview Process encourage implicit bias in the grading and ultimate selection of those participating in the Promotional Process that adversely impacts members of the proposed classes? c) Do Defendants follow their own policy requirements and recommendations with regards to structured interviews to avoid implicit bias? d) Are there less discriminatory processes that Defendants could or should be using to select applicants for the Promotional Process? e) Do the additional points given to applicants for background experience have a discriminatory impact?

Dkt. No. 440 at 5–6.  In sum, Plaintiffs appear to allege that the specific employment practices that are responsible for statistical disparities are: (1) the eligibility requirements, including the annual performance evaluation process, as well as (2) the interview process.  In addition to arguing that these official practices may be discriminatory, Plaintiffs also argue that Defendants "have a pattern or practice of violating their own policies regarding eligibility requirements that adversely impacts proposed class members' promotional opportunities."  *Id.*

Although Plaintiffs may identify multiple discriminatory employment practices that allegedly have a disparate impact claim on a classwide basis, *see Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55 (S.D.N.Y. 2018) (certifying class based on multiple specific discriminatory employment practices), Plaintiffs must still show that whether Defendants used these specific employment practices to discriminate against the proposed class raises "raises yes-or-no questions that can each be answered 'in one stroke,'" *id.* at 75 (quoting *Dukes*, 564 U.S at 350). In addition, they must "offer 'significant proof' that these 'common modes' were discriminatory."  *Id.*

In the case at bar, Plaintiffs, however, fail to demonstrate that these specific employment practices have a discriminatory impact on a classwide basis.  Instead, the evidence supports that the question of which of these specific employment practices has a discriminatory impact on an applicant is largely an individualized inquiry.  As summarized in Background Section I.B.1, each of Plaintiffs' declarants submitted their own unique story, highlighting a different part of the promotional process that disfavored them:  Boyd alleges that she was discriminatorily given a lower grade on her annual performance evaluation, which in turn hurt her chances for promotion. Dkt. No. 306 ¶¶ 3–4; Oral Argument Tr. 7.  Mascol, on the other hand, alleges that "notwithstanding her credentials, she has been passed over after completing the promotion process five times before she became Captain" as she was told during her interview that "she did well, but not well enough" and "had been secretly removed from the list of potential candidates" due to a disciplinary action.  Dkt. No. 302 ¶ 6.  And, Rodriguez alleges that he was unlawfully denied a promotion as he was told he "had taken 'too much' leave for a line of duty injury."  Dkt. No. 303 ¶ 5.  Furthermore, at oral argument, Plaintiffs alleged that certain other plaintiffs will be shown to have suffered injury because "defendants use as pretext the claim that individuals, specifically women and people of color, are disqualified through discipline to exclude them from promotional process impermissibility."  Oral Argument Tr. at 7.

Thus, even taking Plaintiffs' allegations that each member of the putative class faced discrimination during the promotional process as true, the anecdotal evidence does not support that "the discrimination manifested itself in . . . promotion practices *in the same general fashion*."  *Dukes*, 564 U.S. at 353 (emphasis added).  To the contrary, it appears that while some proposed class members were not promoted as a result of the interview process in a given year, other proposed class members never participated in that interview process as they were deemed

ineligible for promotion due to their performance evaluation scores from the prior year or disciplinary issues (both of which are determined by individuals entirely separate from those who conduct interviews).  And, while some proposed class members may be shown to have been discriminated against due to the imposition of one of Defendants' policies, others may have been discriminated against because Defendants "violat[ed] their own policies regarding eligibility requirements."  Dkt. No. 440 at 5.  In other words, the proposed class members do not appear to have  "common answer to the crucial question *why was I disfavored*.'"  *Richardson*, 2021 WL 1910689, at *7 (quoting *Dukes*, 564 U.S. at 352); *see Valerino v. Holder*, 283 F.R.D. 302, 314 (E.D. Va. 2012) ("[T]he Court must assess the specific thing that a plaintiff claims creates bias and understand the way in which it is common to the class.").

