UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

:

LOCAL 3621, EMS OFFICERS UNION, DC-37,    :
AFSCME, AFL-CIO, *individually and on behalf of its*    :
*members*, RENAE MASCOL, and LUIS RODRIGUEZ,    :

:

Plaintiffs,    :

:

-v-    :

:

CITY OF NEW YORK, NEW YORK CITY FIRE    :
DEPARTMENT, and DEPARTMENT OF CITYWIDE    :
ADMINISTRATIVE SERVICES,    :

:

Defendants.    :

:

------------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:  9/30/2025           │
└─────────────────────────────────┘
```

18-cv-4476 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

This case concerns certain promotional policies, practices, and procedures within the Emergency Medical Services Bureau ("EMS") of the New York City Fire Department ("FDNY"). Plaintiffs—two EMS officers, Renae Mascol ("Mascol") and Luis Rodriguez ("Rodriguez"), and their union ("Local 3621")—allege that the City of New York (the "City"), the Department of Citywide Administrative Services ("DCAS"), and FDNY (collectively, "Defendants") have subjected them and other EMS officers to disparate treatment and disparate impact on the basis of race, gender, and disability in granting and denying promotions above the rank of EMS Lieutenant. Dkt. No. 1 ("Compl."). Plaintiffs bring claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*; the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; the New York State Human Rights Law, N.Y. Exec. L. § 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"). *Id.*

Defendants now move for summary judgment on all claims. Dkt. No. 649. Plaintiffs oppose summary judgment and cross move to exclude the testimony of Defendants' expert, Dr. Christoper Erath ("Dr. Erath"). Dkt. No. 689. For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part, and Plaintiffs' cross-motion to exclude the testimony of Dr. Erath is denied.

Before proceeding further, the Court notes that this Opinion and Order addresses only those claims that Plaintiffs have not waived, withdrawn, or otherwise abandoned throughout the course of this litigation. *See Ruradan Corp. v. City of New York*, 2024 WL 1555230, at *5 (S.D.N.Y. Apr. 10, 2024) ("The Second Circuit has held that where a counseled party responds to some claims on a motion for summary judgment but not others, a district court may deem the unaddressed claims to have been abandoned." (citing *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014))). Among the claims that Plaintiffs have either waived, withdrawn, or abandoned are the following: (1) all claims against FDNY and DCAS, *see* Dkt. No. 689 at 10 n.10; (2) all claims of disparate treatment on the basis of race, *see id.* at 19, 21 & n.20; (3) Rodriguez's claims of disparate treatment on the basis of disability under Title VII and NYSHRL, *see id.* at 21 & n.20; (4) all constitutional due process claims brought under 42 U.S.C. § 1983, *see id.* at 3 n.3; (5) all claims brought under 42 U.S.C. § 1981, *see* Dkt. No. 643-1; and (6) all claims brought by Local 3621, except for its claim seeking injunctive relief under Section 1983 for alleged Equal Protection Clause violations, *see* Dkt. No. 689 at 31–33. Those claims are dismissed.

That leaves the following claims: (1) Rodriguez and Mascol's claims against the City for disparate impact on the basis of race under Title VII, NYSHRL, and NYCHRL, and Mascol's claim for disparate impact on the basis of gender under those same statutes, Compl. ¶¶ 89–90,

97–99, 105–09; (2) Mascol's claim against the City for disparate treatment on the basis of gender under Title VII, NYSHRL, and NYCHRL, *id.* ¶¶ 87–94, 100–02, 110–12; (3) Rodriguez's claim against the City for disparate treatment on the basis of disability under NYCHRL, *id.* ¶ 110–12; and (4) Mascol, Rodriguez, and Local 3621's Section 1983 equal protection claims against the City, *id.* ¶¶ 120–24.

## BACKGROUND

The following facts are drawn from the parties' Rule 56.1 statements and supporting documents. *See* Dkt. Nos. 656, 685; *see also* Fed. R. Civ. P. 56(c)(1).

The Court notes that both parties have lodged stock objections in their Rule 56.1 counterstatements to most assertions of material fact offered by the opposing party. *See* Dkt. Nos. 687, 696. Plaintiffs, for example, repeatedly assert without explanation or elaboration that the Defendants' supporting documents are "unauthenticated and inadmissible." *See* Dkt. No. 687. Defendants have provided a declaration sworn under penalty of perjury from Laura C. Williams ("Williams"), an Assistant Corporation Counsel for the City who represents Defendants in this action, which incorporates and attaches each relevant document. Dkt. No. 651. "Declarations of attorneys frequently function as vehicles to introduce evidence produced in discovery into the record and may suffice to authenticate documents at the summary judgment stage." *Thieriot v. Laggner*, 2024 WL 3862086, at *6 (S.D.N.Y. Aug. 19, 2024); *see also Sanmina Corp. v. Dialight PLC*, 2023 WL 9022882, at *6 (S.D.N.Y. Dec. 29, 2023) (holding that an attorney's declaration was sufficient to authenticate exhibits at the summary judgment stage). Plaintiffs, moreover, have not contested the authenticity of the relevant documents. *See InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 559 (S.D.N.Y. 2021) ("Notably, InspiRx does not object to the *authenticity* of the Profit & Loss Statement, but just whether it was *authenticated*."). Nor have they briefed the issue at any length. Additionally,

"[i]n general, even if evidence is not properly authenticated at the summary judgment stage, 'so long as evidence will be presented in admissible form at trial, it may be considered on summary judgment.'" *Hill v. County of Montgomery*, 2019 WL 5842822, at *10 (N.D.N.Y. Nov. 7, 2019) (quoting *Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*, 752 F. App'x 90, 93–94 (2d Cir. 2019) (summary order)). The Court accordingly considers the documents incorporated in Defendants' Rule 56.1 statement insofar as they are relevant.

## I.    EMS's Promotional Framework

EMS is a bureau that, since 1996, has been housed within FDNY "to provide general ambulance services, emergency medical services and other response services necessary to preserve public health, safety and welfare." N.Y.C. Charter § 487(f); Dkt. No. 651-5 at 52:12– 24. Pursuant to the New York State Civil Service Law, certain positions within EMS require competitive examinations for the selection of appointees. *See* N.Y. Civ. Serv. Law § 50, 59-b. Under the New York City Charter, DCAS administers these examinations and is responsible for "(1) preserv[ing] and promot[ing] merit and fitness in city employment, [and] (2) ensur[ing] that appointments and promotions in city service are made . . . without unlawful discrimination based on sex, race, color, religion, religious observance, national origin, disability, age, marital status, citizenship status or sexual orientation." N.Y.C. Charter § 812(a).

At issue in this case is the Supervising Emergency Medical Service Specialist ("SEMSS") civil service title for EMS officers. There are four positions within the SEMSS umbrella, each with varying levels of responsibility: lieutenant, captain, deputy chief, and division chief/commander. Dkt. No. 653 at 3; Dkt. No. 689 at 4; Dkt. No. 683-1 at 19:4–25. Each position requires experience in the prior role, such that division chiefs are hired from deputy chiefs, deputy chiefs are hired from captains, and captains are hired from lieutenants. Dkt. No. 683-4 at 18.

For years, FDNY has taken the position that these roles are not separate civil service titles within the meaning of the New York State Civil Service Law. Dkt. No. 696 at 7. Thus, although promotion into SEMSS's lowest level, lieutenant, requires completing a civil-service exam and otherwise meeting eligibility criteria established by DCAS, all other promotions within the SEMSS umbrella have been made at FDNY's discretion without civil-service exams and without DCAS's oversight or involvement. *See* Dkt. No. 651-4 at 60:16–61:25, 63:4–15; Dkt. No. 651-5 at 38:22–40:13, 56:3–11, 78:3–19, 83:22–84:4.

FDNY has established the following procedures for promotions above the rank of lieutenant. The selection process commences when FDNY disseminates "EMS Operations Orders" inviting interested and qualified employees to apply for the promotional opportunity. Dkt. Nos. 651-12, 651-13, 651-14, 651-15; Dkt. No. 683-3 at 198:6–14; Dkt. No. 683-12 at 124:17–22. To be considered, employees are informed that they must submit an application and meet certain eligibility requirements. Dkt. Nos. 651-12, 651-13, 651-14, 651-15; Dkt. No. 651-38 at 29:3–29. Between 2014 and 2017, the eligibility criteria for promotion from lieutenant to captain were as follows:

> a. Four years full time experience as an EMS Lieutenant by the posting closing date;
>
> b. A current valid New York State Department of Health EMT-B or EMT-Paramedic certification;
>
> c. A clean disciplinary and patient care record for the past two (2) years;
>
> d. A satisfactory attendance record; and
>
> e. An overall annual performance evaluation rating of "Very Good" or "Outstanding" for the previous calendar year.

Dkt. Nos. 651-12, 651-13, 651-14, 651-15.  Beginning in 2018, FDNY lowered the minimum

annual performance evaluation required to be eligible for promotion from "Very Good" to

"Good," while the other eligibility criteria remained the same.  Dkt. Nos. 651-16, 651-17.[1]

FDNY vets applicants by, among other things, submitting inquiries regarding candidate

eligibility to various internal bureaus and offices, including the FDNY Bureau of Trials and

Investigations ("BITs"), which handles formal disciplinary matters.  Dkt. No. 651-41 at 66:21–

68:9.  Applicants who have open, pending investigations with BITs or a record of discipline

within the prior two years are rendered ineligible for promotion.  *Id.* at 70:3–7, 89:18–25, 144:8–

16; Dkt. No. 651-11 at 122:13–123:15.

FDNY also assesses applicants by inviting them to participate in structured interviews

conducted by three-member panels composed of two EMS officers and one representative from

the FDNY Bureau of Human Resources.  Dkt. No. 651-38 at 29:3–30:3; Dkt. No. 651-40 at

69:19–25.  An attorney from FDNY's Bureau of Equal Employment Opportunity ("EEO")

observes the interviews.  Dkt. No. 651-38 at 29:21–30:16.  After each interview, panelists grade

the applicant by assigning scores to the applicant's responses to the questions asked.  Dkt. No.

651-31.  The scores are summed and averaged for a combined interview score.  Dkt. Nos. 651-

33, 651-37; Dkt. No. 651-38 at 39:8–18.  Alternatively, applicants have at times been ranked

holistically rather than by each response.  Dkt. No. 651-38 at 39:8–18.  A list of applicants

ranked from highest to lowest based on interview performance is sent to the FDNY EMS Chief

of Operations, who in turn sends the list to the FDNY Chief of Department and FDNY

---

[1] The eligibility criteria for promotion above the rank of captain largely mirror those for
promotion from lieutenant to captain, although only two years of active experience in the prior
role are required (as opposed to four years for lieutenants to apply for captain), and the necessary
performance evaluation has remained at "Very Good" or "Outstanding."  *See* Dkt. Nos. 651-18,
651-19.

Commissioner for final appointment to open positions.  Dkt. No. 651-38 at 160:21–161:11,

224:13–23; Dkt. No. 651-56 at 133:16–134:19; Dkt. No. 651-41 at 60:4–63:15.

## II.    Plaintiffs

### A.    Local 3621

Local 3621 is a union affiliate of DC-37, AFSCME, AFL-CIO.  Compl. ¶ 8.  It represents

all EMS Lieutenants and Captains within FDNY, some 600 officers.  Dkt. No. 683-2 ¶ 3.  Since

EMS merged into FDNY in 1996, Local 3621 has sought to compel Defendants to promote EMS

officers in the same manner that FDNY promotes other employees (i.e., through the formal civil-

service process).  *Id.* ¶ 18; Dkt. No. 687 ¶¶ 43–45.  Local 3621 asserts that over the years it has

expended significant time and resources attempting to pass legislation ensuring that all SEMSS

positions are governed by a civil-service process.  Dkt. No. 683-2 ¶ 18.  Local 3621 has provided

billing statements from its law firm associated with these legislative efforts.  *Id.* at 8–39.[2]

The union likewise asserts that it has expended time and resources representing EMS

officers in grievance and arbitration hearings involving discrimination that members face, which

Local 3621 says would be remedied if Defendants were forced to comply with state civil-service

laws.  *Id.* ¶ 18.  For example, Local 3621 points to a complaint it filed on behalf of EMS officer

Tonya Boyd ("Boyd") with FDNY's EEO in March 2014.  Dkt. No. 683-7 ¶ 5.  The complaint

alleged that Boyd's "annual performance evaluations were conducted in a way that result[ed] in

discrimination through implicit bias."  *Id.*  On October 27, 2014, FDNY's EEO substantiated the

complaint, finding that "white males[] discriminated against [Boyd] on account of her gender

and/or race when [they] rated her 'Overall Rating' as 'Good' instead of 'Very Good' in her 2012

and 2013 evaluations."  Dkt. No. 683-7 at 10–11.[3]  Local 3621 subsequently filed a charge of

---

[2] Citations to this document use ECF pagination.
[3] Citations to this document use ECF pagination.

discrimination with the U.S. Equal Employment Commission ("EEOC") on behalf of Boyd and similarly situated officers.  Dkt. No. 1-1.  On March 27, 2018, EEOC issued a right-to-sue letter.  Dkt. No. 1-2.  Boyd subsequently settled her case with Defendants.  Dkt. No. 683-7 ¶ 7.