Not only does Plaintiffs' anecdotal evidence not support that there are classwide answers as to which of Defendants' specific employment practice or practices are discriminatory, but Plaintiffs' statistical evidence is similarly unhelpful.  Dr. Thompson's statistical evidence, at most, shows that there is a racial and gender disparity in those individuals who hold leadership positions within EMS relative to those who do not hold such positions. Dkt. No. 307-8 at 9.  It does not, however, attempt to identify what part or parts of the promotion process account for that disparity or whether the parts of that promotion process that may, for example, account for gender disparities are the same as those that account for racial disparities.  To put it differently, Dr. Thompson's analysis is just as consistent with an explanation that a variety of individualized occurrences, on net, resulted in the injuries allegedly suffered by each member of the putative classes as it is with an explanation that a "unitary course of conduct by a single system" resulted in those injuries.  *See Chalmers*, 2022 WL 4330119, at *13.  And, as noted, Plaintiffs' anecdotal

evidence undercuts that there exists a common answer, as each declarant largely appears to have been discriminated against by different courses of conduct.

The lack of evidence that any of Defendants' specific employment practices created a disparate impact on non-white and female applicants thus distinguishes this case from *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55.  In that case, a district court in this District certified a class of women who had worked at Goldman Sachs based on the facts that (i) all class members were subject to two specific job evaluation processes (specifically, the 360 review and quartiling processes) as well as a cross-ruffing process, which determined who was promoted to Vice President; and (ii) plaintiffs presented evidence that each of those specific job evaluation processes created significant classwide gender disparities.  *Id.* at 74–75.  For example, with respect to (ii), plaintiffs' expert found that "[w]omen are evaluated lower on the 360-degree review and are less likely to be ranked in the top quartile than otherwise similar men."  *Id.* at 75.  Plaintiffs, as detailed, present no such evidence.[6]

It is also worth noting that the endorsement by the district court in *Chen-Oster* of an aggregate analysis of disparities across business units does not support Dr. Thompson's aggregate analysis of disparities across steps in the relevant EMS promotion process (*e.g.*, performance evaluation, interview, etc.).  In *Chen-Oster*, the court rejected Goldman Sachs's

---

[6] The fact that a single supervisor, namely, the FDNY Commissioner, may have had ultimate authority for the decision as to who was promoted does not suffice to show commonality. "[M]ere approval or limited oversight by higher-level executives, without more, falls short of showing a sufficient common denominator," *Kassman*, 416 F. Supp. 3d at 280, and Plaintiffs offer no evidence that the Commissioner did not, for the most part, just approve the list of names provided to him.  Even if this were not true, Plaintiffs do not appear to claim, nor have they produced any evidence in support of such a claim, that any disparity resulted from the influence of the FDNY Commissioner in deciding whom to promote.  *See Dukes*, 564 U.S. at 350 (stating that commonality may be satisfied if class members were subject to "discriminatory bias on the part of the same supervisor").

argument that plaintiffs' expert should have "tested whether the gender disparities 'were the result of anomalies specific to individual Business Units.'"  *Id.* at 75.  In rejecting that argument, the court noted that (1) "business units are not stable or permanent," and (2) "the challenged performance evaluation processes do not occur on a unit-by-unit basis," as class members were evaluated on a cross-unit basis and virtually all final decision-making was funneled to division heads and either division-wide or firm-wide committees.  *Id.* at 75–76.  In other words, as the district court held, the units did not make performance evaluations independently of one another and thus an aggregate analysis (as opposed to a unit-by-unit one) provided significant proof of discrimination.  Here, however, the various steps of the promotion process appear to be wholly independent of one another (except that an applicant must pass certain steps prior to moving to others).  There is no evidence, for example, that an applicant's score during the interview portion of the promotion process was impacted by, for example, the applicant's disciplinary history or performance evaluation score.  To the contrary, the evidence supports that applicants were judged solely based on their answers to questions during the interview.  Thus, the reasoning in *Chen-Oster* does not support Dr. Thompson's aggregate analysis as a basis for Plaintiffs' disparate impact claims.