### B.    Plaintiff Mascol

Plaintiff Renae Mascol is an EMS officer who identifies as an African American female.  Dkt. No. 651-2 at 16:14–18.  In June or July 2010 after completing a civil-service exam, Mascol was promoted to the rank of EMS Lieutenant.  *Id.* at 66:3–13.  In June or July 2014, she obtained the four years of experience as a lieutenant necessary for promotion to captain under FDNY's promotional procedures.  *Id.*  The parties dispute whether Mascol was otherwise eligible for a promotion at that time.  In particular, they disagree over the effect that a prior disciplinary matter had on Mascol's eligibility.

On or about March 13, 2013, when Mascol was a lieutenant, BITS served disciplinary charges on her based on allegations that she had influenced two male EMS subordinates to file a false report.  Dkt. Nos. 651-67, 651-69.  The disciplinary charges alleged in relevant part:

> On or about April 28, 2012, EMS Lieutenant Renae Mascol, of Division 2, violated . . . sections of the Operating Guide and Procedures governing the Fire Department's Emergency Medical Services (EMS) personnel when, while assigned to EMS Battalion 57 and on-duty influenced two (2) subordinate EMS employees to file a child abuse complaint, she reasonably believed to be false, against another subordinate EMS employee. As a result of Lt. Mascol's conduct, the Administration of Child Services (ACS) and the New York City Police Department (NYPD) initiated an investigation that resulted in the aforementioned complaint to be unfounded.

Dkt. No. 651-67 at 2.  Mascol disputed the charges and filed a grievance with FDNY alleging that the charges and disciplinary process were improper.  Dkt. No. 683-8 ¶ 27.

On October 30, 2014, Mascol and FDNY entered into an agreement (the "Stipulation and Agreement") resolving the disciplinary matter.  Dkt. No. 683-11.  Among other things, the Stipulation and Agreement provided that Mascol "knowingly and intentionally, without coercion,

duress or undue influence": admitted violating provision 101-01 § 4.2.49 of the Emergency

Medical Services Operating Guide and Procedure, which prohibits engaging in conduct

"Unbecoming of an FDNY Member"; accepted as penalty for the violation the loss of twenty

days of annual leave; and agreed to withdraw her grievance with prejudice. *Id.* at 3–4. FDNY,

meanwhile, agreed "that upon execution of the Stipulation and Agreement, Lt. Mascol will be

afforded consideration, in accordance with the applicable rules, regulations and policies, to apply

for promotion within the EMS civil service title specifications and that the Department makes no

other promises, assurances or guarantees as to the Respondent's promotion." *Id.* at 3.

The Stipulation and Agreement further provided that Mascol waived any rights with

respect to her withdrawn grievance:

> Lt. Mascol waives any and all rights she may have under Sections 75 and 76 of the
> New York State Civil Service Law, Article 78 of the New York Civil Practice Law
> and Rules with respect to the charges/violations referred to in paragraphs (1) and
> (5) . . .

> [T]his Stipulation and Agreement constitutes a waiver by Lt. Mascol and hereby,
> she is estopped from commencing or continuing any judicial or administrative
> proceedings or appeal before any court of competent jurisdiction, administrative
> tribunal or Civil Service Commission, including but not limited to, actions pursuant
> to the Civil Rights Act of 1964, or any other Federal Civil Rights Statute, the Age
> Discrimination in Employment Act of 1967, to contest the authority and jurisdiction
> of the Fire Department to impose the terms and conditions which are embodied in
> this Stipulation, including the events which led up to, and are included, in her
> Grievance . . . and any events up to the date of the full execution of this Stipulation
> and Agreement . . .

> Lt. Mascol agrees and understands that she must withdraw her current Grievance
> (A014401-13), with prejudice and waive any right to file a future claim or civil suit
> concerning any of the same or similar issues contained in the current Grievance and
> that if she fails to withdraw said Grievance within two weeks of the full execution
> of this stipulation and agreement, it will result in the automatic termination of this
> agreement and that the Department will have the right to reinstate the original
> Charges and Specifications and proceed to a hearing at OATH.

*Id.* at 2–4. Mascol, her union attorney, and the Fire Commissioner's designee signed the

Stipulation and Agreement. *Id.* at 5.

Mascol asserts that she signed the document not because she committed the alleged violation but because "doing so would allow [her] to be eligible to apply for and be considered for the promotional process for EMS Captain that was currently happening at the time."  Dkt. No. 683-8 ¶¶ 27–31.  She contends that the penalty of twenty days of lost vacation time "was negotiated for the express purpose of allowing [her] to be able to be considered for promotion." *Id.* ¶ 30; *see also* Dkt. No 687 at 49.

On October 1, 2014—approximately one month prior to the Stipulation and Agreement—FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain.  Dkt. No. 651-12.  Mascol and eighteen other lieutenants applied.  Dkt. No. 651-27.  On November 13, 2014, she was interviewed for the promotion by a three-person panel, which included EMS Chief James Booth ("Booth").  Dkt. No. 651-26; Dkt. No. 683-8 at 30.  She received a combined interview score of five.  Dkt. No. 651-26.  She was not promoted.  Dkt. No. 651-46.  The four lieutenants who were promoted received higher interview scores of six, eight, eight, and nine.  Dkt. No. 651-26.

Defendants assert that even though Mascol was interviewed, her 2014 disciplinary matter rendered her ineligible for promotion at that time.  Dkt. No. 687 ¶ 110; *see* Dkt. Nos. 651-12, 651-21.  They further contend that she would not have been promoted in any event because her interview score was lower than those of the individuals who were promoted.  Dkt. No. 695 at 4–5.  Mascol counters that she was eligible for promotion because the Stipulation and Agreement was executed to allow her to apply for the captain position in exchange for her agreement to withdraw her grievance, plead guilty to committing a lesser infraction, and forfeit twenty vacation days.  Dkt. No. 683-8 ¶¶ 28–30.  Mascol cites paragraph nine of the Stipulation and Agreement, which states that she "will be afforded consideration, in accordance with the

applicable rules, regulations and policies, to apply for promotion within the EMS civil service title specifications and that the Department makes no other promises, assurances or guarantees as to the Respondent's promotion."  Dkt. No. 687 at 55–56; Dkt. No. 683-11 at 3.  Mascol asserts that this provision established her eligibility for promotion.  Dkt. No. 683-8 ¶ 29.

Mascol further asserts that Defendants had full knowledge of her pending disciplinary matter and that they waited to schedule her interview until after the matter had been resolved, which suggests that Defendants themselves understood Plaintiff to be eligible for promotion. Dkt. No. 696 ¶ 48.  Defendants respond that Mascol's interview does not establish she was eligible for promotion, as candidates are occasionally determined to be ineligible after their interviews.  Dkt. No. 687 ¶ 67; Dkt. No. 651-38 at 218:7–11.

On October 21, 2014, approximately three weeks before Mascol's interview, EMT Nathan Chang ("Chang") of EMS Operations sent an email to Rosharna Hazel ("Hazel") of BITs with a list of applicants for EMS Captain and requesting that Hazel "vet the candidates . . . and inform us of any issues they have."  Dkt. No. 651-21 at 1–2.  Mascol was on the list sent to Hazel.  *Id.*  Hazel replied one week later with the applicants' disciplinary histories.  *Id.* at 1. Hazel noted that Mascol had forfeited twenty days of annual leave in 2014 but that the stipulation resolving that matter had not yet been finalized.  *Id.*  On November 10, 2014, Chang responded to the email attaching Mascol's Stipulation and Agreement and noting that it had been executed.  Dkt. No. 683-8 at 27.  Approximately two hours later, EMS Operations scheduled Mascol's interview for November 13, 2014.  *Id.* at 30.

Instead of honoring what she believes was her right to apply for promotion under the Stipulation and Agreement, Mascol asserts that her supervisor, Booth, who was also one of her interviewers, improperly used her disciplinary history against her to deny her the promotion.  *Id.*

¶¶ 10–11.  Mascol alleges that Booth did this at least in part because of her gender.  She asserts that Booth treated her differently than male EMS Lieutenants by "ignoring [her] or dismissing [her] while showing favoritism to male colleagues."  *Id.* ¶¶ 7, 15.  During her interview, Booth noted the following question on his interview form for Mascol: "Unblemished work record?"  Dkt. No. 651-41 at 535:4–21.  Booth testified at his deposition that he wrote the question on Mascol's interview sheet because she stated during the interview that she had an "unblemished work record," yet he was aware that she had either been recently disciplined or was in the process of being disciplined.  *Id.* at 535:25–536:8.  Mascol denies that she stated she had an unblemished work record during her interview.  Dkt. No. 683-8 ¶ 13.  She further states that as one of her interviewers, Booth should not have taken any steps to disqualify her but instead should have judged only the quality of her answers to the questions.  *Id.*

Mascol applied for promotion to captain on five other occasions from June 2015 to October 2019.  She asserts that for each of these opportunities except the last, Booth, who was Chief of EMS, "use[d Mascol's] disciplinary past and the FDNY's eligibility requirements for promotion to EMS Captain" to deny her promotion on the basis of her gender.  *Id.* ¶ 11.  She was not promoted to captain until October 2019.

On June 17, 2015, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain.  Dkt. No. 651-13.  Mascol and forty-one other lieutenants applied.  Dkt. No. 651-28.  On July 28, 2015, Hazel emailed Chang a list of the applicants' disciplinary histories.  Dkt. No. 651-23 at 1–2.  The email noted that Mascol had forfeited twenty days of annual leave in 2014.  *Id.*  On August 12, 2015, Mascol was interviewed and received a combined interview score of six.  Dkt. No. 651-29.  She was not promoted.  Dkt.

No. 651-46.  The thirteen lieutenants who were promoted received higher interview scores of between 7.5 and 9.5.  Dkt. No. 651-29.

On September 20, 2016, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain.  Dkt. No. 651-14.  Mascol and fifty-three other lieutenants applied.  Dkt. No. 651-30.  On October 13, 2016, Hazel emailed Chang a list of the applicants' disciplinary histories.  Dkt. No. 651-24 at 1–2.  The email noted that Mascol had forfeited twenty days of annual leave in 2014.  *Id.*  Mascol was interviewed and received a combined interview score of 32.5.  Dkt. No. 651-31.  She was not promoted.  Dkt. No. 651-50.  The fifteen lieutenants who were promoted received higher interview scores of between 40.5 and fifty-eight.  Dkt. No. 651-30.

On September 19, 2017, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain.  Dkt. No. 651-15.  Mascol and fifty-three other lieutenants applied.  Dkt. No. 651-32.  Mascol was noted as not having any BITs disciplinary issues within the preceding two years.  *See id.*  On November 9, 2017, she was interviewed and received a combined interview score of forty-four.  *Id.*  She was not promoted.  Dkt. No. 651-51.  The thirteen lieutenants who were promoted received higher interview scores of between forty-eight and sixty-seven.  Dkt. No. 651-32.

On September 18, 2018, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain.  Dkt. No. 651-16.  Mascol and seventy-four other lieutenants applied.  Dkt. No. 651-34.  Mascol was noted as not having any BITs disciplinary issues within the preceding two years.  *See id.*  On November 26, 2018, she was interviewed and received a combined interview score of fifty-five.  *Id.*  She was not promoted.  Dkt. No. 651-55.  The twenty-three lieutenants who were promoted received interview scores of

between thirty-eight and eighty-five.  Dkt. No. 651-34.  Three applicates who were promoted received lower interview scores than Mascol's fifty-five (the applicants received scores of thirty-eight, forty-three, and fifty-two).  *Id.*  Defendants assert that these three applicants were selected above Mascol because the EMS Bureau of Communications – Emergency Medical Dispatch ("EMD") required additional EMS Captains, and the three applicants had experience working in EMD, while Mascol did not.  Dkt. Nos. 651-34, 651-53, 651-54; Dkt. No. 651-56 at 137:4–25; Dkt. No. 651-52 at 3.  Mascol counters that all EMS officers are trained and have the sufficient merit and fitness to perform duties irrespective of where they are assigned.  Dkt. No. 683-2 ¶ 21.

Finally, on October 28, 2019, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain.  Dkt. No. 651-17.  Mascol and sixty-two other lieutenants applied.  Dkt. No. 651-36.  Mascol was noted as not having any BITs disciplinary issues within the preceding two years.  *See id.*  On December 26, 2019, she was interviewed and received a combined interview score of ninety-six.  *Id.*  She was promoted along with twenty other lieutenants whose interview scores ranged from eighty-eight to 107.  *Id.*

Mascol was subsequently promoted from captain to deputy chief.  On February 22, 2021, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Deputy Chief.  Dkt. No. 651-18.  The Operations Order specified as one of the five eligibility criteria that applicants had to have at least two years of active experience as a full-duty EMS Captain by the posting closing date, March 10, 2021.  *Id.*  Mascol applied for the position but had fewer than two years of active experience as of the posting closing date.  Dkt. No. 651-59.  FDNY therefore deemed her ineligible for the promotion, and she was not interviewed.  *Id.*  The following year, on January 18, 2022, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Deputy Chief.  Dkt. No. 651-19.  Mascol and

sixteen other captains applied.  Dkt. No. 651-62.  Mascol was interviewed and received a

combined interview score of eighty-eight.  *Id.*  She was promoted along with ten other applicants

whose interview scores ranged from seventy-seven to 110.  *Id.*

### C.    Plaintiff Rodriguez

Plaintiff Luis Rodriguez is an EMS officer who identifies as a Hispanic male.  Dkt. No.