Because Plaintiffs have failed to identify a specific employment process and to draw any causal connection between that employment process and any disparities, the Court denies Plaintiffs' request to certify the Race/Sex/Gender Class disparate impact claims.

## B.    Disparate Treatment Claims

Plaintiffs also bring disparate treatment or pattern and practice claims related to the Equitable Class and the Non-Full Duty Class under Title VII, NYSHRL, and/or NYCHRL.[7]  "In

---

[7] *See supra* note 4.

a disparate treatment class action, plaintiffs must provide evidence of a 'systemwide pattern or practice' of pervasive discrimination against the class, such that the discrimination is 'the regular rather than the unusual practice.'" *Kassman*, 416 F. Supp. 3d at 281 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).  "[S]tatistics alone may be sufficient to establish a pattern or practice of discrimination, though the statistics must not only be statistically significant in the mathematical sense." *Richardson*, 2021 WL 1910689, at *9 (internal quotation marks omitted) (quoting *Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015)).  "They 'must also be of a level that makes other plausible non-discriminatory explanations very unlikely.'" *Id.* (quoting *Burgis*, 798 F.3d at 69).

The inquiry to determine whether a plaintiff may proceed with a pattern and practice claim overlaps with proof of commonality for purposes of Rule 23.  *See Richardson*, 2021 WL 1910689, at *9; *Kassman*, 416 F. Supp. 3d at 281.  "Although the commonality requirement can be satisfied 'via statistical and anecdotal evidence,' the evidence must offer 'significant proof' of a general policy of discrimination." *Richardson*, 2021 WL 1910689, at *9 (quoting *Chen-Oster*, 325 F.R.D. at 76).  Significant proof may exist where "a class-based difference is 'statistically significant by several standard deviations,' and a substantial portion of the difference is traceable to the employer's choices." *Id.* (quoting *Chen-Oster*, 325 F.R.D. at 76).  "It would not be satisfied by an equivocal statistical analysis or an analysis that 'obfuscate[s] the principal explanatory variable' to create the appearance of difference." *Id.* (quoting *Kassman*, 416 F. Supp. 3d at 283).

Plaintiffs' statistical evidence from Dr. Thompson does not offer significant proof of a general policy of discrimination.  Dr. Thompson conducted two regression analyses.  Dkt. No. 307-8.  First, Dr. Thompson looked at the race and gender of EMS officers in Leadership

Positions (defined as those SMSS II positions) and EMS officers in non-Leadership Positions. *Id.* ¶ 13.  Second, Dr. Thompson analyzed the race and gender of EMS officers who were Lieutenants in 2012 to 2019 and the race and gender of EMS officers who were in Leadership Positions during that same time period.  *Id.*  In the first analysis, Dr. Thompson found that "non-white males and non-white females have statistically significantly lower odds of having Leadership Positions than white males, even if they have the same tenure as white males"— specifically about 2% odds versus around 4% odds.  *Id.*  In the second analysis, in which he removed EMTs and Paramedics from the non-leadership group leaving only Lieutenants as a comparison, he found that the difference between white males (27.7%) and non-white males (19.5%) remains statistically significant.  *Id.* ¶ 16.

First, taken on their own terms, these analyses offer virtually no support for the proposition that Defendants had a pattern and practice of gender-based discrimination. Dr. Thompson's first analysis found that white females and white males had similar odds of having a Leadership Position (4.1% vs. 4.4%) and non-white females had a *higher* likelihood of having a Leadership Position than non-white males (2.5% vs. 2.0%).  *Id.*  The results of his second analysis were similar.  Non-white females had a similar likelihood of having a Leadership Position as white males (26.3% vs. 27.7%) and white females were not far behind (with 24.4%).  *Id.*  Thus, to the extent Plaintiffs seek to allege disparate treatment based on sex or gender, Dr. Thompson's analyses do not provide the substantial support that is required.[8]  *See*

---

[8] This is also true of Dr. Thompson's third analysis, in which he examined the time it took for EMS officers to be promoted from EMT to Captain.  *Id.* ¶ 17.  In that analysis, Dr. Thompson found that non-white females were promoted in less time than non-white males and that white females were promoted only about 6 months on average after white males.  *Id.* ¶ 20.  Moreover, the analysis was only conducted on a population of 39 EMS officers, and thus, as Dr. Erath stated, "with such a small sample the results can be unduly influenced by a single person."  Dkt. No. 392 at 8.