683-14 ¶ 2.  On or about October 12, 2010, Rodriguez was promoted to the rank of EMS

Lieutenant after completing a civil-service exam.  Dkt. No. 651-3 at 49:15–24.  On October 12,

2014, he obtained the four years of experience as a lieutenant necessary for promotion to captain

under FDNY's promotional procedures.  *Id.*

Rodriguez applied for promotion on four occasions from June 2015 to September 2018.

He was denied promotion on the first three occasions.

On June 17, 2015, FDNY issued an EMS Operations Order announcing promotional

opportunities for the rank of EMS Captain.  Dkt. No. 651-13.  Roriguez and forty-one other

lieutenants applied.  Dkt. No. 651-28.  On August 17, 2015, Rodriguez was interviewed and

received a combined interview score of 6.5.  Dkt. No. 651-29.  He was not promoted.  Dkt. No.

651-46.  The thirteen lieutenants who were promoted received higher interview scores of

between 7.5 and 9.5.  Dkt. No. 651-29.

On September 20, 2016, FDNY issued an EMS Operations Order announcing

promotional opportunities for the rank of EMS Captain.  Dkt. No. 651-14.  Rodriguez and fifty-

three other lieutenants applied.  Dkt. No. 651-30.  Rodriguez was interviewed and received a

combined interview score of thirty-seven.  Dkt. No. 651-31.  He was not promoted.  Dkt. No.

651-50.  The fifteen lieutenants who were promoted received higher interview scores of between

40.5 and fifty-eight.  Dkt. No. 651-30.

On September 19, 2017, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain. Dkt. No. 651-15. Rodriguez and fifty-three other lieutenants applied. Dkt. No. 651-32. On November 15, 2017, he was interviewed and received a combined interview score of forty-six. *Id.* He was not promoted. Dkt. No. 651-51. The thirteen lieutenants who were promoted received higher interview scores of between forty-eight and sixty-seven. Dkt. No. 651-32.

On September 18, 2018, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Captain. Dkt. No. 651-16. Rodriguez and seventy-four other lieutenants applied. Dkt. No. 651-34. On November 29, 2018, he was interviewed and received a combined interview score of seventy-seven. *Id.* He was promoted along with twenty-two lieutenants who received interview scores of between thirty-eight and eighty-five. Dkt. No. 651-34; Dkt. No. 651-55.

Rodriguez was subsequently promoted from captain to deputy chief. On February 22, 2021, FDNY issued an EMS Operations Order announcing promotional opportunities for the rank of EMS Deputy Chief. Dkt. No. 651-18. Rodriguez and twenty-six other captains applied. Dkt. No. 651-59. On May 11, 2021, he was interviewed and received the highest overall combined interview score of 107. *Id.* He was promoted along with fourteen captains who received interview scores of between forty-five and 101.5. *Id.*

Rodriguez alleges that he was denied promotion in 2015, 2016, and 2017 because he had taken leave and light-duty status due to line of duty injuries ("LODI"). Dkt. No. 683-14 ¶ 4. Specifically, he states that between 2012 and 2015, he sustained injuries including a broken wrist that resulted in limited use of his right arm. *Id.* ¶ 5; Dkt. No. 651-49 at 2. These injuries were "short-term," and he asserts that they did not interfere with his ability to perform the essential

functions of lieutenant or captain.  Dkt. No. 683-14 ¶ 5.  By the time he applied for each

promotion, he had returned to full duty.  *Id.*; Dkt. No. 696 at 39.

Rodriguez asserts that FDNY has an unwritten policy of not promoting individuals who

have taken leave or light-duty status.  He testified in his deposition that in June 2015 when he

submitted his application for promotion to captain, his supervisor Roberto Colon ("Colon") told

him that he would not be promoted because he had sustained LODI for which he received

accommodations in the form of light-duty status and leave.  Dkt. No. 651-3 at 113:15–20; *see*

*also* Dkt. No. 651-49 at 2.  In his own deposition, Colon stated that his "experiences throughout

all these years . . . [is that] members get passed over because of LODI[.]  I made a comment to

[Rodriguez], but nowhere there said that he wouldn't be promoted, only by my past experiences

because I got passed over seven times for promotion as well, so I know the feeling of not getting

promoted when you think you're going to get it."  Dkt. No. 683-16 at 23:11–24:22.

Additionally, EMS Assistant Chief Jerry Gombo testified that to apply for captain, deputy chief,

or division chief, an applicant has to be full duty, although he clarified that if someone is

permanently injured and cannot perform field work, they can still go through the promotion

process but might only be assigned non-field positions.  Dkt. No. 831-12 at 156:18–157:2; Dkt.

No. 307-6 at 37–41.  As further evidence of FDNY's alleged anti-LODI policy, Rodriguez cites a

declaration prepared by EMS Captain Jason Saffon ("Saffon"), in which Saffon asserts that he

was informed he was disqualified for promotion because he had a reasonable accommodation

due to a short-term disability.  Dkt. No. 306 ¶ 3.  As an attachment to that declaration, Saffon

includes an email from EMS Assistant Chief Alvin Suriel informing Saffon that he was

disqualified from further consideration for promotion because he was not full duty.  *Id.* ¶ 4.

Rodriguez alleges that Colon interfered with his 2015 application by conveying information about his LODI status to the two other interview panel members.  Dkt. No. 687 at 70.  As Rodriguez's supervisor, Colon was responsible for completing annual performance evaluations for Rodriguez, and these evaluations were in turn shared with the panel members. Dkt. No. 683-14 ¶¶ 6, 14.  The evaluations noted Rodriguez's occasional LODI status between 2012 and 2015.  *Id.* ¶ 6.  For example, his 2012 evaluation states that his "absenteeism and limited field performance have contributed to an overall lower rating."  *Id.* ¶ 7.  His 2013 evaluation included as an "Other Factor" impacting his overall rating the fact that he had taken ninety-two days of limited status and nineteen days of leave.  *Id.* ¶ 8.  And his 2014 and 2015 evaluations stated that his "attendance will be monitored for improvement."  *Id.*  Despite these notations, Rodriguez received a "Very Good" performance evaluation in 2015, which rendered him eligible for promotion to captain.  Dkt. No. 651-28.  Rodriguez also received "Very Good" performance evaluations in 2016, 2017, and 2018.  Dkt. Nos. 651-30, 651-32, 651-34.  FDNY's internal spreadsheets of candidates for promotional opportunities further indicate that Rodriguez was full duty at the time of each of his applications for promotion to captain.  Dkt. Nos. 651-30, 651-32, 651-34.

In August 2015, Rodriguez filed an EEO complaint with FDNY alleging that Colon discriminated against him on the basis of his disability by interfering with his 2015 application for promotion to captain.  Dkt. No. 683-14 at 104–08.[4]  On July 11, 2016, FDNY's EEO issued a Final Investigation Memorandum concluding that Rodriguez had failed to prove his allegations of disability discrimination.  *Id.*  The EEO first noted that light-duty status was not a protected classification under federal, state, or local law.  *Id.* at 108.  The memorandum continued that

---

[4] Citations to this document use ECF pagination.

even it were, there was insufficient evidence that Colon acted improperly.  *Id.*  The memorandum explained that there was no evidence Colon influenced the other two interview panel members, who all denied speaking with each other before, during, or after the captain interviews about Rodriguez.  *Id.*

## PROCEDURAL HISTORY

### I.    The Instant Suit

After the EEOC issued its right-to-sue letter on March 28, 2018, Dkt. No. 1-2, Plaintiffs filed this suit as a putative class action on May 21, 2018, Dkt. No. 1.  Defendants answered on October 11, 2018, Dkt. No. 24, and filed an amended answer on February 5, 2021, Dkt. No. 310.

Broadly, the complaint alleges that Defendants' "use of a subjective promotional process for EMS applicants where more objective processes exist . . . has resulted in disparate and discriminatory promotional practices . . . [which] have adversely affected the employment and promotional opportunities of members who belong to the protected classes despite having the requisite skills, training, and expertise."  *Id.* ¶ 3.  The complaint clarifies that "[w]hile Plaintiff[s] believe[] that civil service examinations are practicable for EMS officer promotions above the rank of Lieutenant as a matter of state law, and therefore required, this is not at issue before the Court in this action."  *Id.* ¶ 24.  Rather, Plaintiffs allege that "Defendants' affirmative decision to abandon objective promotional criteria, even those constitutionally mandated such as New York's civil service requirements and specifically civil service examinations, in favor of subjective promotional processes left to the discretion of mostly white and male decisionmakers, is further evidence of Defendants' discriminatory actions."  *Id.*  The complaint asserts that while FDNY's fire-side workforce, which is approximately 99.5% male, continues to use the formal civil-service process for promotions above the rank of lieutenant, FDNY has chosen to abandon

a similar process for EMS, which is populated by more women and people of color than any other emergency workforce in the City.  *Id.* ¶¶ 16–20, 27–29.

The complaint focuses in large part on the interview process, which it deems "highly subjective," susceptible to inherent and implicit biases, and "not based on merit but on impermissible factors."  *Id.* ¶¶ 36–41.  It further alleges that officers "have been penalized for taking LODI leave or other medical leave," and that when lieutenants who are not promoted are given a reason, "it often involves an impermissible consideration, such as having a disability, taking time off for a LODI injury, taking leave pursuant to the FMLA, and/or taking time off related to military training and service."  *Id.* ¶¶ 44–45.

The complaint seeks damages and injunctive and declaratory relief under Title VII of the Civil Rights Act, NYSHRL, NYCHRL, and Section 1983, among other statutes.  *Id.* ¶ 4.

## II.    Plaintiffs Move for Class Certification

On January 18, 2021, Plaintiffs moved for an order certifying classes pursuant to Federal Rule of Civil Procedure 23.  Dkt. Nos. 300–07.

On November 22, 2022, the Court issued an opinion and order denying class certification on the grounds that Plaintiffs had failed to sufficiently demonstrate commonality under Rule 23(a)(2).  Dkt. No. 453 at 14.  With respect to Plaintiffs' disparate impact claims, the Court found that Plaintiffs failed to establish that the specific employment practices they identified— namely, the interview process and the eligibility requirements—had a discriminatory impact on a classwide basis.  *Id.* at 19–20.  Instead, the Court found that determining which one of these specific employment practices had a discriminatory impact on an applicant was largely an individualized inquiry.  *Id.* at 20.  Even accepting Plaintiffs' allegations that each member of the putative class faced discrimination during the promotional process, the Court found that the

evidence did not support a finding that the discrimination manifested itself "in the same general fashion." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

The Court likewise found statistical evidence from Plaintiffs' expert, Dr. Shane Thompson ("Dr. Thompson"), unhelpful. *Id.* at 21. At most, this evidence demonstrated a racial and gender disparity in individuals who held leadership positions in EMS relative to those who did not. *Id.* The statistical evidence did not attempt to identify what part or parts of the promotion process accounted for that disparity, or whether the parts of that promotion process that might have accounted for gender disparities were the same as those that might have accounted for racial disparities. *Id.* The Court concluded that because Plaintiffs had failed to identify a specific employment process and to draw any causal connection between that employment process and disparities, the disparate impact claims could not support class certification. *Id.* at 23.

The Court reached a similar conclusion with respect to Plaintiffs' disparate treatment claims. It noted that "[a]lthough the commonality requirement can be satisfied via statistical and anecdotal evidence, the evidence must offer significant proof of a general policy of discrimination," and Dr. Thompson's statistical evidence failed to rise to that level. *Id.* at 24 (internal quotation marks omitted) (quoting *Richardson v. City of New York*, 2021 WL 1910689, at *9 (S.D.N.Y. May 12, 2021)). Dr. Thompson conducted two regression analyses. *Id.* First, he looked at the race and gender of EMS officers in leadership positions (defined as captains and above) and EMS officers in non-leadership positions (defined as all other positions). *Id.* at 25. That analysis showed that non-white males and non-white females had statistically significantly lower odds of holding leadership positions than white males, even if they had the same tenure as white males (specifically about 2% odds versus around 4% odds). *Id.* Though the numbers

appeared "startling at first," the Court explained that the conclusions that could be drawn from these findings were limited, as Dr. Thompson did not analyze who was eligible or applied for promotion. *Id.* at 26. Instead, he compared the demographic makeup of non-leadership-position employees—including those in positions too junior to qualify for promotion to captain—with those in leadership positions, regardless of when they assumed those positions. *Id.* This method of evaluating discrimination was of questionable probative value, as the composition of the class of persons who were in leadership positions might have been the product of decisions taken years earlier to hire more white persons than persons of color into entry-level positions, and not any defect or discrimination in the promotion process for SEMSS positions. *Id.* at 27.

Dr. Thompson's second regression analyzed the race and gender of EMS Lieutenants in 2012 to 2019 and the race and gender of EMS officers who were in leadership positions during that same period. *Id.* at 25. The results showed that the difference between white males (27.7%) and non-white males (19.5%) remained statistically significant, while non-white females had higher odds than white females (26.3% versus 24.4%). *Id* at 25, 28. The Court observed that the analysis of Defendants' expert, Dr. Erath, was better tailored to the issue at hand, as that analysis considered the populations who were actually eligible for promotion. *Id.* at 28. Dr. Erath's analysis found substantially lesser evidence of discrimination; in fact, white males were less likely to be promoted to captain than their counterparts, as were white candidates more generally. *Id.* Furthermore, Dr. Thompson's report failed to account for non-discriminatory explanations for any disparities such as an "employee's own choices . . . not to apply for a promotion, or non-discriminatory factors, such as a disciplinary violation." *Id.*

Finally, the Court noted that Plaintiffs had offered no statistical evidence in support of their disparate treatment claims regarding officers who were not on full-duty status. *Id.* at 29.