*Richardson*, 2021 WL 1910689, at *9 (quoting *Chen-Oster*, 325 F.R.D. at 76) (holding that significant proof may exist where "a class-based difference is 'statistically significant by several standard deviations,' and a substantial portion of the difference is traceable to the employer's choices").

Dr. Thompson's analyses also offer inadequate evidence of race-based discrimination. The most striking statistical differences between white males and females and non-white males and females is found in Dr. Thompson's first regression analysis. In that regression analysis, Dr. Thompson found that white EMS officers were approximately two times as likely as non-white EMS officers to have Leadership Positions. Dkt. No. 307-8 ¶13. Although those numbers are startling at first, a closer analysis shows that the conclusions that can be drawn from these findings about bias in the promotion process are limited at best. In conducting this analysis, Dr. Thompson did not look at who was actually eligible or applied for promotion and then, of those individuals, who was promoted in a given year. *See Malave v. Potter*, 320 F.3d 321, 326 (2d Cir. 2003) ("In the context of promotions, we have held that the appropriate comparison is customarily between the composition of candidates seeking to be promoted and the composition of those actually promoted."). Instead, Dr. Thompson merely compared the demographic makeup of non-Leadership Position employees—including those in positions too junior to qualify for promotion to Captain—with those in Leadership Positions regardless of when they assumed those positions. *See* Dkt. No. 354-19. This method of evaluating discrimination in the promotion process is of questionable probative value: while a comparison of the demographics of officers in non-Leadership Positions with those in Leadership Positions could conceivably reflect the demographics of those who are promoted in a given year, this would only be true if the demographic makeup of EMS officers stayed largely stable over time and across class years

and if those who were in Leadership Positions were the same persons who had been promoted

during the time the challenged practices were in effect.  If, on the other hand, FDNY had

historically, for example, hired or promoted mostly white person as EMS officers,

Dr. Thompson's mode of analysis would distort the results of Defendants' recent promotional

practices.  The composition of the class of persons who were in Leadership Positions might be

the product of decisions taken years earlier to hire more white persons than persons of color into

the entry level positions of Emergency Medical Specialist Trainee or EMT, and not of any defect

or discrimination in the promotion process.  But Dr. Thompson's analysis would make it appear

that the differences in the compositions of those who are not in Leadership Positions from those

who are in Leadership Positions is a result of differing promotion rates for those who are diverse

and non-white from those who are white.  The conclusion would be false.  The fact that there are

more white officers currently in Leadership Positions does not mean necessarily that non-white

officers had been discriminated against in the promotion process, particularly in recent years.  In

fact, such non-white officers may actually have been promoted at greater rates.  It could simply

mean that historically there were fewer non-white persons to select for the Leadership Position.

Exacerbating the questionable nature of the inferences that can be drawn from the analysis is that

Dr. Thompson included EMS officers already at the position Captain or higher when first

observed in the non-Leadership Positions category.  However, these officers are clearly not

eligible for promotion to Captain and thus, as Dr. Erath states, "such individuals can tell us

nothing about the likelihood of promotion to leadership position from 2013–2019."  *Id.* at 3.