Plaintiffs argued that such evidence was unnecessary because it was undisputed that Defendants did not allow non-full-duty EMS officers to be considered for promotion to leadership positions, but the Court disagreed with that proposition. *Id.* The Court cited Gombo's testimony that individuals who were permanently injured and could not perform field work could still go through the promotion process but might only be assigned to non-field positions. *Id.* at 30. The Court also cited Rodriguez's EEO Final Investigation Memorandum, which found insufficient evidence of disability discrimination because Rodriguez was deemed to have a "satisfactory attendance record" notwithstanding his prior use of LODI leave. *Id.* at 31.

The Court therefore denied Plaintiffs' motion for class certification in full.

## III.    Defendants' Motion for Summary Judgment

On November 18, 2024, Defendants filed the instant motion for summary judgment. Dkt. No. 649. Defendants simultaneously filed a supporting declaration from Assistant Corporation Counsel Williams, which attached certain documents incorporated by reference, including an updated expert report prepared by Dr. Erath. Dkt. Nos. 651, 651-48. Defendants also filed a memorandum of law, Dkt. No. 653, and a Rule 56.1 statement, Dkt. No. 656. Defendants' motion seeks summary judgment on all claims and asks that the complaint be dismissed with prejudice and judgment entered in their favor. Dkt. No. 653 at 33.

On February 25, 2025, Plaintiffs filed a memorandum of law in opposition to Defendants' motion. Dkt. No. 689. The opposition is accompanied by a declaration from Plaintiffs' counsel Yetta G. Kurland, which, like Defendants' declaration, incorporates certain documents, including a new expert report prepared by Dr. Thompson. Dkt. Nos. 683, 683-5. Plaintiffs also filed their own Rule 56.1 statement, Dkt. No. 685, a counterstatement to Defendant's Rule 56.1 statement, Dkt. No. 687, and a motion to preclude the testimony of Dr. Erath, Dkt. No. 682.

On March 24, 2025, Defendants filed a reply memorandum of law in support of their motion for summary judgment and in opposition to Plaintiffs' motion to preclude Dr. Erath's testimony, Dkt. No. 695, a reply affirmation from Williams with attached documents, Dkt. No. 697, and a counterstatement to Plaintiffs' Rule 56.1 statement, Dkt. No. 696.

### A.    Dr. Thompson's Expert Report

Dr. Thompson's updated report (the "Thompson Report") sets out three main goals:

> First, to determine whether the policy used to make promotional decisions regarding EMS Officers, i.e. through an in-house promotional process in lieu of a civil service examination, has a disparate impact based on race and/or gender, that denies non-white and/or female EMS Lieutenants equal promotional opportunity. Second, to respond to issues raised in the Court's order of November 22, 2022 denying class certification to the extent those findings are relevant to Plaintiffs' individual claims by using the new and more comprehensive data that is now available to me (henceforth, "New Data"). Third, to identify the specific practice within the identified promotional policy that has caused this statistically significant discriminatory impact on non-white and female EMS Lieutenants.

Dkt. No. 683-5 ¶ 5.  Unlike Dr. Thompson's original report submitted at the class certification stage, the new report considers only EMS officers in the rank held by Plaintiffs at the time they initiated this action (lieutenant) and the position they sought promotion to (captain).  *Id.* ¶ 8.

The report begins by establishing that statistically significant disparities exist based on gender and race in the populations of lieutenants and captains.  *Id.* ¶ 17.  Dr. Thompson finds that white EMS officers are 48% more likely to be captains than non-white EMS officers.  *Id.* ¶ 17a. Male EMS officers are 6% more likely to be captains than female EMS officers.  *Id.* ¶ 17b. White and male EMS officers are 34% more likely to be captains than non-white female EMS officers.  *Id.*

The report then considers whether these disparities are the result of non-discriminatory causes.  *Id.* ¶ 20.  It concludes that they are not.  *Id.*  First, considering only those EMS Lieutenants who were actually eligible to apply for promotion, the Thompson Report states that

non-white lieutenants applied at statistically significantly higher rates than their white peers (12.4% to 9.3%). *Id.* ¶¶ 21. Furthermore, eligible non-white female lieutenants applied for promotions at the highest rate of all race-gender combinations, 17.6%, which was statistically significantly higher than all other race-gender combinations. *Id.* ¶ 22. Although the rate that eligible female lieutenants applied (11.4%) was not statistically significantly higher than that of eligible male lieutenants (10.2%), Dr. Thompson notes that female lieutenants had at least an equal or greater desire for captain positions. *Id.* ¶ 22 n.14. He therefore concludes that the racial and gender differences between lieutenants and captains cannot be explained by employee preferences or choices in applying for promotion. *Id.* ¶ 23.

The Thompson Report next discounts the proposition that prior demographics of entry-level EMS employees can account for the statistical disparities. It finds that the proportions of non-white and female employees in entry-level positions (55–60% and 24–28% respectively) have remained stable over a nineteen-year period from 2004 to 2022. *Id.* ¶ 24. Given that the majority of entry-level employees have been non-white since 2004 (the first year for which there are data), the Thompson Report asserts that the over-representation of white captains (as well as deputy chiefs and division chiefs) that exists today cannot be explained by an over-prevalence of white EMS members historically. *Id.* ¶ 25. The report further asserts that no influx of male entry-level employees would explain the over-prevalence of white male captains today. *Id.* Additionally, extending the dataset from 2012 (the first year for which there was data in Dr. Thompson's original report) to 2004 strengthens the finding of disparities between white and non-white, and male and female at the lieutenant and captain levels. *Id.* ¶ 26. The report contends that this, too, suggests that any disparities are not attributable to changing demographics over time at EMS.

Having purportedly refuted any non-discriminatory explanations for the statistical disparities, Dr. Thompson goes on to identify the specific promotional policies and procedures that he asserts cause the disparities. *Id.* ¶ 31. The report identifies three such causes. *Id.* First, it cites the requirement that EMS Lieutenants spend four years in title before being eligible for promotion (the "Time-in-Title Requirement"). *Id.* ¶ 32. The report notes that the Time-in-Title Requirement for FDNY Fire Lieutenants is only one year, and that the more stringent requirement for EMS officers has an adverse impact on non-white EMS Lieutenants, as those individuals have statistically significantly higher rates of attrition than white EMS Lieutenants. *Id.* ¶ 33. Since 2014, 100% of white EMS Lieutenants have attained four years in title (101/101), while non-white lieutenants have had a statistically significantly lower rate of 95.2% (120/126). *Id.* Female lieutenant attrition is slightly higher than male lieutenant attrition, but not statistically significantly higher. *Id.* ¶ 34 n.16.

Second, the Thompson Report identifies the annual performance ratings for EMS Lieutenants as a statistically significant cause for the promotional disparities. The data are incomplete, as evaluations have not always been conducted for EMS officers, but they reveal that before 2019, non-white lieutenants were disqualified from being eligible for promotion based on their performance rating at a statistically significantly higher rate (31.2%) than white lieutenants (24.8%). *Id.* ¶¶ 35, 36a. From this data, the Thompson Report concludes that prior to 2019, seventy-two non-white lieutenants were disqualified from promotion before they could even apply based on performance ratings that their white peers would not have received. *Id.* ¶ 36b. The evaluation rating system also disfavored female lieutenants. *Id.* ¶ 36c. Before 2019, female lieutenants were disqualified from being eligible for promotion based on their performance rating at a statistically significantly higher rate (30.4%) than male lieutenants (26.3%). *Id.*

Extrapolating from this finding, the report determines that prior to 2019, twenty-eight female lieutenants were disqualified for promotion before they could even apply based on performance ratings that their male peers would not have received.  *Id.* ¶ 36d.

The third and final cause of the disparities that Dr. Thompson identifies is the rate at which EMS officers have been disciplined.  *Id.* ¶ 37.  Male lieutenants have had statistically significantly fewer disciplinary actions taken against them than female lieutenants.  *Id.* ¶ 38.  The report also finds that white male lieutenants have had the lowest likelihood of disciplinary actions, statistically significantly lower than non-white male lieutenants and white female lieutenants.  *Id.*  Although white lieutenants had lower rates of disciplinary actions than non-white lieutenants, the difference was not statistically significantly different.  *Id.*  Dr. Thompson theorizes that the difference is not statistically significant because the prevalence of disciplinary actions is so small.  *Id.*

In sum, the Thompson Report concludes that the racial and gender disparities between lieutenants and captains is explained by Defendants' use of an in-house promotional process, which has a discriminatory adverse impact on the promotional opportunities of non-white and female lieutenants.  *Id.* ¶ 41.

**B.    Dr. Erath's Expert Report**

As at the class certification stage, Defendants offer their own expert report prepared by Dr. Erath (the "Erath Report").  Dkt. No. 651-48.  The critical distinction between Plaintiffs' and Defendants' expert reports is that the Erath Report considers only those lieutenants who in fact applied for promotion, Dkt. No. 651-48 at 1–4, while the Thompson Report does not, Dkt. No. 683-5 ¶ 17.

The Erath Report's findings are as follows: Considering all eligible applicants for promotional opportunities for captain between 2014 and 2019, women were promoted at a

greater rate (26/61 or 43%) than men (63/195 or 32%), and non-white applicants (47/117 or 40%) were promoted at a higher rate than white applicants (42/139 or 30%).  *Id.* at 3. Considering all applicants, regardless of ultimate eligibility, women were promoted at a greater rate (26/67 or 39%) than men (63/228 or 27%), and non-white applicants were promoted at a greater rate (47/138 or 34%) than white applicants (42/157 or 27%).  *Id.* at 4.  The Erath Report accordingly concludes that there is no statistical evidence to support the claim that either female or non-white applicants have been disfavored in the promotional process.  *Id.*

## LEGAL STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).  If the nonmoving party bears the ultimate burden of proof at trial, the movant may meet its burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact.  *Gil-Cabrera v. City of New York*, 2023 WL 2601132, at *3 (S.D.N.Y. Mar. 22, 2023) (first citing *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322–23 (1986); then citing *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam)).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Rather, to survive a motion for summary judgment, the nonmoving party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir. 1983).

"Local Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York prescribes the manner and method in which a party is to present undisputed issues of fact to the Court."  *Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468, 483 (S.D.N.Y. 2024).  The rule requires a moving party to include with its motion for summary judgment "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."

L. Civ. R. 56.1(a).  The party in opposition must also "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." L. Civ. R. 56.1(b).  For both submissions, the statements "must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  L. Civ. R. 56.1(d).  If the party served the Rule 56.1 statement does not "specifically controvert[]" facts stated therein, those uncontested facts "will be deemed to be admitted for the purposes of the motion."  L. Civ. R. 56.1(c).  Any opposition must be supported with admissible evidence, or "the Court is instructed to disregard those portions and deem the factual statements in the original Local Rule 56.1 statements admitted."  *Mangahas*, 754 F. Supp. 3d at 483.

Finally, it is often said that "one may not amend one's complaint via an opposition to a summary judgment motion."  *Rene v. Mustafa*, 2024 WL 1332556, at *16 (E.D.N.Y. Mar. 28, 2024); *see Smith v. City of New York*, 385 F. Supp. 3d 323, 338 (S.D.N.Y. 2019); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016); *N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, 998 F. Supp. 2d 301, 326 (S.D.N.Y. 2014); *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order).  Stated in such an unqualified fashion, that proposition is only partially correct.  Federal Rule of Civil Procedure 15(b)(2) provides that when "an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  The rule further provides that a "party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."  *Id.*

The Second Circuit, moreover, has applied Rule 15(b)(2) at the summary judgment stage to consider claims not expressly raised in the complaint.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569–70 (2d Cir. 2000); *see also Delanuez v. City of Yonkers*, 2022 WL 16540682, at

*6 (S.D.N.Y. Oct. 28, 2022); *King v. Puershner*, 2019 WL 4519692, at *10 (S.D.N.Y. Sept. 19, 2019).  The critical inquiry is whether considering the claim would prejudice the opposing party.  *See Cruz*, 202 F.3d at 569.  "[A] party cannot normally show that it suffered prejudice simply because of a change in its opponent's legal theory.  Instead, a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case."  *Id.* (quoting *N.Y. State Elec. & Gas Corp. v. Sec'y of Lab.*, 88 F.3d 98, 104 (2d Cir. 1996)).  "Claims that are entirely new—that is, claims based [on] new facts and new legal theories with no relation to the previously pled claims—are commonly rejected at the summary judgment stage due to the prejudice to the defendant, who may not have had fair notice of the claim and consequently may not have had an adequate opportunity for discovery."  *Henry v. Metro. Transp. Auth.*, 2014 WL 4783014, at *10 (S.D.N.Y. Sept. 25, 2014) (quoting *Coudert v. Janney Montgomery Scott, LLC,* 2005 WL 1563325, at *2 (D. Conn. July 1, 2005)); *see also Armstrong v. Metro. Transp. Auth.*, 2015 WL 992737, at *11 (S.D.N.Y. Mar. 3, 2015); *Cruz*, 202 F.3d at 569 (noting an absence of prejudice where "the essential elements of the charge . . . appear[ed] in the complaint").

## DISCUSSION

The Court addresses Defendants' motion for summary judgment as to each of Plaintiffs' remaining claims before turning to Plaintiffs' cross-motion to exclude the testimony of Dr. Erath.

## I.    Disparate Impact

Plaintiffs Mascol and Rodriguez first allege that Defendants' promotional policies and practices disparately impact non-white and female EMS Lieutenants in violation of Title VII of the Civil Rights Act, NYSHRL, and NYCHRL.  *See* Compl. ¶¶ 89–90, 97–99, 105–09.