That this analysis does not provide substantial support for Plaintiffs' disparate treatment

claim is further underscored by the second analysis that Dr. Thompson conducted as well as one

of the analyses conducted by Defendants' expert, Dr. Erath— both of which were more finely

tailored to the actual populations *eligible* for promotion and both of which found substantially

lesser evidence of discrimination.  In Dr. Thompson's second analysis, he retained only

Lieutenants in the non-leadership group and removed EMTs and Paramedics who are ineligible

for promotion to Leadership Positions.  While Dr. Thompson still found some race-based

disparities, those disparities were significantly less: White males had 27.7% odds of having

Leadership Positions versus 19.5% odds for non-white males; however, non-white females

actually had higher odds than white females (26.3% versus 24.4%).  Dkt. No. 307-8 ¶ 13.  In

addition, in an analysis conducted by Dr. Erath, Dr. Erath looked only at those candidates that

met the first eligibility criteria—which is that they must have spent four years as a Lieutenant—

for promotion to the Leadership Positions, Dkt. No. 354-19 at 4, and he found that "[a]mong

those eligible for a promotion to Captain by Lieutenant service, white men were *less likely* to be

promoted to Captain than their counterparts over the 2013-2019 period. . . and whites were *less*

*likely* to be promoted to Captain than non-whites," *id.* at 5 (emphasis added).

Another flaw with Dr. Thompson's analyses is the failure to account for non-

discriminatory explanations for any disparities.  As detailed, to be considered for promotion, a

Lieutenant must first apply for the promotion and meet certain eligibility criteria.  It is thus

possible that the disparities could be attributable to the employee's own choices, such as not to

apply for a promotion, or non-discriminatory factors, such as a disciplinary violation.

Dr. Thompson takes into account none of these potential explanations for the disparities.

Moreover, when Dr. Erath, Defendants' expert, did analyze data on each opening for

Captain from 2014 to 2019, the applicants for the position, applicants disqualified on account of

criteria such as disciplinary record, and those promoted, Dkt. No. 354-19 at 6, he found that there

was no support for the claim that white men were benefited in the promotion process and that

"[i]n virtually every one of these comparisons non-whites, women, or the counterparts of white men were promoted at a greater rate than whites, men, and white men."  *Id.* at 7.

For these reasons, Plaintiffs' evidence to support their classwide claims of disparate treatment based on race, sex, and gender discrimination is inadequate.[9]

Plaintiffs offer no statistical evidence in support of their disparate treatment claim regarding Non-Full Duty Status Officers.  Instead, Plaintiffs argue that such evidence is unnecessary as "there is no dispute of facts, as Defendants acknowledge that they do not allow EMS Officers in Non-Full Duty Status to be considered for Promotional Positions."  Dkt. No. 301 at 16.  And, Plaintiffs largely point to "anecdotal evidence" from Representative Plaintiffs as well as Saffron.  *Id.*  Saffron states that he was twice denied promotion, the first time because he was told that he was disqualified because he had a reasonable accommodation due to a short-term disability and the second time because he had taken FMLA leave due to his short-term disability for the year prior and thus was deemed unratable in his performance evaluation for that year.  Dkt. No. 306 ¶¶ 3–5.  Rodriguez states that when he applied to the position of Captain, he was told that he would not be promoted because he had taken too much leave for a line of duty injury.  Dkt. No. 303 ¶ 5.  Finally, while Mascol does not claim to have been discriminated on this basis herself, she states generally that "if you take allowable leave such as

---

[9] "It bears mention that Plaintiffs' anecdotal evidence cannot salvage their claims.  More specific testimony about discrimination will rarely in itself support an organization-wide remedy, and anecdotal evidence is most useful as a supplement to strong statistical evidence." *Richardson*, 2021 WL 1910689, at *11 (internal quotation marks and citations omitted) (alterations adopted).  This is particularly true in this case as Plaintiffs' anecdotal evidence of discrimination is "thin or purely speculative with respect to whether race [or gender] animated a challenged employment decision." *Id.* at *12.  For example, Representative Plaintiff Mascol merely states that before she even got to the interview process, "the bias in the process was evident" and that she believes she was "removed from the list of applicants because of bias directed at me"; however, she does not justify either statement or provide details.  Dkt. No. 302 ¶ 9.

parental leave or military leave prior to applying for Promotional Positions, you are deemed 'unratable' and are not given a performance evaluation" and this "disqualifies you from being able to apply." *Id.* ¶ 12.  Mascol also states that individuals with disabilities, notwithstanding the ability to have a reasonable accommodation, are disqualified from applying.  *Id.*