### A.    Background Principles

Disparate impact claims under Title VII of the Civil Rights Act "follow a three-part analysis involving shifting evidentiary burdens."  *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d

361, 382 (2d Cir. 2006).  First, the plaintiff "bears the initial burden of establishing a prima facie showing of disparate impact." *Id.*  To do so, the plaintiff must "(1) "identify a specific employment practice or policy, (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (cleaned up) (first quoting *Malave v. Potter*, 320 F.3d 321, 326 (2d Cir.2003); then quoting *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001)).  In contrast to Title VII disparate treatment claims, a plaintiff need not show that the disparity exists as a result of intentional discrimination on the basis of race, color, religion, sex, or national origin.  *See Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020).  Instead, "a prima facie case of disparate-impact liability . . . essentially [requires] a threshold showing of a significant statistical disparity." *Ricci v. DeStefano*, 557 U.S. 557, 587 (2009).  "The statistics must reveal that the disparity is substantial or significant," and "must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Robinson*, 267 F.3d at 161; *see also E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 117 (2d Cir. 1999) ("[A] plaintiff's statistical evidence must reflect a disparity so great that it cannot be accounted for by chance.").

The defendant has two avenues of rebutting the plaintiff's prima facie case.  *Gulino*, 460 F.3d at 382.  First, the defendant may "directly attack plaintiff's statistical proof by pointing out deficiencies in data or fallacies in the analysis," *id.*, such that "either no statistically significant disparity in fact exists or the challenged practice did not cause the disparity," *Chin*, 685 F.3d at 151 (quoting *Robinson*, 267 F.3d at 161).  Second, and alternatively, the defendant may "concede that the identified policy has a disparate impact, but nevertheless defend it as 'job

related for the position in question and consistent with business necessity.'" *Mandala*, 975 F.3d at 208 (quoting *Ricci*, 557 U.S. at 587); *see also* 42 U.S.C. § 2000e–2(k)(1)(A)(i).

If the defendant establishes that the challenged practice is job related—meaning it has "a manifest relationship to the employment in question," *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 998 (1988) (citation omitted)—and consistent with "business necessity," the plaintiff can prevail only by showing that "other tests or selection devices, without a similarly undesirable [disparate] effect, would also serve the employer's legitimate interest[s]," *id.*; *see also Mandala*, 973 F.3d at 208.

Disparate impact claims under NYSHRL "are analytically identical to those brought under Title VII." *Hagan v. City of New York*, 39 F. Supp. 3d 481, 503 (S.D.N.Y. 2014) (quoting *Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11 n.2 (2d Cir. 2013) (summary order)); *see also LaBarbera v. NYU Winthrop Hosp.*, 527 F. Supp. 3d 275, 303 (E.D.N.Y. 2021); *Mikolaenko v. N.Y. Univ.*, 2017 WL 4174928, at *8 (S.D.N.Y. Sept. 7, 2017).[5]

Those brought under NYCHRL require "an independent analysis," *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), and are governed by Section 8–107 of the New York City Administrative Code, *see Teasdale v. N.Y.C. Fire Dep't, FDNY*, 574 F. App'x 50, 51 (2d Cir. 2014) (summary order).  Establishing a disparate impact claim under Section 8–107 requires demonstrating that "(1) a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of

---

[5] Disparate impact claims brought under NYSHRL accruing after October 11, 2019, require the same prima facie showing as those brought under Title VII, although post-2019 claims are, like those under NYCHRL, construed more liberally than their Title VII counterparts.  *See Syeed v. Bloomberg L.P.*, 2022 WL 3447987, at *6 (S.D.N.Y. Aug. 17, 2022); *Wellner v. Montefiore Med. Ctr.*, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).  Plaintiffs filed this suit on May 21, 2018, before the NYSHRL amendments went into effect.  *See* Dkt. No. 1.  In any event, the altered standard has no bearing on the outcome here.

any group protected by the provisions of this chapter; and (2) the covered entity fails to plead and prove as an affirmative defense that each such policy or practice bears a significant relationship to a significant business objective of the covered entity or does not contribute to the disparate impact." *Id.* (internal quotation marks omitted) (quoting N.Y.C. Admin. Code § 8–107(17)(a)(1)–(2)). "The mere existence of a statistical imbalance between a covered entity's challenged demographic composition and the general population is not alone sufficient to establish a prima facie case of disparate impact violation unless the general population is shown to be the relevant pool for comparison, the imbalance is shown to be statistically significant and there is an identifiable policy or practice or group of policies or practices that allegedly causes the imbalance." *Id.* (quoting N.Y.C. Admin. Code § 8–107(17)(b)). The law is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible," and state and federal civil rights statutes provide a "floor below which the City's Human Rights law cannot fall." *Mihalik*, 715 F.3d at 109 (first quoting *Albunio v. City of New York*, 947 N.E.2d 135, 137 (N.Y. 2011); then quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).

Finally, a "plaintiff must demonstrate standing for each claim that they press and for each form of relief that they seek." *Brown v. S. Shore Univ. Hosp.*, 762 F. Supp. 3d 191, 202 (E.D.N.Y. 2025) (quoting *Soule v. Conn. Ass'n of Schs.*, 90 F.4th 34, 45 (2d Cir. 2023)). Thus, where a defendant asserts at the summary judgment stage that the plaintiff has failed to establish standing to support a disparate impact claim, the plaintiff must demonstrate a genuine issue of material fact with respect to that issue that warrants resolution by trial. *See Lugo v. City of Troy*, 114 F.4th 80, 88 (2d Cir. 2024). Article III standing requires a plaintiff to show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000)).

### B.    Analysis

At the first step of the burden-shifting framework, Mascol and Rodriguez identify a statistically significant disparity: "white EMS Officers are 48% more likely to be Captains than non-white EMS Officers," and "male EMS Officers are 6% more likely to be Captains than female EMS Officers." Dkt. No. 683-5 ¶¶ 17a, 28. At least with respect to racial disparities, Dr. Thompson notes that these demographic findings are "statistically significant at the 1% level," meaning "there is a less than 1% chance that what we are seeing occurred by chance." *Id.* ¶ 30.

Plaintiffs also identify three "employment practice[s] or polic[ies]" which they claim are causally responsible for the disparity. *Chin*, 685 F.3d at 151. In particular, they contend that the eligibility criteria for promotion to EMS Captain requiring (1) four years in title as a lieutenant, (2) an annual performance evaluation of at least "Very Good" (or "Good" for the years following 2017), and (3) a clean disciplinary history in the preceding two years are requirements that disfavor non-white and female EMS Lieutenants at statistically significant rates. Dkt. No. 689 at 6, 14. Plaintiffs do not argue, as they have in the past, that the interview process disparately impacts non-white and female EMS officers. *Id.* Plaintiffs' prima facie case of disparate impact is predicated solely on the eligibility criteria.

Before addressing this claim, the Court pauses to consider whether it has been sufficiently pleaded. The complaint focuses in large part on the interview process, which Plaintiffs assert "allows and amplifies implicit bias." *See* Compl. ¶ 36; *see also id.* ¶¶ 31–32, 37–38, 40. By contrast, the complaint makes no mention of the eligibility criteria for promotion

to captain—either generally or by way of specific reference to the Time-in-Title or clean-disciplinary-history requirements.[6]  Looking solely at the complaint, then, it is not at all clear that Plaintiffs have adequately pleaded their current disparate impact claim.  Ultimately, however, the Court determines that Defendants had sufficient notice that these criteria formed the basis of Plaintiffs' claim; Defendants therefore cannot establish prejudice, and the pleadings are deemed effectively amended under Rule 15(b)(2).

This litigation has been ongoing for more than seven years.  In that time, Plaintiffs have made clear their intention to challenge Defendants' eligibility criteria for promotion as disparately impacting non-white and female EMS Lieutenants.  At the class certification stage, for example, Plaintiffs identified the following common question of fact: "Do the eligibility requirements for the Promotional Process have an impermissible and adverse impact on the proposed classes in violation of Title VII?"  Dkt. No. 453 at 18.  Plaintiffs elaborated further with the narrower questions (1) "Is there bias in the grading of the required annual performance evaluation such that proposed class members' promotional opportunities are unfairly decreased?" and (2) "Is discipline history impermissibly used against members of the proposed classes thereby unfairly excluding them from promotional opportunity?"  *Id.* at 18–19.  "In sum," the Court noted, "Plaintiffs appear to allege that the specific employment practices that are responsible for statistical disparities are . . . the eligibility requirements, including the annual performance evaluation process."  *Id.* at 19.

Additionally, the eligibility criteria appear to have been a central focus of discovery.  *See, e.g.*, Dkt. No. 683-3 at 107:15–109:22, 195:10–198:23 (discussing the Time-in-Title requirement); *id.* at 234:5–235:25 (discussing the clean-disciplinary-history requirement); *id.* at

---

[6] The Complaint does reference the annual supervisor evaluations.  Compl. ¶¶ 32, 39, 48, 51.

193:16–195:7 (discussing the performance evaluation requirement); *cf. Armstrong*, 2015 WL 992737, at *11 (noting that a defendant may be able to establish prejudice where it did not have "an adequate opportunity for discovery").  As such, this is the unusual case where Defendants cannot establish lack of notice or another form of prejudice from considering a claim not expressly pleaded in the complaint.  The Court therefore proceeds to analyze whether the evidence establishes a genuine issue of material fact for trial.

Defendants argue that summary judgment is warranted for three reasons.  First, they assert that Plaintiffs have failed to identify a specific, facially neutral employment policy responsible for a statistically significant disparity.  Dkt. No. 653 at 27–28.  As explained above, however, Plaintiffs have come forward with three specific policies, and the Court has already determined that Defendants had sufficient notice these policies were at issue in the case.

Second, Defendants assert that Plaintiffs cannot establish causation and a statistically significant disparity because the Thompson Report fails to consider (at least what Defendants to believe) the correct pool of individuals: those who actually applied for promotion to EMS Captain.  Dkt. No. 695 at 7–9.  This response misses the mark.  Plaintiffs' contention is that the eligibility criteria *prevented EMS Lieutenants from being able to apply in the first place*.  It would be unduly restrictive, and ignore the crux of Plaintiffs' claim, to consider only those applicants who actually applied promotion.  *See Mandala*, 975 F.3d at 210 n.4 ("'[A] statistical showing of disparate impact need not, and in [certain] instances . . . should not, be premised on an analysis of the characteristics of actual applicants' because would-be applicants might refrain from applying for a position because of a 'self-recognized inability . . . to meet the very standards challenged as being discriminatory.'" (quoting *Joint Apprenticeship Comm.*, 186 F.3d at 119–20)).  In this way, the Court agrees with Defendants that "there are no 'dueling

experts' . . . because the reports of Dr. Erath and Dr. Thompson are not contradictory." Dkt. No.
685 at 9. Dr. Erath cabins his analysis to individuals who applied for promotion, while Dr.
Thompson does not. It is not inconsistent to say that the eligibility criteria have
disproportionately prevented certain groups from applying (Dr. Thompson's theory), but that
when those groups have been eligible to apply, they have been promoted at equal or greater rates
(Dr. Erath's theory).

To be sure, at the class certification stage, the Court suggested that the more relevant pool
of individuals might be those who had applied for promotion. Dkt. No. 453 at 28. That notion
stemmed from the idea that considering all EMS officers, even those who had not applied for
promotion, ran the risk of overlooking other possible causal factors—including individual
employee choices not to apply for promotion—that might explain the disparities. *Id.* But the
Thompson Report specifically discounts the premise that the disparities can be accounted for by
employee preferences, as eligible non-white lieutenants have applied at statistically significantly
higher rates than their white peers (12.4% to 9.3%), and eligible female lieutenants have also
applied at higher rates than males (11.4% to 10.2%)—a disparity that, while not statistically
significant, suggests at least similar levels of promotional interest. Dkt. No. 683-5 ¶¶ 21–23.[7]

The Court further cautioned at the class certification stage that comparing demographic
data for all EMS Lieutenants, even those who were ineligible and did not apply, with EMS

---

[7] Defendants argue that these application rates "contradict[] the thesis of Dr. Thompson's report,
which purports to show that the eligibility criteria result in a disparate impact on women and
non-white EMS Lieutenants by causing them to apply for promotions at lower rates than their
male and white coworkers." Dkt. No. 695 at 8–9. Defendants' assertion misunderstands both
Plaintiffs' claim and the data. Dr. Thompson's statistical analysis shows that, of the individuals
who were eligible to apply, non-white and female EMS Lieutenants applied at higher rates than
their white and male peers. *See* Dkt. No. 683-5 ¶¶ 21–23. That conclusion does not contradict
Plaintiffs' claim that the eligibility criteria disproportionately disqualify non-white and female
lieutenants from being able to apply in the first place.

Captains, might overlook another possible cause of the disparity: historically higher rates of white EMTs in entry-level positions. But the Thompson Report considers and rejects that possibility, too, demonstrating historically consistent rates of entry-level EMS employees by race and gender. *Id.* ¶¶ 24–30. Indeed, since at least 2004, the earliest year for which there is data, entry-level EMS employees have been predominantly non-white. *Id.* ¶ 24.