Plaintiffs' claim that it is undisputed that Defendants do not allow EMS officers in Non-Full Duty Status to be considered for promotion to Leadership Positions is incorrect.  To the contrary, the evidence, if anything, supports that Defendants do not generally bar Non-Full Duty Status applicants from participating in the promotion process.  EMS Assistant Chief Jerry Gombo ("Gombo") testified that while a person generally had to be "full-duty" and "not on medical leave" to be promoted, Dkt. No. 307-6 at ECF p. 37, if someone was permanently injured and could not perform field work, *id.* at ECF pp. 39–41, they could still go through the promotion process but would only be assigned to non-field positions, *id.* at p. 41.  Gombo further testified that while he would not expect someone to apply for promotion if they were on military leave, if someone were on FMLA leave when they applied for promotion, "Human Resources would. . . determine, based on the specifics, whether the candidate would be eligible or not and then either forward or not forward their application."  *Id.* at pp. 47–48.  Furthermore, Gombo stated that if an applicant had been away on military or on FMLA leave, the leave would "[a]bsolutely not" be used against them in the promotional process.  *Id.* at ECF p. 49.  He also testified that, with respect to performance evaluations, even if an applicant had been on leave for some period of time during the relevant performance evaluation year, FDNY would still try to evaluate the person for the duration that they were actually working.  *Id.* at ECF pp. 50–51. Chief of EMS Alvin Suriel ("Suriel"), however, testified that if someone only came to work for thirty days for the entire year or took leave for the entire year, then their evaluation would be

marked unratable.  *See* Dkt. No. 307-16 at ECF pp. 11–13.  Suriel provided no information on how frequently this happens.

Further undercutting Plaintiffs' claim, Defendants submit a Final Investigation Memorandum in which the FDNY EEO Office reviewed Rodriguez's allegations that he was discriminated against in the promotional process due to his purported disability, specifically his Light Duty status.  Dkt. No. 354-24.  The EEO Office found that Rodriguez satisfied the eligibility criteria for promotion and was scheduled for an interview, *id.* at 2, and Rodriguez was deemed to have a "satisfactory attendance record," which was a prerequisite to being interviewed, *id.* at 3.  The EEO Office found that there was "insufficient evidence that" anyone "engaged in disability discrimination against Rodriguez."  *Id.*

Thus, the primary evidence in favor of Plaintiffs' claim appears to come from the anecdotal evidence of Plaintiffs' declarants.  This anecdotal evidence, however, is insufficient to salvage their disparate treatment claim.  "Anecdotal evidence, by definition, raises individual rather than common questions."  *Kassman*, 416 F. Supp. 3d at 285.  Thus, "while anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination."  *Id.* at 284 (citation omitted).  This is particularly true where, as here, Plaintiffs offer only the testimony of two individuals who were allegedly denied promotion due to their Non-Full Duty Status and the testimony of the third individual is wholly conclusory.  Mascol states that "if you take allowable leave such as parental leave or military leave prior to applying for Promotional Positions, you are deemed 'unratable' and are not given a performance evaluation" and this "disqualifies you from being able to apply" and that individuals with disabilities, notwithstanding the ability to have a reasonable accommodation, are disqualified from applying.  *Id.* ¶ 12. However, Mascol does not substantiate

her claim that individuals with disabilities are disqualified from applying or discuss exactly how much leave one must take to be considered unratable, how often this occurs, and whether she knows of more than the two individual declarants whom this policy has impacted.

In conclusion, having reviewed the parties' statistical analyses and the pertinent anecdotal evidence, the Court holds that Plaintiffs have not offered significant proof of a pattern or practice of unlawful discrimination.  Plaintiffs therefore have not met Rule 23(a)'s commonality requirement, and their proposed classes cannot be certified.

## CONCLUSION

The motion for class certification is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 300.


SO ORDERED.

Dated: November 22, 2022
        New York, New York                         _____
                                                            LEWIS J. LIMAN
                                                       United States District Judge