Given that Dr. Thompson's updated report "account[s] for non-discriminatory explanations for any disparities," Dkt. No. 453 at 28, the same concerns raised at the class certification stage over considering non-applicant EMS Lieutenants have less purchase here. It is also worth noting that the class certification and summary judgment stages address different issues under different standards. "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). At the summary judgment stage, a non-movant need only present evidence from which the jury could reasonably find in their favor, and the Court must disregard evidence offered by the moving party that is inconsistent with that offered by the non-moving party. *See New All. Party v. F.B.I.*, 858 F. Supp. 425, 429 (S.D.N.Y. 1994) (citing *Anderson*, 477 U.S. at 252); *Sacks v. Gandhi Eng'g, Inc.*, 999 F. Supp. 2d 629, 642 (S.D.N.Y. 2014) ("At the summary judgment stage, the burden of proof that a plaintiff must meet to make out a prima facie case is de minimis."). The Court finds at this stage that the relevant pool of individuals includes non-applicant EMS Lieutenants, and that Plaintiffs have provided sufficient evidence to make out a prima facie case at the first step of the burden-shifting framework.

Other than contesting whether non-applicants should be considered in the relevant pool, Defendants offer little in the way of a response at the second step of the framework. They do not

"directly attack plaintiff's statistical proof by pointing out deficiencies in data or fallacies in the analysis." *Gulino*, 460 F.3d at 382. For example, they do not attempt to explain why Dr. Thompson's consideration and rejection of alternative causal factors is statistically or analytically mistaken. They likewise do not argue that the statistical disparities Dr. Thompson identifies with respect to the eligibility criteria are "[in]substantial or [in]significant." *See Robinson*, 267 F.3d at 161. Nor do they defend any disparities as "job related . . . and consistent with business necessity." *Mandala*, 975 F.3d at 208. As such, they have failed to establish the absence of a genuine issue of material fact.

That brings the Court to Defendants' third argument for why summary judgment is warranted. Defendants assert that Mascol and Rodriguez lack standing to challenge the eligibility requirements because they cannot show that the criteria ever prevented them from being promoted. Dkt. No. 695 at 3. Plaintiffs respond that they need not show individual examples of how they were treated under these policies, such as a specific instance in which they were denied an opportunity to apply. Dkt. No. 689 at 11. Whether framed as a matter of standing or as an element of Plaintiffs' case, the Court agrees with Defendants that in order to bring a disparate impact claim, an individual plaintiff must demonstrate that he or she was adversely affected by the relevant policy.

This conclusion stems from well-established principles of employment law. In the context of disparate treatment claims, courts have long held that individuals must show that they either applied for the relevant position or would have done so absent the allegedly discriminatory conduct. *See, e.g.*, *Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 442 (S.D.N.Y. 2014) (dismissing individual Title VII failure-to-promote claims where the plaintiffs did not "allege[] that they were interested in a promotion or that there was an open position to which they could

have (or would have) applied"); *Wright v. Stern*, 450 F. Supp. 2d 335, 376 (S.D.N.Y. 2006)

(Chin, J.) (explaining that at the summary judgment stage, "the plaintiff must demonstrate either

that he would have applied for the position had he known of its availability or that he did apply

through the employer's informal processes and was rejected"); *see also Brown v. McLean*, 159

F.3d 898, 903 (4th Cir. 1998) ("While Title VII does not require a plaintiff to apply for a job

when to do so would be a futile gesture, a plaintiff claiming he was deterred from applying for a

job by his employer's discriminatory practices has the burden of proving that he would have

applied for the job had it not been for those practices.").

     As the Supreme Court explained in *International Brotherhood of Teamsters v. United

States*:

> To conclude that a person's failure to submit an application for a job does not
> inevitably and forever foreclose his entitlement to . . . relief under Title VII is a far
> cry, however, from holding that nonapplicants are always entitled to such relief. A
> nonapplicant must show that he was a potential victim of unlawful discrimination.
> Because he is necessarily claiming that he was deterred from applying for the job
> by the employer's discriminatory practices, his is the not always easy burden of
> proving that he would have applied for the job had it not been for those practices

431 U.S. 324, 367–68 (1977). This requirement "reflects standing-like concerns [by closing] . . .

the causal gap between the employer's decision-making process and the complained-of condition

of the employee." *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994). To satisfy this

burden, a plaintiff must produce evidence of a desire to apply such as an "informal inquiry,

expression of interest, or even unexpressed desire [that is] credible and convincing." *Int'l Bhd.*,

431 U.S. at 371 n. 58; *see also* 1 Larson on Employment Discrimination § 8.02[3][c] (2025).

     This requirement applies in the disparate impact context as well. *See Waisome v. Port

Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1375 (2d Cir. 1991) ("To prove disparate impact, a plaintiff

must first identify the specific employment practice he is challenging, and then show that the

practice *excluded him or her*, as a member of a protected group, from a job or promotion

opportunity." (emphasis added)); *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 577 (6th Cir. 2004) (rejecting a disparate impact claim challenging certain promotional eligibility criteria as disparately impacting African Americans, as the individual plaintiffs could not "show that the policies injured them personally"); *Robinson v. Polaroid Corp.*, 732 F.2d 1010, 1016 (1st Cir. 1984) ("Where the disparate impact doctrine has been used by the courts in individual actions rather than class actions, a plaintiff has been required to show that he personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group." (quoting *Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 451 (10th Cir. 1981)); *see also McCain v. Sprint Cellular Corp.*, 2016 WL 11596029, at *7 (D. Vt. Aug. 16, 2016) ("[W]hether construed as an element of the claim or a standing requirement, a plaintiff asserting a disparate-impact claim must 'show that the policies injured them personally.'" (citation omitted)); *Nunez v. Cuomo*, 2012 WL 3241260, at *11 (E.D.N.Y. Aug. 7, 2012) (dismissing a disparate impact claim where the plaintiffs failed to establish that they were "personally injured").

Applying this requirement in the disparate impact context makes sense given that disparate impact and treatment claims are "simply alternative doctrinal premises for a statutory violation." *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992). It can hardly be maintained that, to take an example from *International Brotherhood of Teamsters*, a non-applicant confronted with a "Whites Only" sign must demonstrate that they would have applied in order to bring a disparate treatment claim, but need not do so to bring a disparate impact claim. *See* 431 U.S. at 365.

Requiring a disparate impact plaintiff to demonstrate some personal stake in the matter does not mean, as Defendants seem to suggest, that plaintiffs lose standing to bring a claim once

they meet the relevant eligibility criteria. In those circumstances, it may still be possible for plaintiffs to recover damages for the time they were excluded from eligibility, provided they can demonstrate that they would have applied for the promotion at that time. *See Walls v. Miss. State Dep't of Pub. Welfare*, 730 F.2d 306, 314 (5th Cir. 1984) ("[S]tanding to sue for accrued monetary damages is not lost because the injury has abated at the time the complaint is filed. A party who was denied employment because of an educational requirement which she has subsequently met, has no less stake in the litigation for the deprivation which occurred prior to obtaining her degree, even though injunctive relief might be mooted."); *Ortiz v. Pace Univ.*, 761 F. Supp. 3d 695, 700 (S.D.N.Y. 2025) (noting that a plaintiff may have "standing to seek monetary damages for past injuries regardless of the likelihood of future injury").

Turning to the facts of this case, Plaintiffs Mascol and Rodriguez first applied for promotion in 2014 and 2015. At those times, they met the relevant eligibility criteria.[8] Mascol and Rodriguez accordingly cannot establish that the eligibility criteria harmed them in 2014 or 2015 or thereafter. They may, however, be able to recover damages for periods of prior ineligibility if they can establish that, but for the relevant promotional requirements, they would have applied for the EMS Captain position. This is an issue that the parties have not briefed.[9] In

---

[8] Mascol arguably did not meet the clean-disciplinary-record requirement, as she was disciplined in 2014. She has maintained, however, that the Stipulation and Agreement specifically preserved her right to apply for captain, effectively creating an exception to this eligibility requirement. Dkt. No. 683-8 ¶¶ 28–30. Thus, regardless of whether the requirement rendered her ineligible, she cannot now premise her disparate impact claim on it. Doing so would permit her simultaneously to argue that the policy did not bar her from being promoted, while also allowing her to argue that the policy caused her underlying adverse employment action. Whether the clean-disciplinary-requirement was used pretextually against Mascol to deny her promotion on the basis of gender is an issued addressed below in relation to her disparate treatment claim.

[9] The parties have likewise not briefed whether Defendants had notice of Plaintiffs' claim that Mascol and Rodriguez specifically were deterred from applying due to the eligibility criteria. *See* Compl. ¶¶ 67–86 (defining the proposed class as *applicants* for promotion). Nor have they

many respects, their filings talk past one another.  The Court therefore denies Defendants' motion for summary judgment with respect to Plaintiffs' disparate impact claims, including their claims under NYCHRL—but it does so without prejudice.  Should Defendants choose to move for summary judgment on these claims again, they would also be permitted to raise objections, if any, at the second step of the burden-shifting framework.

## II.    Disparate Treatment

Mascol and Rodriguez next allege disparate treatment on the basis of gender and disability, respectively.  Dkt. No. 689 at 17; Compl. ¶¶ 87–94, 100–02, 110–12.  Mascol brings her claim under Title VII, NYSHRL, and NYCHRL, while Rodriguez brings his claim solely under NYCHRL.  Dkt. No. 689 at 17.

### A.    Background Principles

Disparate treatment claims brought under Title VII, NYSHRL, and NYCHRL follow the same three-part burden-shifting framework set forth in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006); *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  First, the plaintiff must establish a prima facie case of discrimination, which under Title VII and NYSHRL requires showing that "(1) he is a member of a protected class, (2) he was qualified for the job for which he applied, (3) he was denied the job, and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination."  *Vivenzio*, 611 F.3d at 106; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010); *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 13 (2d Cir. 2018) (summary order).  A prima facia case of discrimination under NYCHRL requires "simply show[ing] that [the

---

briefed whether Mascol and Rodriguez's claims of being deterred from applying are time barred. The Court therefore does not address those issues.

plaintiff] was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (quoting *Williams v. Regus Mgmt. Grp., LLC,* 836 F.Supp.2d 159, 173 (S.D.N.Y.2011)); *see also Mihalik*, 715 F.3d at 110.

The burden then shifts "to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action in question." *Ferraro*, 440 F.3d at 99. If the employer does so, "the presumption of discrimination 'drops from the picture,' and 'the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination.'" *Allen v. City of New York*, 2024 WL 3965697, at *6 (S.D.N.Y. Aug. 28, 2024) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

Under Title VII and NYCHRL, a plaintiff may succeed at this third step "by establishing that sex (or another protected characteristic) was a 'motivating factor for any employment practice, even though other factors also motivated the practice.'" *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013)); *see Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc.*, 2021 WL 4851384, at *1 (2d Cir. Oct. 19, 2021) (summary order) ("We have . . . suggested that a plaintiff may prevail in a NYCHRL case if discrimination was a partial motivating factor."). Thus, an employer "may present a legitimate, non-discriminatory reason for its actions, but it is entitled to summary judgment 'only if the record established as a matter of law that discrimination played *no* role in its actions.'" *Livingston v. City of New York*, 563 F. Supp. 3d 201, 234 (S.D.N.Y. 2021) (quoting *Kops v. PPM Am., Inc.*, 2016 WL 7188793, at *5 (S.D.N.Y. Dec. 5, 2016)); *see also Bart v. Golub Corp.*, 96 F.4th 566, 576 (2d Cir.), *cert. denied*, 145 S. Ct. 173 (2024).

NYSHRL's antidiscrimination provision, by contrast, omits any "motivating factor" language and therefore requires establishing that the discrimination was a "but-for" cause of the adverse employment action. *See Heiden v. N.Y.C. Health & Hosps. Corp.*, 2023 WL 171888, at *22 (S.D.N.Y. Jan. 11, 2023).

As in the disparate impact context, disparate treatment claims under NYCHRL "must be analyzed separately and independently from federal and state discrimination claims," and the law's provisions are to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109.

### B.    Plaintiff Mascol

#### 1.    Title VII and NYSHRL

At the first step of the burden-shifting framework, Mascol identifies three circumstances that she says warrant an inference of discrimination under Title VII and NYSHRL and create a genuine issue of material fact for trial. Dkt. No. 689 at 19–20. First, she asserts that she was targeted for discipline while two male co-workers were not disciplined for the same incident. *Id.* Second, she states that her supervisor, Chief Booth—who was allegedly dismissive of her and showed favoritism toward her male colleagues—improperly used that discipline against her and circumvented the Stipulation and Agreement by withdrawing her applications from consideration for promotion. *Id.* And third, she contends that discrimination can be inferred from the fact that in 2018, three males were promoted over her even though they received lower interview scores. *Id.* at 25. The Court addresses each in turn.

##### a.    Mascol's 2014 Discipline

Mascol argues that she "has clearly established that Defendants treated her differently on the basis of her gender by concocting false charges on her and not on similarly situated male colleagues." *Id.* at 19. This claim fails for several reasons.

To begin, the complaint contains no allegations regarding disciplinary matters generally or Mascol's 2014 discipline more specifically. Even more importantly, Plaintiffs have insisted throughout this case that facts related to Mascol's discipline are irrelevant to the litigation. Thus, considering Mascol's claim at this juncture would prejudice Defendants. During discovery, Plaintiffs argued that Defendants were not entitled to information regarding Mascol's discipline precisely because it was not at issue in the case. During Mascol's deposition, her counsel repeatedly refused to allow her to answer Defendants' questions about her discipline, calling those questions "totally irrelevant," "inflammatory," "prejudicial," and "harassing." Dkt. No. 697-1 at 154:6–162:3, 182:10–13, 192:22–24; *see also* Dkt. No. 486 at 5 (Mascol's counsel asserting elsewhere that these questions were intended to "harass and attack [Mascol's] character"). So steadfast were counsel's objections that the parties had to seek the Court's intervention during Mascol's deposition. Dkt. No. 697-1 at 157:4–158:5, 160:23–162:5, 178:23–184:19. Even after the Court intervened permitting certain questions regarding Mascol's discipline, Plaintiffs' counsel continued to object, leading to yet another call to the Court. *See id.* at 186:17–192:5. Mascol cannot now, at the eleventh hour, argue that her discipline is not only relevant to her disparate treatment claim, but the very basis for inferring discrimination. *See Henry*, 2014 WL 4783014, at *10 (noting that prejudice exists under Rule 15(b)(2) at the summary judgment stage where a party has not had an adequate opportunity to conduct discovery on a contested issue).

Mascol has waived this claim in other ways as well. Notably, she signed a stipulation expressly agreeing not to bring any claim related to her 2014 disciplinary process and admitting that she violated EMS's Operating Guide and Procedure. Dkt. No. 683-11 at 1–4. The Stipulation and Agreement states that Mascol "is estopped from commencing or continuing any

47

judicial or administrative proceedings or appeal before any court of competent jurisdiction, administrative tribunal or Civil Service Commission, including but not limited to, actions pursuant to the Civil Rights Act of 1964, or any other Federal Civil Rights Statute . . . to contest the authority and jurisdiction of the Fire Department to impose the terms and conditions which are embodied in this Stipulation, including the events which led up to, and are included, in her Grievance . . . and any events up to the date of the full execution of this Stipulation and Agreement." *Id.* at 2–3.  The document further provides that Mascol "waive[s] any right to file a future claim or civil suit concerning any of the same or similar issues contained in the current Grievance." *Id.* at 3–4.  And it indicates that "Mascol consents to the legal authority and jurisdiction of the Fire Commissioner to impose the terms and conditions embodied in this Stipulation and Agreement." *Id.* at 3.  Mascol and her union attorney both signed this waiver, and they indicated that they did so "knowingly and intentionally, without coercion, duress or undue influence." *Id.* at 5.  Mascol has therefore waived her claim many times over.  *See Rozenfeld v. Dep't of Design & Const. of City of N.Y.*, 522 F. App'x 46, 47 (2d Cir. 2013) (summary order) (explaining that the "district court correctly held that [the plaintiff's] claims pursuant to Title VII, § 1983, the SHRL, and the CHRL failed because he signed the stipulation waiving these rights knowingly and voluntarily"); *Branker v. Pfizer, Inc.*, 981 F. Supp. 862, 866 (S.D.N.Y. 1997) (holding that a plaintiff's decision to sign a release "bar[red] her action under the NYCHRL [and] NYSHRL").[10]

---

[10] Plaintiffs assert in their counterstatement to Defendants' Rule 56.1 statement that these waiver provisions are "unlawful and unenforceable," Dkt. No. 687 at 51, but that contention is wholly conclusory, and Plaintiffs have not briefed the issue or provided any reason why the waiver does not apply to her disparate treatment claims or should not be enforced.

Another reason exists for denying the claim, at least insofar as it is brought under Title VII: Mascol has failed to exhaust her administrative remedies. "Before bringing a Title VII suit in federal court, an individual must first present 'the claims forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency.'" *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (per curiam)). Claims not raised before the EEOC "may still be part of the complaint later filed in federal court if they are reasonably related to the claim filed with the agency," meaning "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (internal quotation marks and citation omitted). This inquiry focuses "on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (citation omitted).

Plaintiffs' underlying EEOC complaint, much like the complaint in this case, makes no mention of disciplinary matters generally or Mascol's discipline specifically. Dkt. No. 1-1. Because Mascol's current claim is insufficiently related to the underlying EEOC complaint, she has failed to exhaust her administrative remedies. *See Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 439 (S.D.N.Y. 2023) ("The exhaustion requirement applies not only to causes of action but also to underlying factual allegations.").

Finally, the Court notes that Mascol is not similarly situated with respect to the male officers who were not charged. The disciplinary charges against Mascol alleged that she "influenced two (2) subordinate EMS employees to file a child abuse complaint." Dkt. No. 651-67 at 2. She argues that the two subordinate EMS employees were similarly situated. However, given this power imbalance and that the employees allegedly acted at Mascol's direction, the fact

that she and not they were disciplined does not raise an inference of discrimination.  *See Jordan v. United Health Grp. Inc.*, 783 Fed. App'x 31, 33 (2d Cir. 2019) (summary order) ("While similarly situated employees who receive different treatment can be evidence of discrimination, the employees 'must be similarly situated in all material aspects.'" (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997))).

### b.    Chief Booth

Although Mascol's various forms of waiver prevent her from arguing that her 2014 discipline was discriminatory—the first basis for her disparate treatment claim—they do not necessarily preclude her from raising her second set of allegations regarding Booth's efforts to withdraw her application from consideration.  That is because under this second set of allegations, Mascol essentially argues that *even if her discipline was valid*, it did not preclude her from applying for captain because the Stipulation and Agreement preserved her right to apply, so Booth's attempts to disqualify her on that basis give rise to an inference of discrimination.

It is true that if Mascol were eligible to be promoted, Booth knew this fact, and he nonetheless withdrew her application from consideration using her disciplinary history as a pretense, this might be sufficient to make out a prima facie case of discrimination.  But Mascol has presented insufficient evidence establishing a genuine issue of material fact with respect to these allegations.  The only evidence Mascol has presented regarding this issue is her own declaration, which states in relevant part that: "Chief Booth used his influence as a top ranking EMS official to use [Mascol's] disciplinary past and the FDNY's eligibility requirements for promotion to EMS Captain to deny five separate promotions over a period from 2014 to 2018"; "Chief Booth secretly removed [Mascol] from consideration claiming that it was because of [her] past disciplinary history"; Chief Booth treated Mascol "differently than male EMS Lieutenants, often ignoring [her] or dismissing [her] while showing favoritism to male colleagues"; and when

Mascol "raised the issue of promotion he specifically told [her] 'don't worry about it.'"  Dkt. No.
683-3 ¶¶ 11–16; Dkt. No. 689 at 7–8, 19–20; *see also* Dkt. No. 696 ¶ 49 (Plaintiffs' Rule 56.1
statement mentioning Booth only once in conclusory fashion).  Mascol has identified no
documents, deposition testimony, or other evidence supporting these assertions.

"'An adverse party may not rest upon mere conclusory allegations or denials' in a self-
serving declaration that is not supported by other evidence to raise a triable issue of material
fact."  *Nance v. N.Y. Pub. Int. Rsch. Grp. Fund, Inc.*, 2025 WL 965883, at *4 (S.D.N.Y. Mar. 31,
2025) (quoting *789 Ninth & 414 E. 74th Assocs. LLC v. Hundalani*, 2023 WL 4472162, at *4
(S.D.N.Y. July 11, 2023)); *see also Ben-Levy v. Bloomberg L.P.*, 2012 WL 2477685, at *4
(S.D.N.Y. June 26, 2012), *aff'd*, 518 F. App'x 17 (2d Cir. 2013) (summary order) ("It is well-
settled that conclusory and self-serving allegations, without evidentiary support, are insufficient
to create a genuine issue of fact." (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)));
*Rys v. Davis*, 2025 WL 896844, at *6 (S.D.N.Y. Mar. 24, 2025) ("[A] nonmoving party's self-
serving statement, without direct or circumstantial evidence to support the charge, is insufficient
to defeat a motion for summary judgment." (citation omitted)).  Mascol's unsupported and self-
serving allegations regarding Booth's "secret" attempts to withdraw her application from
consideration are too conclusory to establish a genuine issue of material fact.

### c.    Individuals with Lower Interview Scores

In 2018, three individuals were promoted with lower interview scores than Mascol.  Dkt.
No. 689 at 25.  This fact likewise fails to establish a genuine issue of material fact regarding her
gender discrimination claim.  To be sure, it is "well settled that departures from procedural
regularity can create an inference of discriminatory intent, sufficient to establish a prima facie
case of employment discrimination."  *Armstrong*, 2014 WL 4276336, at *14.  But Defendants
have explained why, in this specific instance, they departed from their typical practice of

promoting individuals with the highest interview scores.  At the time, there was a particular need for captains in the Bureau of Communications, Dkt. No. 651-52 at 2–3; Dkt. No. 651-56 at 137:11–25, and the three individuals with lower interview scores who were promoted had experience in that bureau, Dkt. No. 651-34, while Mascol did not, Dkt. No. 651-54. Furthermore, eight male applicants who scored the same or better than Mascol in their interviews were similarly passed over for promotion that year.  Dkt. No. 651-34.  Mascol therefore cannot establish that "the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination," *Allen*, 2024 WL 3965697, at *6, or that gender played *any role* in the denial of her promotion.

### 2.    NYCHRL

Mascol's disparate treatment claim brought under NYCHRL must be dismissed for many of the same reasons.  Notwithstanding NYCHRL's more plaintiff-friendly substantive standards, Mascol cannot overcome waiver, deficient pleadings, or failing to identify specific evidence raising a genuine issue of material fact.

The Second Circuit has explained that "[w]hile the New York City Council may provide a different substantive standard to be applied to particular claims in federal court, the same federal procedural rules apply." *Mihalik*, 715 F.3d at 111–12.  "Accordingly, district courts may still grant summary judgment with respect to NYCHRL claims if there is no genuine dispute as to any material fact regarding plaintiff's claim and the employer's affirmative defense." *Id.* at 12.  Moreover, state and local claims brought in federal court are "subject to the federal pleading standard, and not the relaxed pleading standards of New York state courts." *Eng v. City of New York*, 715 F. App'x 49, 52 (2d Cir. 2017) (summary order).

As already explained, Mascol identifies three specific ways in which she was "treated differently" at least partly because of her gender, the prima facie standard for NYCHRL claims.

*See Sotomayor*, 862 F. Supp. 2d at 258. But even if those allegations were adequately pleaded—and at least some of them certainly were not—she has either waived her arguments or failed to present evidence suggesting that gender-based discrimination played any role in the promotion process.

The Court accordingly grants Defendants' motion for summary judgment as to Plaintiff Mascol's disparate treatment claims under Title VII, NYSHRL, and NYCHRL.

### C.    Plaintiff Rodriguez

Rodriguez brings his disparate treatment claim solely under NYCHRL for disability discrimination. Dkt. No. 689 at 21. Defendants assert that this claim fails because the complaint never alleges that Rodriguez was or is disabled. Dkt. No. 653 at 18; Dkt. No. 695 at 12–13. It is correct that the complaint contains no such allegations. At most, the complaint alleges that Rodriguez "has suffered several injuries in the line of duty that have forced him to take Line of Duty Injury ('LODI') medical leave." Dkt. No. 689 at 21; Compl. ¶ 64; *see also id.* ¶ 44 (noting that EMS officers "have been penalized for taking LODI leave or other medical leave"). During Rodriguez's deposition, however, he identified at least one of his injuries as a broken wrist, and Defendants have addressed this issue on the merits in both their opening and reply briefs. Dkt. No. 654 at 18–19; Dkt. No. 695 at 12–14.

Regardless of whether the issue has been adequately pleaded, the Court declines to exercise supplemental jurisdiction over the claim, as it "raises a novel or complex issue of State law"—namely, whether a broken bone necessarily qualifies as a disability under NYCHRL. *See* 28 U.S.C. § 1367(c)(1). The answer to this question is far from clear. On the one hand, NYCHRL defines "disability" broadly as "any physical, medical, mental or psychological impairment," a category further defined as "including, but not limited to, [an impairment of] . . .

the musculoskeletal system."  NYC Admin. Code § 8–102.  A broken wrist may, of course,

qualify as "an impairment of . . . the musculoskeletal system."  *Id.*

At the same time, courts have occasionally imposed some threshold requirement of

seriousness or permanence for an injury or illness to qualify as a disability under the law.  *See*

*Anonymous v. Mount Sinai Hosp.*, 82 N.Y.S.3d 408, 409 (1st Dep't 2018) (holding that "a soft-

tissue injury near [the plaintiff's] knees . . . [did] not rise to the level of a cognizable disability

under the City HRL . . . [because the] doctor from whom he sought treatment for the injury asked

that plaintiff be excused from work for 10 days, after which he could return with 'no

restrictions'"); *Dillon v. Silverman*, 2014 WL 1483666, at *5–6 (N.Y. Sup. Ct. Apr. 9, 2014)

(holding that two-week illness did not qualify as a disability under the NYCHRL, as there is "no

indication that the City Council ever contemplated that the NYCHRL would cover . . . any

illness of short duration and with little or no long-lasting or permanent physical manifestations");

*Toth v. N.Y.C. Dep't of Citywide Admin. Servs.*, 988 N.Y.S.2d 488, 489 (1st Dep't 2014)

(holding that anxiety and stress did not necessarily qualify as a disability under the law); *see also*

*Shankar v. Accenture LLP*, 2023 WL 2908660, at *4 (S.D.N.Y. Feb. 14, 2023), *report and*

*recommendation adopted*, 2023 WL 2557315 (S.D.N.Y. Mar. 17, 2023) ("Plaintiff has not

provided allegations about the extent of his 'stomach issue,' how long his expected recovery

was, or what particular tasks he believed he was expected to do before, after, or during his

surgery.  Accordingly, Plaintiff has not pled enough factual content for the Court to conclude

that his 'stomach issue' was a disability within the meaning of . . . NYCHRL."); *Lee v. Delta Air*

*Lines, Inc.*, 2024 WL 3928876, at *20 (S.D.N.Y. July 29, 2024), *report and recommendation*

*adopted as modified*, 2024 WL 4345584 (S.D.N.Y. Sept. 30, 2024) (dismissing a disability claim

under NYCHRL where the plaintiff made only a "general reference to a 'mobility impairment'"

and the complaint did not "include any allegations about the nature of the mobility impairment");

*Tatas v. Ali Baba's Terrace, Inc.*, 2022 WL 993566, at *12 (S.D.N.Y. Mar. 31, 2022) (holding

that a type of cancer did not qualify as a disability under NYCHRL because it "simply d[id] not

impair the body in the same way as other types of cancer"). *But see Arazi v. Cohen Bros. Realty

Corp.*, 2022 WL 912940, at *10 (S.D.N.Y. Mar. 28, 2022) (holding that a "minor" or

"transitory" injury may qualify as a disability under NYCHRL).

The Court is aware of no case in which a New York court has addressed whether and to

what extent broken bones may qualify as disabilities under NYCHRL, and as noted above, the

authority interpreting NYCHRL's definition of disability is conflicting and underdeveloped. *See

Martin v. Sprint United Mgmt. Co.*, 2017 WL 5028621, at *5 (S.D.N.Y. Oct. 31, 2017) (noting

that the "parties have not drawn to the Court's attention any appellate decisions on these

standards" and declining to exercise supplemental jurisdiction); *see also Walsh v. Nat'l

Westminster Bancorp., Inc.*, 921 F. Supp. 168, 174 (S.D.N.Y. 1995) (declining to exercise

supplemental jurisdiction where "neither party has cited any New York cases on this issue");

*Bray v. City of New York*, 356 F. Supp. 2d 277, 284 (S.D.N.Y. 2004) (same). Especially given

that the facts regarding Rodriguez's broken wrist are unclear and unbriefed—he asserts only in

his declaration that he "did not have full use of [his] right arm" and needed to "take several days

of leave," Dkt. No. 683-14 ¶ 5—it would be unwise for this Court to opine on those issues.

Indeed, the Second Circuit has on multiple occasions prompted district courts to consider

whether to decline to exercise supplemental jurisdiction over claims under NYCHRL. *See

Harge v. City of New York*, 2022 WL 17481819, at *3 (2d Cir. Dec. 7, 2022) (summary order)

(remanding NYCHRL claims "with instructions to the district court to dismiss them without

prejudice," as "the questions posed by [the plaintiff's] city discrimination claims are best left to

the courts of the State of New York, should [the plaintiff] seek to pursue them further" (internal

quotation marks and citation omitted)); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010)

(noting that "neither the New York Court of Appeals nor any intermediate New York appellate

court" had addressed whether a condition qualified as a disability under NYCHRL, and

indicating that the district court on remand "may determine that this area of law would benefit

from further development in the state courts and therefore dismiss the claim without prejudice to

refiling in state court"); *Brief v. Albert Einstein Coll. of Med.*, 423 F. App'x 88, 93 (2d Cir. 2011)

(summary order) ("Because these issues have not been fully briefed and argued and because the

law of New York in regard to relative state and federal disability claim analysis is still

developing, we see no reason to decide them in this appeal . . . .  Instead, in the absence of any

continuing basis for federal question jurisdiction, we leave these issues to the parties to pursue in

state court if the plaintiff seeks to reinstate his state and city law claims in that forum.");

*Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) (concluding "that the state-law

claims should be dismissed so that state courts can, if so called upon, decide for themselves" the

"appropriate analytic framework to be applied to discrimination claims based on a 'disability' as

defined by New York state and municipal law").

Moreover, addressing Rodriguez's claim would not "promote the values of economy,

convenience, fairness and comity."  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d

234, 250 n.9 (2d Cir. 2011).  Although there was at least some discovery regarding Rodriguez's

injuries, the parties' barebones presentation of facts to this Court suggests that any such

discovery was not extensive.  Fairness principles also militate in favor of declining supplemental

jurisdiction given that Rodriguez's injuries have not been pleaded with any specificity in the

complaint.  And with respect to comity, "our circuit takes a very strong position that state issues

should be decided by state courts." *See Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017); *Martin*, 2017 WL 5028621, at *5 (holding that "[w]ithout significant state-court guidance, and absent mandatory federal jurisdiction, comity is best served by allowing a state court to address these matters of state law in the first instance").[11]

The Court therefore dismisses this claim without prejudice to filing in the state courts.

## III.    Section 1983

Mascol, Rodriguez, and Local 3621 also bring Equal Protection Clause claims under Section 1983. Dkt. No. 689 at 28–30; *see* Compl. ¶¶ 120–24. Mascol and Rodriguez's claims are based on the "same evidence" underlying their disparate treatment claims. Dkt. No. 689 at 30. Local 3621, meanwhile, "brings claims solely for injunctive relief based on Defendants' failure to abide by § 812.a of the NYC Charter and §59-b of the New York State Civil Service Law, which ultimately denies all of its member-EMS employees equal protection under § 1983." Dkt. No. 689 at 32.

### A.    Background Principles

"The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons similarly situated should be treated alike." *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). But the Fourteenth Amendment "guarantees equal laws, not equal

---

[11] Even if Plaintiffs' Title VII disparate impact claims survive a subsequent motion for summary judgment, the Second Circuit has found supplemental jurisdiction "lacking when the federal and state claims rest[] on essentially unrelated facts," *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000), and Rodriguez's disparate impact and disability discrimination claims concern substantially dissimilar constellations of relevant facts. Rodriguez's disparate impact claim turns on whether the three eligibility criteria deterred him from applying for promotion. That claim implicates alleged race-based discrimination and facts predating Rodriguez's applications for promotion. Rodriguez's NYCHRL claim centers on alleged disability discrimination when he applied.

results." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979). Equal protection claims

under Section 1983 therefore "cannot be based solely on the disparate impact of a facially neutral

policy." *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012). Instead, "[p]roof of racially

discriminatory intent or purpose is required." *Id.* (internal quotation marks and citation omitted).

In the context of employment discrimination, "[o]nce action under color of state law is

established, [a plaintiff's] equal protection claim parallels his [disparate treatment claim under]

Title VII claim. The elements of one are generally the same as the elements of the other and the

two must stand or fall together." *McKinney v. County of Dutchess*, 2025 WL 1499364, at *1 (2d

Cir. May 27, 2025) (summary order) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir.

2004)); *see also Chick v. County of Suffolk*, 546 F. App'x 58, 59 (2d Cir. 2013) (summary order).

"[F]reedom from discrimination on the basis of disability is a right secured by statute . . .

not by the Constitution," *Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 590 (S.D.N.Y.

2014), and Section 1983 claims "may not . . . be brought to vindicate rights conferred only by a

statute that contains its own structure for private enforcement," *Baptiste v. City Univ. of N.Y.*,

680 F. Supp. 3d 415, 425 (S.D.N.Y. 2023) (quoting *Patterson v. County of Oneida, N.Y.*, 375

F.3d 206, 225 (2d Cir. 2004)). "Thus, courts in this Circuit have long held that 'claims of

employment discrimination based on disability . . . are not cognizable under § 1983.'" *Id.*

(quoting *Bonds v. County of Westchester*, 2020 WL 4347704, at *8 (S.D.N.Y. July 28, 2020)).

**B.    Analysis**

As with Plaintiffs' other claims, issues regarding the pleadings require discussion at the

outset. In their brief in opposition to Defendants' motion for summary judgment, Plaintiffs

explain that their Section 1983 claims are predicated on violations of the Equal Protection

Clause. Dkt. No. 689 at 28. Specifically, they state that Defendants' "abdication of its

obligations" under the NYC Charter, Chapter 35, § 812(a) and Section 59-b of the New York

State Civil Service Law to promote applicants through a competitive DCAS-administered examination process has "led to rampant discrimination in the FDNY" and resulted in corresponding violations of the Equal Protection Clause. *Id.* at 29–30. As Defendants point out, the complaint makes no mention of the Equal Protection Clause. Dkt. No. 695 at 15. Instead, the Section 1983 cause of action focuses exclusively on alleged deprivations of "*statutory* civil rights secured by Title VII and related statutes based on their race, sex, and/or gender in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, *et seq.*" Compl. ¶ 121; *see also id.* ¶ 122 ("Defendants intentionally failed to redress these *statutory violations* and/or showed reckless disregard for Plaintiffs' *statutorily protected* rights. (emphasis added)). Nor does the complaint mention the specific provisions of state and local law under which Defendants have allegedly "abdicated" their obligations. For good reason—one of these laws, Section 59-b of the New York State Civil Service Law, was not even law when Plaintiffs filed their complaint in May 2018. *See* Dkt. No. 1; N.Y. Civ. Serv. Law § 59-b (effective Dec. 21, 2018).

Although Defendants have long been aware of Plaintiffs' belief that civil-service exams are required under state and local law, they lacked notice that this issue formed the basis of any equal protection claim under Section 1983. In addition to the fact that the complaint's Section 1983 discussion focuses exclusively on "statutorily protected rights," not constitutional rights, Plaintiffs have explicitly disclaimed the fact that this case raises the issue of whether civil-service exams are required. The complaint asserts in no uncertain terms: "While Plaintiff believes that civil service examinations are practicable for EMS officer promotions above the rank of Lieutenant as a matter of state law, and therefore required, *this is not at issue before the Court in this action*." Compl. ¶ 24 (emphasis added). What is more, Plaintiffs have raised this very issue—i.e., whether FDNY's promotional process complies with Sections 812(a) and 59-

b—in a different proceeding in New York State Supreme Court. Dkt. No. 695 at 16. That proceeding is ongoing. *Id.* It was more than reasonable for Defendants to assume that, given this parallel litigation and the underlying complaint in this case, Plaintiffs' arguments regarding civil-service exams were not squarely presented here.

This lack of notice prejudiced Defendants. Their opening brief in support of the motion for summary judgment does not discuss the Equal Protection Clause. It instead (quite understandably) presumes that Plaintiffs' Section 1983 claims are brought under the Due Process Clause, and it addresses that issue. Dkt. No. 653 at 28–30. Defendants have accordingly been "disadvantaged . . . in presenting [their] case." *Cruz*, 202. F.3d at 569; *cf. Turner v. Shinseki*, 824 F. Supp. 2d 99, 123 (D.D.C. 2011) ("[A] number of other courts confronting similar situations have taken the position that a complaint was constructively amended when the parties had *fully briefed* an issue that was not necessarily raised in the complaint." (emphasis added)).

Because Defendants have been prejudiced, the Court finds that Plaintiffs' equal protection arguments have been neither expressly nor impliedly raised under Rule 15(b)(2). Those claims are accordingly dismissed. [12]

## IV.    Motion to Exclude Dr. Erath's Testimony

Plaintiffs move under Federal Rule of Evidence 702 to exclude Dr. Erath's testimony and the two expert reports he has prepared. Dkt. No. 689 at 34–38. Rule 702 provides:

---

[12] Mascol and Rodriguez's Section 1983 claims fail in the alternative because (1) they cannot bring disparate impact claims under the Equal Protection Clause, *see Reynolds*, 685 F.3d at 201; (2) nor can they bring Title VII claims through the vehicle of a Section 1983 claim, *see Patterson*, 375 F.3d at 225; (3) they have failed to establish disparate treatment under Title VII, and "the elements of [these claims] are generally the same . . . [and they] must stand or fall together," *McKinney*, 2025 WL 1499364, at *1; and (4) "claims of employment discrimination based on disability . . . are not cognizable under § 1983," *Baptiste*, 680 F. Supp. 3d at 425 (citation omitted).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). This burden includes establishing that the relevant testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

Plaintiffs primarily argue that Dr. Erath's reports and testimony would not be helpful to the jury and are not relevant. *See* Dkt. No. 689 at 34–38. But these arguments are best addressed in the context of a motion *in liminie* when the issues for trial have been identified. *See Sahiti v. Tarentum, Ltd.*, 2021 WL 3115813, at *7 (S.D.N.Y. July 22, 2021) ("[G]enerally, courts have declined to reach the merits of motions *in limine* at the summary judgment stage." (citing *Senior ex rel. Senior v. Eihab Hum. Servs., Inc.*, 2019 WL 8128563, at *4 (E.D.N.Y. Oct. 10, 2019))); *Castle v. United States*, 2017 WL 6459514, at *16 (N.D.N.Y. Dec. 18, 2017) ("Plaintiff's cross-motion is essentially a motion *in limine* seeking to exclude certain evidence that is premature at this stage."); *Jones v. Harris*, 665 F. Supp. 2d 384, 404 (S.D.N.Y. 2009) ("*In limine* motions deal with evidentiary matters and are not to be filed until the eve of trial.").

To the extent Plaintiffs argue that the reports and testimony go to issues relating to summary judgment, the Court has already explained that there is no apparent conflict between the propositions offered by Plaintiffs' and Defendants' experts. Even if there were, that has not resulted in summary judgment for Defendants. *See supra* § I.B.

Plaintiffs' motion is denied without prejudice.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Specifically, Defendants' motion with respect to Plaintiffs' disparate impact claims is denied without prejudice. The motion is granted with respect to Plaintiffs' disparate treatment and equal protection claims.

Plaintiffs' cross-motion to exclude the testimony of Dr. Erath is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 649 and 682.

SO ORDERED.

Dated: September 30, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge